Leaann D. HALL, Plaintiff,

v.

BAXTER HEALTHCARE CORP.;
et al., Defendants.

Tammy JOHNSTON; Robert Johnston; Laura Bentley; Ralph Bentley; Susan Eisele; Darrell Dwayne Eisele; Michelle Tytlar; Jeffrey Tytlar, Plaintiffs,

v.

BRISTOL–MYERS SQUIBB COMPANY,
et al., Defendants.

Debra SHERVEY, Plaintiff,

v.

BRISTOL–MYERS SQUIBB COMPANY,
et al., Defendants.

Civil Nos. 92–182–JO (LEAD), 94–892–JO, 94–903–JO, 94–907–JO, 94–258–JO, 93–589–JO (LEAD), 94–260–JO, 94–765–JO, 94–902–JO, 94–949–JO and 94–1280–JO.

United States District Court,
D. Oregon.

Dec. 18, 1996.

Keith E. Tichenor, Jeffrey S. Mutnick, Peter W. Preston, Jodie A. Phillips, Pozzi Wilson Atchison, Portland, OR, Michael L. Williams, Kathleen M. Dailey, Williams & Troutwine, P.C., Portland, OR, Don Corson, Arthur C. Johnson, Johnson Clifton Larson & Corson, Eugene, OR, Janet Adamson, John Adamson, Portland, OR, Linda K. Eyerman, Gaylord & Eyerman, Portland, OR, Leslie A. Kocher, MacMillan Scholz & Marks, Portland, OR, Diana L. Craine, Craine & Love, Lake Oswego, OR, for Plaintiffs and Plaintiffs Pro Se.

Jonathan M. Hoffman, Martin Bischoff Templeton Langslet & Hoffman, Portland, OR, Paul R. Duden, Stephen R. Frank, Eric J. Neiman, Matthew J. Mullaney, Jr., Tooze Shenker Duden Creamer Frank & Hutchison, Portland, OR, John Ostrander, Bonaparte Elliott & Ostrander, Portland, OR, Robert W. Roley, Donald H. Pyle, Lane Powell Spears & Lubersky, Portland, OR, Ronald E. Bailey, Marilyn E. Litzenberger, Jeanne F. Loftis, Bullivant Houser Bailey Pendergrass & Hoffman, Portland, OR, James H. Gidley, Crowe & Gidley, Portland, OR, Jeffrey D. Austin, William B. Crow, Miller Nash Wiener Hager & Carlsen, Portland, OR, Barbara H. Thompson, Lehner Mitchell Rodrigues & Sears, Portland, OR, Steven K. Blackhurst, Michael J. Sandmire, Ater Wynne Hewitt Dodson & Skerritt, Portland, OR, Michael C. McClinton, Clark Lindauer McClinton Krueger & Fetherston, Salem, OR, for Defendants.

## OPINION AND ORDER

ROBERT E. JONES, District Judge:

### I. *INTRODUCTION*

Currently pending in this court are a number of silicone breast implant cases brought by or on behalf of the plaintiffs against various breast implant manufacturers.[1] Plaintiffs seek damages for injuries they claim to have suffered as a result of implantation with silicone gel breast implants.

Among other things, the plaintiffs assert that silicone from the implants has migrated and degraded in their bodies and has caused a systemic syndrome or illness, which they generally refer to as "atypical connective tissue disease" (ACTD). In essence, plaintiffs claim a "unique constellation of symptoms" consisting of hundreds of symptoms commonly experienced by the general population.[2]

This opinion addresses the defendants' motions in limine to exclude testimony by plaintiffs' experts concerning any causal link between silicone breast implants and the alleged systemic disease or syndrome.[3] To resolve these motions, the court, in its role as "gatekeeper" (*see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (hereinafter *Daubert I*), initiated proceedings under Federal Rule of Evidence 104. The process through which the court has endeavored to resolve the pending motions, a process the

---

1. The defendants involved in the present proceedings are Baxter Healthcare Company, Baxter International Inc. (collectively, "Baxter"), Bristol–Myers Squibb, and Minnesota Mining and Manufacturing (together referred to as "defendants"). An early defendant in breast implant litigation, Dow Corning Corp., sought protection under bankruptcy law in May 1995. The bankruptcy proceedings are ongoing.

2. The defense refers to these symptoms as "diseases of ordinary life," *e.g.*, headache, fatigue, joint pain, confusion, etc.

3. Many of the plaintiffs also allege "local injuries" from the implants, such as rupture, contracture, and chest wall pain. This opinion does not address the admissibility of plaintiffs' witnesses' testimony concerning any local injuries. The scope of what constitutes a "local" injury is discussed *infra*.

court believes to be unique in federal practice to date, is described below.

## II. *FACTS AND PROCEDURAL BACKGROUND*

The breast implant cases at issue here were either filed initially in this court or removed from state court. The cases were then transferred to the Judicial Panel for Multidistrict Litigation, *In re Silicone Gel Breast Implant Products Liability Litigation,* MDL No. 926, 1994 WL 114580, where they have been managed expeditiously under the watchful eye of the transferee judge, Chief Judge Sam C. Pointer, Jr. In 1995 and 1996, Judge Pointer remanded a number of cases to Oregon for trial.

All breast implant cases remanded to Oregon federal district court have been assigned to this judge. After a series of status conferences involving all interested parties and counsel, I determined that, at least initially, similar cases should grouped for trial. I designated the following three trial groups:

| | Plaintiffs | Defendant(s) |
|---|---|---|
| Group 1 [4] | Hall<br>Pope<br>Stern<br>Preskey | Baxter |
| Group 2 [5] | Andrews<br>Johnston<br>Eisele<br>Bentley<br>Tytlar | Bristol–Myers Squib |
| Group 3 [6] | Shervey<br>Zingarelli<br>Adamson<br>D. Hall<br>Young<br>Mitchel | Bristol–Myers and Medical Engineering Corp. |

After initial trial dates were set, the court instructed counsel for Groups 1 and 2 to provide a list of all lay and expert witnesses to be called at trial, together with a narrative statement of each witness' proposed testimony. The court also instructed counsel to summarize each expert witness' opinion, to identify all the materials upon which each expert would rely for his or her opinions, and to submit transcripts of any testimony given by the witness in similar cases.

Once the witness materials were duly filed, in July 1996, defendants jointly filed a series of motions in limine to exclude plaintiffs' experts' testimony concerning causation.[7] To address these motions, I scheduled an integrated hearing under Rule 104(a) on the admissibility of the scientific evidence. All interested parties and counsel were invited to attend the hearing, which I set for August 1996.

 In view of the complicated scientific and medical issues involved and in an effort to effectively discharge my role as "gatekeeper" under *Daubert I,* I invoked my inherent authority as a federal district court judge to appoint independent advisors to the court.[8] *See, e.g., Goetz v. Crosson,* 967 F.2d 29, 37 (2d Cir.1992) (VanGraafeiland, J., concurring and dissenting) (citing *Scott v. Spanjer Bros., Inc.,* 298 F.2d 928 (2d Cir.1962)); *see also* 1972 Advisory Committee Notes to FRE 702. Pursuant to that inherent authority, I began a search to find technical advisors with the necessary expertise in the fields of epidemiology, immunology/toxicology, rheumatology,

---

**4.** Group 1 consists of Case Nos. 92–182 (LEAD), 94–892, 94–903, and 94–907.

**5.** Group 2 consists of Case No. 94–258.

**6.** Group 3 consists of Case Nos. 93–589 (LEAD), 94–260, 94–765, 94–902, 94–949, and 94–1280. Although they were invited to participate and attended all four days of the Rule 104 hearing, counsel for the Group 3 plaintiffs repeatedly requested, and the court agreed, that this decision does not apply to them.

**7.** The motions in limine were filed in Group 2 (dkt. Nos. 69, 70, 72, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93,

94, and 95). Some of the motions address plaintiffs' experts' testimony on issues other than a general causal link between silicone and systemic disease. Those portions of the above-listed motions are moot, with leave to refile as necessary in further pretrial proceedings.

**8.** To keep the advisors independent of any ongoing proceedings, I appointed them under FRE 104, not FRE 706, which requires court-appointed experts, in effect, to act as additional witnesses subject to depositions and testifying at trial. Although certain plaintiffs (in Group 3) moved to invoke Rule 706 procedures (in No. 93–589, dkt. Nos. 31 and 36), I denied those motions.

and chemistry to assist in evaluating the reliability and relevance of the scientific evidence.[9] Dr. Richard Jones, M.D., Ph.D.,[10] assisted the court by screening dozens of potential appointees and ultimately selecting four totally unbiased and uncommitted experts in the necessary fields, which the court approved and appointed. The technical advisors and their fields of expertise are: Merwyn R. Greenlick, Ph.D. (epidemiology); Robert F. Wilkens, M.D. (rheumatology); Mary Stenzel–Poore, Ph.D. (immunology/toxicology); and Ronald McClard, Ph.D. (polymer chemistry).

With the exception of Dr. McClard, whom I appointed shortly after the initial Rule 104 hearing terminated, the technical advisors reviewed the parties' voluminous materials in preparation for the hearing and observed most of the testimony in court. After his appointment, Dr. McClard reviewed all of the relevant materials and the videotaped arguments of counsel, and participated in all subsequent proceedings.

I structured the Rule 104 hearing according to subject matter, with plaintiffs presenting their experts in a particular field, followed by defendants' witnesses in the same field. All participating parties stipulated to the experts' qualifications under Rule 702. Because in proceedings pursuant to Rule 104(a) the court is not bound by rules of evidence, except those that pertain to privileges I ruled that no evidentiary objections would be permitted.[11]

At the hearing, which spanned four intense days (August 5–8, 1996),[12] experts on both sides were questioned by counsel, the court, and the technical advisors. The parties then submitted videotaped summations, which the court and all technical advisors reviewed.[13] The court also asked the parties to submit proposed questions to guide the technical advisors in evaluating the testimony and preparing their reports. After considering the parties' proposed questions, the court prepared and submitted the following questions to the advisors:

> 1. Is the expert's opinion supported by scientific reasoning and methodology that is generally accepted in the expert's particular scientific community or otherwise qualified as stated in *Daubert II*, as quoted above?[14]

9. Although I requested federal funding for the Rule 104 experts' fees, my request was denied. The fees, approximately $76,000, have been paid by the parties. Because I did not appoint the experts under Rule 706, their fees are not "costs" that may be awarded to the prevailing party under Fed.R.Civ.P. 54(d) and 28 U.S.C. § 1920(6). *See, e.g., In re Philadelphia Mortg. Trust*, 930 F.2d 306, 308–09 (3d Cir.1991); *State of Kansas v. Deffenbaugh Indus., Inc.*, 154 F.R.D. 269, 270 (D.Kan.1994) ("The legislative history of § 1920(6) expressly refers to court-appointed expert witnesses 'as permitted by rule 706 of the Federal Rules of Evidence'").

10. Dr. Jones is the former acting president of Oregon Health Sciences University and is the longtime chair of the University's biochemistry department.

11. This ruling was remarkably effective, both in permitting the parties to focus on presenting their evidence and in expediting the proceeding. In four days of hearings, only rare objections were made, yet counsel and the witnesses confined the testimony to what, for the most part, would be admissible under the rules of evidence.

12. This court and state court Judge Nely Johnson jointly presided at the hearing. Judge Johnson has been assigned all of the Oregon state court breast implant cases pending in Multnomah County Circuit Court. Judge Johnson participated extensively in the Rule 104 hearings, and her contributions are greatly appreciated. Judge Johnson has yet to rule on the admissibility of the scientific evidence in the state court proceedings.

13. The video presentations by plaintiffs' counsel Mike Williams and defense counsel Mary Wells, Nathan Schachtman, and Jane Thorpe demonstrated the highest professional skills I have had the pleasure to observe in 33 years on first the state and then the federal bench. The level of professionalism and competency shown by all counsel throughout these proceedings is appreciated and commended.

I highly recommend viewing of the four and one-half hours of video argument to any serious student of advanced advocacy. (copies available through counsel).

14. This reference is to the following language from *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 n. 11 (9th Cir.1995):

> [t]he focus * * * is on the reliability of the methodology and in addressing that question the court and the parties are not limited to what is generally accepted; methods accepted by a minority in the scientific community may well be sufficient. However, the party proffer-

2. Is the expert's opinion based upon scientifically reliable data?

3. If epidemiological studies have not been done or are inconclusive, what other data, such as animal studies, biophysical data, clinical experience in the field, medical records, differential diagnosis, preliminary studies, general scientific knowledge, and medical literature can justify, to a reasonable medical probability, a conclusion concerning the cause of the syndrome or disease at issue?

4. Do the methodology and data support the expert's conclusions?

5. Does the scientific data relied upon by the expert apply to the syndrome or disease in issue in these cases? For instance, are epidemiological studies directed at other typical or classical diseases relevant to an atypical disease?

The court also submitted almost all of the parties' proposed questions [15] to the technical advisors for their consideration, with this instruction:

> We are also enclosing suggested questions and references provided by counsel. Do not feel obligated to answer all of counsel's questions, but respond to those that you feel are relevant and that you feel will be helpful to the court in discharging our "gatekeeping" role. For instance, the defense contends that the record of the hearing does not reflect the plaintiffs' reconstruction of their witness' testimony. We leave that issue to you.[16]

The technical advisors submitted their reports to the court in September 1996,[17] and on September 13, 1996, the court gave counsel on both sides an opportunity to question them. Following this hearing, the court expressed preliminary concerns that plaintiffs' position could not be sustained and asked defense counsel to submit proposed findings of fact and conclusions of law. Plaintiffs then filed objections and proposed alternative findings, and the defendants filed a further response.

Having fully reviewed the entire record and the reports of the advisors, I am now prepared to rule on the pending rule 104 hearing motions in limine. For the reasons explained below, the defendants' motions in limine to exclude plaintiffs' expert testimony concerning causation of any systemic disease or syndrome are GRANTED.

I note, however, that while this court was in the midst of the Rule 104 proceedings, Judge Pointer appointed a national panel of experts pursuant to FRE 706 to assist in a similar evaluation of the scientific evidence in the MDL. As recognized by Senior Judge Jack B. Weinstein and Judge Harold Baer, Jr., in their recent joint opinion in breast implant cases pending in the Southern and Eastern Districts of New York (*see In re Breast Implant Cases* (Amended Preliminary Memorandum Oct. 23, 1996)), it will probably be some time before the national panel completes its important work.[18]

In view of the ongoing national proceedings and the potential for further scientific developments during their pendency, the court will defer the effective date of this opinion until the findings of the national Rule 706 panel are available.[19] Depending on the court's evaluation of those findings, plaintiffs

---

ing the evidence must explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has both chosen a reliable scientific method and followed it faithfully.

**15.** Only certain questions posed by one plaintiff (LeaAnn Hall) concerning specific causation were withheld.

**16.** Counsels' questions that the court submitted to the advisors are appended to this opinion as APPENDIX A.

**17.** The advisors' reports, which were marked as court exhibits, are appended to this opinion as APPENDICES B, C, D, and E (the appended copies do not include any exhibits that were attached to the original reports).

**18.** Because the national Rule 706 panel has not completed its work, Judges Weinstein and Baer determined that the defendants' motions for summary judgment on the systemic claims were not yet ripe for adjudication.

**19.** My decision will only be changed in the unlikely event that new scientific research would require such modification. The views of the Rule 706 panel will be carefully considered, but this opinion is not dependent upon the testimony or conclusions of the Rule 706 experts.

in these cases may seek reconsideration, if appropriate, of this decision. Plaintiffs' motion to add the national Rule 706 panel members to the witness lists in Groups 2 and 3 [20] is also deferred pending completion of the panel's work.

## III. ADMISSIBILITY STANDARDS

### A. Rule 702 and Rule 104(a)

■ The Federal Rules of Evidence govern in diversity cases, except in the rare circumstance where a state rule of evidence is " 'intimately bound up' with the rights and obligations being asserted * * *." *Wray v. Gregory*, 61 F.3d 1414, 1417 (9th Cir.1995) (quoting *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938)). With respect to the issues presently before the court, no state evidence rule supplants the federal rules.[21]

Rule 702 is the starting point for any evaluation of the admissibility of expert testimony. *Daubert I*, 509 U.S. at 589, 113 S.Ct. at 2794–95 (Rule 702 is the "primary locus" of the expert screening "obligation"). Rule 702 provides:

> If the scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■ The assessment of whether proffered expert testimony is admissible under Rule 702 is a preliminary question for the court under Rule 104(a). *Daubert I*, 509 U.S. at 592, 113 S.Ct. at 2796. Rule 104(a), which provided the framework for the hearing in this case, states:

> Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.[22]

■ The Ninth Circuit recently emphasized that the proponent of the expert testimony bears the burden of proving admissibility under Rule 104. *Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 598 (9th Cir.1996) ("[i]t is the proponent of the expert who has the burden of proving admissibility"); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir.1995) (hereinafter *Daubert II* ) ("the party presenting the expert must show that the expert's findings are based on sound science"). In this case, the plaintiffs, as proponents of the evidence, have the burden of establishing admissibility by a preponderance of the evidence. *Daubert I*, 509 U.S. at 592 n. 10, 113 S.Ct. at 2796 n. 10.

■ In determining whether the plaintiffs have met their burden of establishing the admissibility of their expert evidence, the court is guided by Rule 702 and the recent

**20.** Docket No. 175 in No. 94–258. Plaintiff Laura Bentley settled her case; accordingly, her separate motion (# 177 in No. 94–258) is moot.

**21.** In any event, Oregon law concerning scientific evidence, as first articulated in *State v. Brown*, 297 Or. 404, 687 P.2d 751 (1984) and explicated in *State v. O'Key*, 321 Or. 285, 899 P.2d 663 (1995), does not significantly differ from federal law as outlined in *Daubert I* and *II*. As the author of *State v. Brown*, a unanimous decision that predates *Daubert I* by 10 years, I wish to assure Judge Nely Johnson, who will be facing these issues in the state cases, that the *Brown* court was the first court in the nation to adopt the Weinstein/Berger thesis, which Justice Blackmun utilized in writing *Daubert I*. In *United States v. Downing*, 753 F.2d 1224 (3d Cir.1985), Judge Becker utilized the same procedures as set

forth in *Brown* for federal litigators. Judge Becker has since amplified *Downing* and *Daubert I* in *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3rd Cir.1994) (hereinafter *Paoli II* ). By like token, Justice Richard L. Unis, writing for the Oregon Supreme Court in *O'Key*, amplified *Brown* without any fundamental changes. I do not interpret Justice Van Hoomissen's recent opinion for the Oregon Supreme Court in *State v. Lyons*, 324 Or. 256, 924 P.2d 802 (1996), as altering the message of *Brown*, *O'Key*, or *Daubert*.

**22.** *See also* FRE 1101 ("The rules (other than with respect to privileges) do not apply * * * [to] [t]he determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under rule 104").

Supreme Court and Ninth Circuit decisions interpreting it, particularly *Daubert I* and *Daubert II*. In *Daubert I*, the Supreme Court clarified that adoption of Rule 702 displaced the traditional *Frye*[23] test, which made "general acceptance" in the relevant scientific community the prerequisite to admissibility. *Daubert I*, 509 U.S. at 589, 113 S.Ct. at 2794–95. Instead, under *Daubert I*, which focused closely on the language of Rule 702, expert scientific opinion is admissible if it qualifies as "scientific knowledge" and is therefore sufficiently "reliable." *Daubert I*, 509 U.S. at 589–90, 113 S.Ct. at 2795; *see also Lust*, 89 F.3d at 597.

According to *Daubert I*, "the adjective 'scientific' implies a grounding in the methods and procedures of science," and "the word 'knowledge' connotes more than subjective belief or unsupported speculation." 509 U.S. at 590, 113 S.Ct. at 2795. The Court explained that

> in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.*, "good grounds," based on what is known.

*Id.* The requirement that an expert's testimony pertain to "scientific knowledge" "establishes a standard of evidentiary reliability," *i.e.*, trustworthiness. 509 U.S. at 590 and n. 9, 113 S.Ct. at 2795 and n. 9.

The Supreme Court charged district courts with the duty to act as "gatekeepers," to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. *Daubert I*, 509 U.S. at 597–98, 113 S.Ct. at 2798–99. Thus, the court must determine at the outset, pursuant to Rule 104(a), "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592–93, 113

S.Ct. at 2796. This determination "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.*

The task before this court, then, is two-pronged. First, the court must determine whether plaintiffs' experts' testimony reflects "scientific knowledge," constitutes "good science," and was "derived by the scientific method." *Daubert II*, 43 F.3d at 1316. Second, the court must ensure that the proposed testimony "fits," that is, that the testimony is " 'relevant to the task at hand' " in that it "logically advances a material aspect of the proposing party's case." *Id.* at 1315 (quoting *Daubert I*, 509 U.S. at 597, 113 S.Ct. at 2798–99).

### 1. Reliability.

*Daubert I* and *Daubert II* list several factors to guide federal courts in deciding the first prong, whether the expert testimony is scientifically valid and therefore reliable. These factors, which may or may not apply in a particular case, include:

1. Whether the theory or technique employed by the expert is generally accepted in the scientific community;

2. Whether the theory has been subjected to peer review and publication;

3. Whether the theory can be and has been tested;

4. Whether the known or potential rate of error is acceptable; and

5. Whether the experts are proposing to testify about matters growing naturally or directly out of research, or whether they have developed their opinions expressly for purposes of testifying.[24]

---

**23.** *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923).

**24.** Bias is more important at trial than at the Rule 104 level, where the focus is on the expert's methodology. Even if an expert is a highly paid trial expert or the expert's research is litigation-driven, the expert's testimony may nonetheless reflect valid methodology and sound science. Because of this, I did not allow the parties to

raise bias in their questioning. Interestingly, only the plaintiffs objected to this ruling—a curious fact given that the motions in limine were directed solely to plaintiffs' experts, some of whom are paid extraordinary sums for their testimony. I assume that both plaintiffs' and defendants' experts were fully compensated for their present and past services. I have not relied, however, on any of the defense experts in decid-

*Daubert I,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97 (first four factors); *Daubert II,* 43 F.3d at 1316–17 (adding fifth factor). The list is illustrative, not exhaustive. *Daubert II,* 43 F.3d at 1317.

As mentioned earlier, with respect to the first listed factor, whether the expert's theory or method is generally accepted, the Ninth Circuit explained in *Daubert II* that in certain circumstances it may be sufficient if a minority in the scientific community accepts the methods employed, but only if the proponent demonstrates in "some objectively verifiable way that the expert has both chosen a reliable scientific method and followed it faithfully." *Daubert II,* 43 F.3d at 1319 n. 11.

### 2. Fit.

Even if the proponents meet their burden of establishing that an expert's testimony qualifies as scientific knowledge, the court must still exclude the evidence if it does not "fit" the matters at issue in the case. *Daubert I,* 509 U.S. at 591, 113 S.Ct. at 2795–96. As the Ninth Circuit in *Daubert II,* explained, to "fit," testimony must "logically advance a material aspect of the proposing party's case." *Daubert II,* 43 F.3d at 1315; *see also In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 743 (3d Cir.1994) (hereinafter *Paoli II* [25]). In *Paoli II,* Judge Becker described the "fit" requirement as follows:

> For example, animal studies may be methodologically acceptable to show that chemical X increases the risk of cancer in animals, but they may not be methodologically acceptable to show that chemical X increases the risk of cancer in humans. *Daubert* explains that, " '[f]it' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." * * * Thus, even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case.* "Rule 702's 'helpfulness' standard requires a valid *scientific* connection to the pertinent inquiry as a precondition to admissibility." * * * For example, in order for animal studies to be admissible to prove causation in humans, there must be good grounds to extrapolate from animals to humans, just as the methodology of the studies must constitute good grounds to reach conclusions about the animals themselves. Thus, the requirement of reliability, or "good grounds," extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case.

*Paoli II,* 35 F.3d at 743 (citations omitted; emphasis in original).

As the defendants correctly point out in their proposed findings and conclusions, the issue before the court, as in the Bendectin litigation considered in *Daubert II,* is causation. In *Daubert II,* the Ninth Circuit concluded that the plaintiffs in that case failed to make any objective showing of admissibility under the first prong of Rule 702. Because the plaintiffs had submitted their expert materials while *Frye* was the law of the circuit, however, rather than remand the case to permit the plaintiffs to augment the record, the court proceeded to reach the second prong, or "fit" requirement, of the *Daubert I* analysis. *Daubert II,* 43 F.3d at 1320. In doing so, the court explained that in assessing whether proffered expert testimony "will assist the trier of fact" in resolving the causation issue, the court must look to the substantive standard—in that case, California tort law. The court commented:

> California tort law requires plaintiffs to show not merely that Bendectin increased

ing the Rule 104 issues, but have restricted my evaluation solely to the validity of the plaintiffs' experts' presentations.

**25.** The *Paoli* litigation involved two trips to the Third Circuit. In *In re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829 (3d Cir.1990), commonly referred to as *Paoli I,* the Third Circuit, under

pre-*Daubert* analysis, reversed the district court's exclusion of certain expert witnesses pursuant to FRE 702 and 703 because the district court's analysis was not sufficiently detailed. *Paoli I,* 916 F.2d at 853–54. After remand, the Third Circuit again reviewed the district court's exclusion in *Paoli II,* this time pursuant to the standards elucidated in *Daubert I.*

the likelihood of injury, but that it more likely than not caused their injuries. * * * In terms of statistical proof, this means that plaintiffs must establish not just that their mothers' ingestion of Bendectin increased somewhat the likelihood of birth defects, but that it more than doubled it—only then can it be said that Bendectin is more likely than not the source of their injury. Because the background rate of limb reduction defects is one per thousand births, plaintiffs must show that among children of mothers who took Bendectin the incidence of such defects was more than two per thousand.

*Id.* at 1320 (citation omitted).[26]

■ The substantive standard under Oregon tort law is quite similar to the California standard. Under Oregon law, the plaintiffs in this litigation must prove not merely the possibility of a causal connection between breast implants and the alleged systemic disease, but the medical probability of a causal connection. *See Harris v. Kissling,* 80 Or. App. 5, 9, 721 P.2d 838 (1986); *see also Griffin v. K.E. McKay's Market of Coos Bay, Inc.,* 125 Or.App. 448, 451–52, 865 P.2d 1320 (1993), in which the court stated:

[The plaintiff] must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in the result. A mere possibility of such causation is not enough * * *. (Citation omitted.)[27]

Under this substantive standard, if an expert cannot state the causal connection in terms of probability or certainty, the expert's testimony must be excluded under the second prong of Rule 702. In *Daubert II,* for example, the Ninth Circuit affirmed the district court's exclusion of certain of plaintiffs' experts' opinions, reasoning that:

As the district court properly found below, "the strongest inference to be drawn for plaintiffs based on the epidemiological evidence is that Bendectin could *possibly* have caused plaintiffs' injuries." * * * The same is true of the other testimony derived from animal studies and chemical structure analyses—these experts "testify to a possibility rather than a probability." * * * Unlike these experts' explanation of their methodology, this is not a shortcoming that could be corrected on remand; plaintiffs' experts could augment their affidavits with independent proof that their methods were sound, but to augment the substantive testimony as to causation would require the experts to change their conclusions altogether. Any such tailoring of the experts' conclusions would, at this stage of the proceedings, fatally undermine any attempt to show that these findings were 'derived by the scientific method.' Plaintiffs' experts must, therefore, stand by the conclusions they originally proffered, *rendering their testimony inadmissible under the second prong of Fed. R.Evid. 702.*

*Daubert II,* 43 F.3d at 1322 (citation omitted; emphasis added).[28]

---

26. The court did note that, in certain circumstances, "[a] statistical study showing a relative risk of less than two could be combined with other evidence to show it is more likely than not that the accused cause is responsible for a particular plaintiff's injury." *Daubert II,* 43 F.3d at 1321 n. 16. At the very least, however, plaintiffs making use of this exception must demonstrate that they differ in some significant way from the subjects of the statistical study, so as to eliminate another, higher relative risk cause. *Id.*

27. Plaintiffs argue that all they need to prove at the Rule 104 hearing level is "possibility" and that the "probability" test is to be reserved for trial. As will be demonstrated, *infra,* the probability test is relevant in deciding the causation issue at the Rule 104 stage of the proceedings.

28. The question of whether expert testimony is admissible under Rule 702 is separate from the question of whether the testimony is sufficient to submit the case to the jury. The "admissibility" and "sufficiency" of scientific evidence "necessitate different inquiries and involve different stakes." *In re Joint Eastern & Southern Dist. Asbestos Lit.,* 52 F.3d 1124, 1132 (2nd Cir.1995) ("Admissibility entails a *threshold* inquiry over whether a certain piece of evidence ought to be admitted at trial. * * * A sufficiency inquiry, which asks whether the collective weight of a litigant's evidence is adequate to present a jury question, lies further down the litigational road"). Although *Daubert II*'s discussion of the "more likely than not" standard at first glance could be interpreted as a discussion of sufficiency, the emphasized portion of the quoted language makes it quite clear that the Ninth Circuit was analyzing the expert evidence against sub-

### 3. Methodology v. Conclusions.

The plaintiffs insist that this court must focus solely on the expert's methodology and may not consider the experts' conclusions in any respect. Certain language in *Daubert I* can be read, superficially, to support plaintiffs' position. The *Daubert I* Court wrote:

The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. *The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.*

*Daubert I,* 509 U.S. at 595, 113 S.Ct. at 2797 (emphasis added).

Since *Daubert I* was decided, however, courts and commentators have wrestled with the methodology/conclusion distinction, concluding that the distinction is of limited practical import. In *Paoli II,* for example, Judge Becker offered the following cogent analysis:

Plaintiffs are correct, of course, that *Daubert* requires the judge's admissibility decision to focus not on the expert's conclusions but on his or her principles and methodology. * * * But we think that *this distinction has only limited practical import.* When a judge disagrees with the conclusions of an expert, it will generally be because he or she thinks that there is a mistake at some step in the investigative or reasoning process of that expert. If the judge thinks that the conclusions of some other expert are correct, it will likely be because the judge thinks that the methodology and reasoning process of the other expert are superior to those of the first expert. This is especially true given that the expert's view that a particular conclusion "fits" a particular case must itself constitute scientific knowledge—a challenge to "fit" is very close to a challenge to

the expert's ultimate conclusion about the particular case, and yet it is part of the judge's admissibility calculus under *Daubert.*

35 F.3d at 746 (emphasis added). In a footnote, Judge Becker added that:

The methodology/conclusion distinction remains of some import, however, to the extent that there will be cases in which a party argues that an expert's testimony is unreliable because the conclusions of an expert's study are different from those of other experts. In such cases, there is no basis for holding the expert's testimony inadmissible.

35 F.3d at 746 n. 15 (citations omitted).

In *Claar v. Burlington Northern R. Co.,* 29 F.3d 499 (9th Cir.1994), the Ninth Circuit emphasized that a district court is "both authorized and obligated to scrutinize carefully the *reasoning* and methodology" underlying the expert's proffered testimony. 29 F.3d at 502 (emphasis added). According to the court in *Claar:*

This requirement means that the court had to determine that [the experts] arrived at their conclusions using scientific methods and procedures, and *that those conclusions were not mere subjective beliefs or unsupported speculation.*

29 F.3d at 502 (emphasis added).[29]

More recently, in *Lust v. Merrell Dow Pharmaceuticals, Inc., supra,* the Ninth Circuit acknowledged that a district court need not ignore an expert's anomalous conclusions in determining admissibility under Rule 702. In *Lust,* plaintiff's expert, Dr. Done, proposed to testify that ingestion of the drug Clomid causes a substantial increase in the probability of all birth defects on the ground that human epidemiological studies and animal studies show an association between the drug and a wide variety of problems. Uncontradicted testimony from defendant's expert, however, indicated that Done's chief

stantive law under the second prong, or "helpfulness" requirement, of Rule 702.

**29.** One of plaintiffs' counsel, Linda Eyerman, insists that *Claar* prohibits the court from scrutinizing the experts' conclusions in any respect, but *Claar* does not permit that reading. *Claar* itself makes clear that the court must scrutinize

the validity of the reasoning leading to the experts' conclusions, if not the conclusions themselves. 29 F.3d at 502. *Ambrosini v. Labarraque et al,* 101 F.3d 129 (D.C.Cir.1996), recently cited by Ms. Eyerman, is consistent with this court's analysis under relevant Ninth Circuit law.

premise—that if there is evidence of a positive association between an agent and a wide variety of birth defects in human epidemiological and animal studies, then the agent substantially increases the probability of all types of birth defects—was not espoused by a relevant minority of teratologists. *Lust,* 89 F.3d at 596.

The Ninth Circuit held that the district court properly excluded Done's testimony. Responding to Done's contention that the district court "violated *Daubert*'s command that " '[t]he focus ... must be solely on principles and methodology, not on the conclusions that they generate,' " the court stated:

> Done's conclusions did arouse the district court's suspicion, but that is to be expected. When a scientist claims to rely on a method practiced by most scientists, yet presents conclusions that are shared by no other scientist, *the district court should be wary that the method has not been faithfully applied.* It is the proponent of the expert who has the burden of proving admissibility. To enforce this burden, *the district court can exclude the opinion if the expert fails to identify and defend the reasons that his conclusions are anomalous.*

*Lust,* 89 F.3d at 598 (emphasis added; citation omitted).

In a recent law review article evaluating the admissibility of scientific evidence after *Daubert,* the author suggests the following approach to the methodology/conclusion debate:

> Rule 702 seeks to ensure that there is a valid scientific connection to the pertinent inquiry, and scientific validity for one purpose is not necessarily scientific validity for other purposes. * * * In a case where a plaintiff alleges personal injury from exposure to a substance, the issue at hand is not whether the agent can potentially cause that injury. Rather, the issue is whether the agent caused the particular plaintiff's injury.
>
> To return to the animal study hypothetical, the court should not simply ask whether the type of animal study relied on by the expert can be validly used to determine whether Bendectin is a teratogen, but should also ask whether scientists reasonably rely on that type of animal study to prove that Bendectin is a teratogen in humans. If the answer is yes, the court should ask whether the animal study provides sufficient information to allow a scientist to reasonably rely on it to prove that Bendectin caused a birth defect in a particular individual.
>
> Finally, assuming those questions are answered to the court's satisfaction, the court must determine whether the expert's principles and methodology are sound. *In other words, has the expert properly extrapolated from the animal study at issue, or is her reasoning flawed?* Some have argued that Daubert forbids courts to ask this question. * * *
>
> This reasoning is wrong-headed. When Daubert forbids courts to examine an expert's conclusions, it is obviously alluding to the Frye rule. Some courts used Frye to exclude novel expert testimony if it conflicted with the established view in the scientific community, regardless of the soundness of the expert's methodology and reasoning. That is no longer permissible after Daubert.
>
> But Daubert does demand that courts assess the scientific validity of the expert's testimony. Daubert demands that in reviewing the expert's principles and methodology, a court should determine whether "the principle supports what is purports to show." * * * *Daubert therefore not only allows, but requires, courts to determine whether an expert's extrapolations from underlying studies or data are proper, or whether the expert has committed scientific or mathematical errors.*

David E. Bernstein, *The Admissibility of Scientific Evidence After Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 15 CARDOZO L.REV. 2139, 2165–66 (1994) (emphasis added; footnotes omitted).

In *Paoli II,* 35 F.3d at 745, Judge Becker noted that

> *Daubert*'s requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step

in the analysis—means that *any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.* (Emphasis in original; footnote omitted.)

 There appears to be no clear demarcation between scientific methodology and the conclusions it generates. *Daubert I* acknowledged this much, recognizing that science is a process, not "an encyclopedic body of knowledge." 509 U.S. at 590, 113 S.Ct. at 2795 (citation omitted). This court need not and should not ignore any step in that process, but must ensure that in each step, from initial premise to ultimate conclusion, the expert faithfully followed valid scientific methodology. In other words, this court need not accept, as scientifically reliable, any conclusion that good science does not permit to be drawn from the underlying data but which, instead, constitutes "unsupported speculation," or, in the words of Dr. Stenzel-Poore, a "leap of faith." The Ninth Circuit requires no less. *See Claar,* 29 F.3d at 502; *see also Lust,* 89 F.3d at 598.

Accordingly, in resolving the pending issues before me, this court will examine the evidence to ensure, as Judge Becker noted in *Paoli II,* that *every* step in the expert's reasoning process, including the expert's formulation of conclusions, are grounded in good science.

## IV. *FINDINGS AND CONCLUSIONS*

Physicians have used silicone [30] products in the human body for various purposes since the 1950s. Medical devices made from hard silicone include shunts, finger joints, hip joints, and heart valves. In addition, the United States and Japan experimented with injecting liquid silicone directly into the human body in the 1950s and 1960s. However, the FDA eventually classified silicone liquid directly injected as a drug and has approved it only for experimental investigations. The silicone gel breast implants involved in this litigation consist of 80 to 90 percent liquid silicone combined with 10 to 20 percent silicone gel, contained in a silicone rubber shell.

Plaintiffs' theory of causation—or, as they refer to it, bioplausibility—begins with the premise that silicone from breast implants is released into a woman's body, either through implant rupture or through "gel bleed," the slow but continuous release of very small droplets ("microdroplets") of silicone gel through the silicone rubber implant cover. Once released into the body, plaintiffs assert, silicone migrates throughout the body, either by diffusing through cell membranes or by being carried by macrophages, the cells in a person's body that devour and eliminate invading foreign bodies and wastes. In the process, the silicone degrades, or is chemically converted, into more reactive molecules such as silanols. The released silicone and the reactive products of silicone degradation purportedly elicit an autoimmune response from the woman's immune system, essentially turning her immune system against her. The result, plaintiffs conclude, is general, systemic disease and particular signs and symptoms such as muscle and joint pain, headaches, rashes, and an inability to concentrate.

---

**30.** The terminology surrounding silicone can be confusing. "Silicon" is an element, chemically very similar to carbon. "Silica" is any combination of elemental silicon with elemental oxygen. Silicas occur in nature and either have a more ordered structure, referred to as "crystalline silica," or a less ordered structure, referred to as "amorphous silica." Both crystalline and amorphous silicas are solids, but they differ in structure much as a diamond (crystalline carbon) differs from graphite (amorphous carbon).

"Silicone," by contrast, is a human invention, the combination of elemental silicon with elemental carbon. Silicone molecules are chains of carbon and silicon atoms, with hydrogens attached to the sides, and can be made to almost any length. The chains can also be cross-linked to form sponge-like networks. Shorter chains are fluid, forming liquid silicone; longer, cross-linked chains form silicone gels. Different configurations can also form silicone rubber or a hard silicone "plastic."

"Silanols" are silicone molecules containing a silanol group. In silanols, a silicon atom in the chain bonds to an $-OH$, or hydroxyl, group instead of to a carbon atom and its attached hydrogens, collectively referred to as a $-CH3$, or methyl group. Hydroxyl groups, which are the defining group for alcohols, are generally more reactive than methyl groups.

Plaintiffs' theory of causation thus brings four general areas of science into play: epidemiology; rheumatology; immunology/toxicology; and polymer chemistry. As has been described, the Rule 104 hearings and many of the parties' arguments have been generally structured around these scientific fields. Thus, while I am mindful that the motions in limine actually address the exclusion of particular expert witnesses, my findings and conclusions will track the various disciplines at issue.

### A. Atypical Connective Tissue Disease

Plaintiffs premise many of their claims on the existence of a variously-titled atypical connective tissue disease (ACTD).[31] This "disease" allegedly manifests itself through a constellation of various symptoms[32] and is allegedly caused by an autoimmune response to silicone from breast implants. Plaintiffs have offered Dr. Eric Gershwin and Dr. Kip Kemple as experts in rheumatology to testify that silicone exposure is the probable cause of plaintiffs' atypical constellation of symptoms.

■■■ By definition, ACTD is not one of the classical autoimmune diseases, such as lupus, scleroderma, or rheumatoid arthritis. In addition, plaintiffs' expert Dr. Goldsmith testified that ACTD does not exist even as a hypothesis yet. "Epidemiologically, the question that you have asked me twice is where we are with these atypical diseases. And I am telling you that we are back at the beginning of formulating studiable hypotheses to test. We are really at the beginning

of that." TRANS. OF PRETRIAL HEARINGS BEFORE THE HONORABLE ROBERT E. JONES (hereinafter PORTLAND TRANS.), Aug. 6, 1996, at 164:23 to 165:2. A silicone research group has proposed criteria for this alleged disease, but these criteria have not yet been tested, nor does the rheumatology community generally accept the existence of ACTD. Dr. Gershwin has acknowledged that he would not rely on these criteria as authoritative for his medical opinion. PORTLAND TRANS., Aug. 5, 1996, at 78:25 to 79:23. He also admitted that there is no specific diagnostic test for this alleged disorder. PORTLAND TRANS., Aug. 5, 1996, at 88:1–4, 15–19. Finally, women who allegedly have ACTD do not uniformly exhibit the same signs and symptoms, and there is no "signature" disorder to suggest either that the cause is silicone exposure or that the cause is the same for all women showing this constellation of symptoms.[33] Instead, the asserted constellation of symptoms comprising ACTD overlaps significantly with those comprising chronic fatigue syndrome and fibromyalgia.[34]

Because ACTD is at best an untested hypothesis, there is no scientific basis for any expert testimony as to its causes and presence in plaintiffs. Therefore, defendants' motions are GRANTED as regards any expert testimony relating to the existence and causation of any atypical, silicone-caused, autoimmune disorder.

With the possible exception of plaintiff LeaAnn Hall, moreover, plaintiffs have not been diagnosed as having classical autoimmune disorders. Therefore, the rest of this

---

**31.** The parties have referred to the atypical, silicone-caused disease or disorder variously as "systemic silicone related disorder," "systemic silicone-related disease," "silicone-related disorder," "silicone-induced disorder," and "siliconosis." For purposes of this opinion, "ACTD" refers to any postulated, non-classical, autoimmune disease that exposure to silicone can allegedly cause.

**32.** According to plaintiffs, this constellation of symptoms allegedly always includes fatigue, myalgias (muscle pain), arthralgias (joint pain), and a sicca complex of dry eyes and dry mouth. Cognitive dysfunction, such as memory loss or concentration problems, is almost always present. Other symptoms and signs can, but do not always, include hair loss, skin changes, head-

aches, elevated levels of antinuclear antibodies (ANAs), elevated SED rates, chronic inflammation, and "other signs of immune system disturbance."

**33.** A signature disease is one so associated with a particular cause that the presence of the disease presumes that cause. For example, malignant mesothelioma is a signature disease for asbestos causation. *In re Joint Eastern & Southern Asbestos Litigation*, 52 F.3d at 1130.

**34.** Fibromyalgia is a condition of pain in the connective tissue and muscles near joints. The plaintiffs' proposed constellation of symptoms overlaps significantly even with the notoriously subjective "sick building syndrome."

opinion will address expert testimony in regards to plaintiffs' individual signs and symptoms.

### B. Epidemiology

Plaintiffs offer Dr. David Goldsmith as an expert to testify that there is epidemiological and other scientific data showing that women with silicone breast implants have significantly elevated probability of suffering from classical diseases when compared to women without breast implants.[35] In contrast, plaintiffs offer Dr. Shanna Swan, through transcripts of her previous testimony in other cases, to testify that no valid epidemiological studies regarding the relationship of silicone breast implants and disease have been completed as of August 1996.

Epidemiology is the medical science devoted to determining the causes of disease in human beings. Epidemiologists compare control groups of unexposed individuals to groups of individuals exposed to a hypothetical cause of the disease being studied to determine whether exposed individuals have a greater risk of manifesting that disease. In epidemiological terms, any difference in risk of getting the disease between the two groups is the exposed individuals' relative risk. The existence or nonexistence of relevant epidemiology can be a significant factor in proving general causation in toxic tort cases. *Daubert II*, 43 F.3d at 1320–21; *Brock v. Merrill–Dow Pharmaceuticals, Inc.*, 874 F.2d 307, 311–13 (5th Cir.1989).

To support admissible expert opinions, epidemiological evidence must fit the legal as well as the substantive issues of the case. Because this is a diversity action, Oregon substantive standards of law must apply. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).[36] As discussed above, under Oregon law, a plaintiff seeking to prove causation must "'introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in the result.'" *Griffin v. K.E. McKay's Mkt.*, 125 Or.App. at 451–52, 865 P.2d 1320 (quoting *Eitel v. Times, Inc.*, 221 Or. 585, 594, 352 P.2d 485 (1960)). This burden requires plaintiffs to demonstrate that exposure to breast implants more than doubled the risk of their alleged injuries. *Daubert II*, 43 F.3d at 1320.

In epidemiological terms, Oregon's standard of proof means that plaintiffs must be able to show a relative risk of greater than 2.0:

> The threshold for concluding that an agent was more likely the cause of a disease than not is relative risk greater than 2.0. Recall that a relative risk of 1.0 means that that agent has no effect on the incidence of disease. When the relative risk reaches 2.0, the agent is responsible for an equal number of cases of disease as all other background causes. Thus, a relative risk of 2.0 implies a 50% likelihood that an exposed individual's disease was caused by the agent.

Bailey, *et al.*, Reference Guide on Epidemiology, Reference Manual on Scientific Evidence at 168. The Ninth Circuit has reached a similar conclusion under California's standard of proof, which is very similar to Oregon's, holding that "[f]or an epidemiological study to show causation under a preponderance standard, 'the relative risk of [the condition at issue] arising from the epidemiological data ... will, at minimum, have to exceed "2".'" *Daubert II*, 43 F.3d at 1321 (quoting *DeLuca v. Merrell Dow Pharmaceuticals*, 911 F.2d 941, 958 (3d Cir.1990)).

---

**35.** Plaintiffs also offer Dr. Goldsmith to testify that there is epidemiological and other scientific data showing that women with silicone breast implants have a significantly elevated probability of suffering from ACTD than women without such implants. However, as was discussed above, no expert testimony regarding ACTD will be allowed because, given the pre-hypothetical state of ACTD, there is no scientific basis for such testimony. Therefore, this proffered testimony is excluded on that basis.

**36.** As is discussed elsewhere, however, the federal standards of evidence under *Daubert* is applicable to this litigation because screening of evidence under FRE 104 is a procedural, not a substantive, matter. In contrast, the standard of proof in a toxic tort case is a substantive issue and Oregon law applies.

Although, as discussed above, epidemiological studies showing a relative risk of less than 2.0 might be relevant under some circumstances, here, as in *Daubert II,* "plaintiffs' experts did not seek to differentiate these plaintiffs from the subjects of the statistical studies. The studies must therefore stand or fall on their own." *Id.* at 1321 n. 16.

Plaintiffs' experts base their proffered expert opinions on the sixteen epidemiological studies [37] assessing the relationship of silicone breast implants to classical connective tissue disease. In addition, plaintiffs have called this court's attention to the 1996 Liang–Schottenfeld abstract recently presented at a meeting of the American College of Rheumatology that reports a relative risk of 2.27 for Undifferentiated Connective Tissue Diseases (UCTD). [38]

Dr. Goldsmith testified in the proceedings before this court that he was not willing to testify, based on the 16 then-available studies, that silicone more likely than not could

cause disease in women. That testimony was as follows:

DR. GREENLICK: You were asked a question if you had an opinion on causality based on whatever other evidence was left, case studies, other animal evidence. I think there is a sense that when you talked about there was a suggestion from some of the things that would mean you had a very low certainty of causality and that causality could go from saying, "We don't know if there's any link at all," all the way to saying, "We are really quite certain, short of randomly implanting women, we are very certain."

Given the fact that there is no epidemiological data on this, where would you say your sense of certainty of your causality is? How close to zero as opposed to 100 percent are you? Are you in certainty with your opinion that there is a causal relationship with breast implants and atypical connective tissue disease?

---

**37.** These studies are:

Dugowson, C.R., *et al. Silicone Breast Implants and Risk for Rheumatoid Arthritis.* ARTHRITIS RHEUM. 35[9] (Supp.) Abstract 192:566 (Sept. 1992).

Englert, H.J., *et al. Scleroderma and Augmentation Mammoplasty—A Causal Relationship?* AUST. NZ J. MED. 24:74–79 (1994).

Gabriel, S.E., *et al. Risk of Connective–Tissue Diseases and Other Disorders After Breast Implantation.* MPJM 330[24]:1697–1702 (June 1994) ("Mayo Clinic Study").

Giltay, Eric J., *et al. Silicone Breast Prostheses and Rheumatic Symptoms: A Retrospective Follow-Up. Study.* ANNALS OF RHEUMATIC DISEASES 53:194–196 (1994).

Goldman, J.A., *et al. Breast Implants, Rheumatoid Arthritis, and Connective Tissue Diseases in a Clinical Practice.* J. CLIN. EPIDEMIOL. 48[4]:571–582 (1995).

Hennekens, Charles H., *et al. Self-Reported Breast Implants and Connective–Tissue Diseases in Female Health Professionals.* JAMA 273:8 616–621 (February 28, 1996).

Hochberg, B., *et al. Association of Augmentation on Mammoplasty with Systemic Sclerosis Preliminary Results from a Case–Control Study.* AMER. COLLEGE OF RHEUM., Abstract 1249 (October 26, 1994).

McLaughlin, *et al. Correspondence Re: Breast Implants, Cancer, and Systemic Sclerosis.* J. OF THE NAT. CANCER INST. 87[18] (Sept. 20, 1995).

Sanches–Guerrero, J., *et al. Silicone Breast Implants and the Risk of Connective–Tissue Diseases and Symptoms.* NEJM 332[25]:1666–1670 (June 1995) ("Harvard Nurses Study").

Schollenfield, D., *et al. The Design of a Population–Based Case–Control Study of Systemic Sclerosis (Scleroderma). Commentary on the University of Michigan Study.* J. CLIN. EPIDEMIOL. 48[4]:583–596 (1995).

Schusterman, Mark A., *et al. Incidence of Autoimmune Disease in Patients After Breast Reconstruction with Silicone Gel Implants Versus Autogenous Tissue: A Preliminary Report.* ANN. PLASTIC SURG. 31[1]:1–6 (1993).

Strom, P.L., *et al. Breast Silicone Implants and Risk of Systemic Lupus Erythematosus.* J. CLIN. EPIDEMIOL. 47[10]:1211–1214 (1994).

Weisman, Michael H., *et al. Connective Tissue Disease Following Breast Augmentation: A Preliminary Test of the Human Adjuvant Disease Hypothesis.* PLASTIC & RECONSTRUCTIVE SURGERY 82[4]:626–630 (1988).

Wells, Karen E., *et al. The Health Status of Women Following Cosmetic Surgery.* PLASTIC RECONSTR. SURGERY 93[5]:907–912 (1994).

Williams, James, *et al. Silicone Based Implants in Patients with Undifferentiated Connective Tissue Disease.* AMER. COLLEGE OF RHEUM., Abstract 1562.

Wolfe, P. *Silicone Breast Implants and the Risk of Fibromyalgia and Rheumatoid Arthritis.* ARTHRITIS CTR. & UNIV. OF KANSAS, Wichita, KS USA 87214.

**38.** The court notes that Dr. Goldsmith has admitted that UCTD is not the same disease as the ACTD plaintiffs claim they have. TRANS. OF HEARING BEFORE THE HONORABLE JACK B. WEINSTEIN, *Nyitray v. Baxter Healthcare Corp.,* No. 93–159 (E.D.N.Y.) (hereinafter NEW YORK TRANS.), at 130:16–20, 133:19–24 (Oct. 7, 1996).

DR. GOLDSMITH: Let me also make sure that I give you an answer that I think is reflective of the—of the question in front of us. I don't believe it should go from zero to—to fully sure. I think it's also possible that breast implants could, in fact, be negatively related to those atypical syndromes as well.

DR. GREENLICK: Right. I was just starting from a zero, yes, could you have gone all the way from they are highly protective through no relationship, all the way to certain causality.

But let's just—I assume you don't—you are not suggesting that the current data would tell you they are protective against atypical disease. So let's start from zero at "I have no certainty whatever there's a relationship," all the way to "I am absolutely certain there's a relationship from the existing data given no epidemiological data." I was wondering where you would—

DR. GOLDSMITH: *At the moment, I must suggest to you that the evidence looks to me as if it's just that, that it's a possibility, and I would have to characterize it as less than 50 percent.* That would be where I am at the moment.

But where the new evidence is going to show that there is or is not an association, I think we have to wait for the science to tell us. We have to wait for the epidemiology.

PORTLAND TRANS., Aug. 6, 1996, at 241:14 to 243:4 (emphasis added).

With the release of the Liang–Schottenfeld abstract, Dr. Goldsmith now indicates a willingness to testify that such causation is "more likely than not."[39] This court cannot accept his proffered change in testimony because it finds the methodology supporting this changed testimony unreliable under

*Daubert I* and *Daubert II*. First, none of the 16 epidemiological studies found that women with silicone breast implants faced a relative risk of classical diseases or disease signs and symptoms of anywhere near 2.0. Indeed, only one study—the Hennekens study—found any statistical relationship between the presence of silicone breast implants and disease, and there the relative risk was only 1.24. Therefore, these studies cannot support expert testimony that silicone "more likely than not" causes disease or signs and symptoms of disease in women.

Second, the Liang–Schottenfeld abstract cannot in itself support Dr. Goldsmith's change in testimony. The abstract is not yet published, nor is a full write-up of the study, including the supporting data, yet available. Indeed, Dr. Goldsmith admitted in his New York testimony that his only knowledge of the details of the study came from a telephone inquiry. NEW YORK TRANS., at 71:17–24. According to the abstract, moreover, the study included only three women with breast implants, calling its epidemiological significance severely into question. In addition, the abstract explicitly concludes that "silicone breast implants were not significantly associated with UCTD," suggesting that silicone gel breast implants are *not* associated with disease. In contrast, the abstract concludes overall that, "[a]mong all types of implanted devices, including breast implants, both those containing silicone * * * and those that did not contain silicone * * * were significantly associated with UCTD." This apparent internal contradiction within the abstract's conclusions calls the value of this study further into question. In light of these shortcomings[40] and in the face of the other 16 studies, which Dr. Goldsmith has already admitted do not support expert testimony that silicone "more likely than not" causes

---

**39.** Indeed, he did so testify in the proceedings before Judge Weinstein in the District Court of New York, on the basis of the new Liang–Schottenfeld abstract. NEW YORK TRANS., at 75:8–22, 122:22 to 123:3. I find this change in so-called "scientific opinion" not only suspect, but shocking, with no scientific basis to support it. This is exactly the type of "junk science" that the Supreme Court in *Daubert I* commanded courts to exclude. However, this is not to say that at some

future date new studies may justify what is now unjustifiable.

**40.** I concur in Judge Weinstein's assessment that the Liang–Schottenfeld abstract is not "in the form that scientists would want" and that Dr. Goldsmith "can't get information like this over the phone that is critical." Like Judge Weinstein, moreover, "I'm very unimpressed by this." NEW YORK TRANS., at 80:2–6.

disease in women, this court GRANTS defendant's motion to exclude Dr. Goldsmith's epidemiological testimony.[41]

■ As for defendants' motion to exclude Dr. Swan's proffered testimony, the motion must be GRANTED because Dr. Swan's testimony is unreliable and no longer "fits" plaintiffs' theory of the case. I first note that several courts have rejected Dr. Swan's testimony and her "reanalysis" approach as unreliable.[42] Dr. Swan's reanalysis of the silicone epidemiology has never been subjected to peer review. MERLIN HEARING TRANS., at 73–76. Moreover, her theory has not been espoused by any other scientist whose work has been subjected to the peer review process. MERLIN HEARING TRANS., at 73–74. Peer review and publication weigh heavily in the calculus of the reliability of expert testimony because such peer review "increases the likelihood that substantive flaws in methodology will be detected." Daubert I, 509 U.S. at 594, 113 S.Ct. at 2797. Thus, the lack of peer review for Dr. Swan's theories weighs heavily against the admissibility of Dr. Swan's testimony.

In addition, Dr. Swan's testimony involves only her opinions and criticisms of others' work; as such, it is not based on any technique that can be scientifically tested. Moreover, her criticisms of the existing epidemiology for silicone gel breast implants have not been generally accepted. In fact, they have not been accepted at all. MERLIN HEARING TRANS., at 92–93. In contrast, Dr. Swan admits that no studies have established a causal link of any scientific significance between silicone breast implants and disease, MERLIN HEARING TRANS., at 82, and this is the recognized consensus of the relevant scientific community.

■ As the Supreme Court stated, "widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique that has been able to attract only minimal support within the community may properly be viewed with skepticism." Daubert I, 509 U.S. at 594, 113 S.Ct. at 2797. Many courts have recognized that an unexplained conflict with the generally accepted methodology or theories in a given scientific field can be a basis for excluding proffered expert testimony. See Turpin v. Merrell Dow Pharmaceuticals, Inc., 959 F.2d 1349, 1360 (6th Cir.), cert. denied, 506 U.S. 826, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992) (finding no scientific basis for testimony of a causation expert who did "not testify on the basis of the collective view of his scientific discipline, nor [did] he take issue with his peers and explain the grounds for his difference"); O'Conner v. Commonwealth Edison Co., 807 F.Supp. 1376, 1398 (D.Ill.1992), aff'd 13 F.3d 1090 (7th Cir.), cert. denied — U.S. ——, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994) (holding that "an expert opinion that actually contradicts directly the scientific consensus is inadmissible"); Conde v. Velsicol Chem. Corp., 804 F.Supp. 972, 1024 (S.D.Ohio 1992), aff'd 24 F.3d 809 (holding that "when an expert expresses an opinion which is not generally accepted within the medical and scientific communities, he has an obligation to provide a reasoned explanation of why his methodology and opinions differ"). In addition to not being peer-reviewed and to being untestable, Dr. Swan's proffered testimony inexplicably conflicts with the general con-

---

41. During the course of these proceedings, plaintiffs accused defendants of improperly concealing the Liang–Schottenfeld abstract, to the plaintiffs' prejudice. I find these accusations to be unfounded.

42. See Lynch v. Merrell–National Laboratories, 646 F.Supp. 856 (D.Mass.1986) (noting that "this Court still could not accept result-based reanalysis of epidemiological studies and criticisms of others' methodology, such as that performed here by Dr. Swan, as reliable data upon which to base an opinion on causation"); Lynch v. Merrell–National Laboratories, 830 F.2d 1190, 1195 (1st Cir.1987) ("Swan's study has never been

refereed or published in a scientific journal or elsewhere * * *. On the basis of what we have, it could not form the foundation for an expert opinion challenging the scientific consensus * * *."); Ealy v. Richardson–Merrell, Inc., 897 F.2d 1159, 1162 (D.C.Cir.1990) ("the plaintiff's epidemiology expert, Dr. Shanna Swan, tried to refute the validity of the published epidemiological data through her own unpublished reanalysis"); Lee v. Richardson–Merrell, Inc., 772 F.Supp. 1027, 1030 (W.D.Tenn.1991); Turpin v. Merrell Dow Pharmaceuticals, Inc., 736 F.Supp. 737, 743 (E.D.Ky.1990).

sensus of the epidemiological community. Thus, it is unreliable and hence inadmissible.

In addition, Dr. Swan's testimony has no "fit." As discussed above, even if the proponents of expert testimony establish that that testimony is reliable scientific knowledge, the court must still exclude the evidence if it does not fit the issues to be decided in the case. *Daubert I*, 509 U.S. at 591, 113 S.Ct. at 2795–96. In the Ninth Circuit, testimony only "fits" a case if it logically advances a material aspect of the proponent party's case. *Daubert II*, 43 F.3d at 1315. Here, Dr. Swan seeks to testify that current epidemiology regarding the relationship of silicone breast implants and classical disease is invalid. However, this court has already determined that the proffered testimony based on that epidemiology is inadmissible, and it will determine, see discussion below, that plaintiffs cannot base their entire case on differential diagnosis. In addition, to the extent that plaintiffs intended to use Dr. Swan's testimony to support their argument that silicone breast implants can cause ACTD, I have already ruled that no testimony regarding ACTD will be permitted. Therefore, Dr. Swan's testimony is now a stepping stone that leads nowhere; it no longer "fits" plaintiffs' case.

■ There is no doubt but that Dr. Swan has impressive credentials, as Justice Blackmun himself recognized in *Daubert I*, 509 U.S. at 583 n. 2, 113 S.Ct. at 2792 n. 2 (noting that Dr. Swan has "a master's degree in biostatics from Columbia University and a doctorate in statistics from the University of California at Berkeley, is chief of the section of the California Department of Health and Sciences that determines causes of birth defects, and has served as a consultant to the World Health Organization, the Food and Drug Administration,, and the National Institutes of Health.") However, as Judge Weinstein noted in the Agent Orange litigation, the jury should "not be permitted to be misled by the glitter of an expert's accomplishments outside the courtroom" if the expert opinion is based on "untrustworthy" data or is otherwise not reliable.[43] *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223, 1245 (E.D.N.Y.1985) (citations omitted). As in that case, " 'the speculation and unfounded assumptions underlying [the] testimony [of Dr. Swan] decrease its probative value, perhaps to the level of the gossamer.' " *Id.* at 1256 (quoting *American Bearing Co. v. Litton Indus., Inc.*, 729 F.2d 943, 950 n. 14 (3d Cir.1984)). In this litigation, Dr. Swan's well-traveled opinions are no more than educated guesses dressed up in evening clothes. Therefore, for all of the above reasons, I GRANT defendants' motions to exclude Dr. Swan's testimony.

## C. Immunology and Toxicology

Plaintiffs have offered Dr. Eric Gershwin as an expert in immunology to testify that silicone is capable of causing plaintiffs' constellation of symptoms because (1) silicone in contact with human tissue results in chronic inflammation through immune activation and cellular reactions; (2) silicone is an immune adjuvant and thus can produce enhanced immune responses when in the presence of a triggering condition and exacerbate existing

---

**43.** Judge Weinstein was relying on FRE 403 as he made this assessment. *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. at 1245. Nevertheless, his comments are applicable here because Rule 403 remains in play during a *Daubert* hearing. *Daubert I*, 509 U.S. at 595, 113 S.Ct. at 2797–98. *See also United States v. Powers*, 59 F.3d 1460, 1471 (4th Cir.1995) ("In determining whether the evidence will be helpful to the trier of fact, the Supreme Court warned that throughout an admissibility determination, a judge must be mindful of other evidentiary rules, such as FRE 403, which permits the exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." (quoting FRE 403 and citing *Daubert*,

509 U.S. at 595, 113 S.Ct. at 2797–98)); *Robinson v. Missouri Pacific Railroad Co.*, 16 F.3d 1083, 1088 (10th Cir.1994) (observing that, under Rule 403, "trial judges should carefully and meticulously examine proposed animation evidence for proper foundation, relevancy, and the potential for undue prejudice."). Therefore, the relevance and probative value of Dr. Swan's testimony, as well as its scientific reliability, is an issue currently before this court. Dr. Swan's testimony would be excludable pursuant to FRE 401, 402, and 403 because it is now, in light of my other rulings, irrelevant and potentially prejudicial. However, because I find Dr. Swan's testimony to be scientifically unreliable and to lack "fit," I do not base its exclusion on these grounds.

**1408**

immune-mediated conditions; and (3) the surface of silicone changes or degrades *in vivo* into silanol groups and/or silica. He relies on the epidemiological studies discussed above, his own clinical experience, biomarker, immune activation, and toxicological studies,[44] and the work of the Harvard

44. These studies include:

Abeles, M. *An Evaluation of Silicone Breast Implants for Silicone Associated Disease.* ACR 38[9], Supp. (Sept. 1995).

Baker, M. *Treatment of Silicone Implant Associated Symptoms.* Abstract presented at the American College of Rheumatology Annual Meeting (1996).

Baldwin, C. *Silicone–Induced Human Adjuvant Disease.* ANNALS OF PLASTIC SURG. 10[4]:172–175 (April 1983).

Bar–Meir, E., *et al.* *Multiple Antibodies in Patients with Silicone Breast Implants.* J. OF AUTOIMMUNITY 8:267–277 (1995).

Bernstein, M. *A Multiple Sclerosis Like Syndrome Associated with Silicone Breast Implants.* Abstract presented at the American College of Rheumatology Annual Meeting (1996).

Borenstein, D. *Siliconosis: A Spectrum of Illness.* SEMINARS IN ARTHRITIS AND RHEUMATISM 24:1, Supp. 1 (Aug. 1994).

Bridges, A.J., *et al.* *Autoantibodies in Patients with Silicone Implants.* Potter, M., and Rose, N., CURRENT TOPICS IN MICROBIOLOGY AND IMMUNOLOGY–IMMUNOLOGY OF SILICONES 210:277–290 (1996).

Bridges, A.J., *et al.* *Clinical and Immunological Evaluation of Women with Silicone Breast Implants and Symptoms of Rheumatic Disease.* SUPP. ARTHRITIS AND RHEUMATISM 35(90):S46:184 (Sept. 1992).

Bridges, A. *A Clinical and Immunological Evaluation of Women with Silicone Breast Implants and Symptoms of Rheumatic Disease.* ANNALS OF INTERNAL MED. 118[12] (June 15, 1993).

Brozena, S. *Human Adjuvant Disease Following Augmentation Mammoplasty.* ARCH DERMATOLOGY 124:1383–1386 (Sept. 1988).

Claman, H.N., Robertson, A.D., *Antinuclear Antibodies in Apparently Healthy Women with Breast Implants.* Potter, M., and Rose, N., eds., CURRENT TOPICS IN MICROBIOLOGY AND IMMUNOLOGY–IMMUNOLOGY OF SILICONES 210:265–268 (1996).

Cuellar, M. *Clinical Outcome of Silicone Breast Implant Women Following Implant Removal.* AMER. COLL. RHEUMATOLOGY 38[9], Supp. (Sept. 1995).

Davis, J. *Clinical Characteristics of 343 Patients with Breast Implants.* ACR 38[9], Supp. (Sept. 1995).

Gutierrez, F. *Progressive Systemic Sclerosis Complicated by Severe Hypertension: Reversal After Silicone Implant Removal.* AMER. J. MED. 89:390–392 (Sept. 1990).

Kaiser, W. *Human Adjuvant Disease: Remission of Silicone Induced Autoimmune Disease After Explantation of Breast Augmentation.* ANNALS OF RHEUMATIC DISEASES 49:937–938 (Nov. 1990).

Kemple, K., and Pestronk, A. *Antiglycolipid Antibodies in Symptomatic Women with Silicone Breast Implants.* Abstract presented at the American College of Rheumatology Annual Meeting (Sept. 1995).

Lugowski, S., *et al.* *Silicon Levels in Blood, Breast Milk, and Breast Capsules of Patients with Silicone Breast Implants and Controls.* FIFTH WORLD BIOMATERIALS CONGRESS, TORONTO, CANADA (1996).

Mease, P. *Clinical Symptoms/Signs and Laboratory Features in Symptomatic Patients with Silicone Breast Implants.* ACR 38[9], Supp. (Sept. 1995).

Peters, W., *et al.* *Silicon and Silicone Levels in Patients with Silicone Implants.* Potter, M., and Rose, N., CURRENT TOPICS IN MICROBIOLOGY AND IMMUNOLOGY–IMMUNOLOGY OF SILICONE 210:39–48 (1996).

Peters, W., *et al.* *Do Patients with Silicone Gel Breast Implants Have Elevated Levels of Blood Silicon Compared with Control Patients?* ANNALS OF PLASTIC SURG. 34[4]:343–347 (April 1995).

Romano, T.J. *Clinical Characteristics of Silicone Breast Implant Patients.* AMER. J. OF PAIN MANAGEMENT 6[1]:13–16 (Jan. 1996).

Rowle, M.J., *et al.* *Antibodies to Collagen: Comparison Epitope Mapping in Women with Silicone Breast Implants, Systemic Lupus, Erythematosus and Rheumatoid Arthritis.* J. OF AUTOIMMUNITY 7:775–789 (1994).

Sahn, E. *Scleroderma Following Augmentation Mammoplasty.* ARCH. DERMATOLOGY 126:1988–1202 (Sept. 1990).

Sanchez–Roman, J., *et al.* *Multiple Clinical and Biological Autoimmune Manifestations in 50 Workers After Occupational Exposure to Silica.* ANNALS OF THE RHEUMATIC DISEASES 52:534–538 (1993).

Seleznick, M. *Is Silicone Associated with Connective Tissue Disease?* 78[2]:85–87 (Feb. 1991).

Shons, A. *Silicone Breast· Implants and Immune . Disease.* ANNALS OF PLASTIC SURG. 28[5]:491–501 (May 1992).

Silver, R. *Demonstration of Silicon in Sites of Connective–Tissue Disease in Patients with Silicone–Gel Breast Implants.* ARCH. DERMATOLOGY 129[1]:63–68 (Jan. 1993).

Solomon, G. *Clinical and Serologic Features of 639 Symptomatic Women with Silicone Gel Implants: Evidence for a Novel Disease Siliconosis.* AMER. COLL. RHEMATOLOGY (1994).

Solomon, G. *A Clinical and Laboratory Profile of Symptomatic Women with Silicone Breast Implants.* SEMINARS IN ARTHRITIS AND RHEUMATISM 24[1], Supp. 1 (Aug. 1994).

Solomon, G. *Clinical Features of a Subset of Symptomatic Women with Silicone Breast Implants and Extreme Elevations of Serum IGM.* Abstract presented at the Amer. Coll. Rheum. Annual Meeting (1996).

NMR Center on the degradation of silicone as the bases of his proffered opinion.

Plaintiffs also offer Dr. Kip Kemple to testify that silicone can produce an immunological response in women. Dr. Kemple relies on immunological studies showing that autoantibodies are elevated in women with breast implants [45] and his own study of anti-ganglioside antibodies in women with breast implants.

The court submitted immunological/toxicological issues to its expert, Dr. Mary Stenzel–Poore,[46] who specifically looked at the adjuvant potential of silicone gel implants, the potential for immune stimulation of T cells by silicone gel implants, altered natural killer cell activity, and immune system cancer formation in rodents. She opined that the studies relied upon by plaintiffs' experts justified the following conclusions regarding silicone gel adjuvant potential:

1a. Silicone gel *emulsified with antigen* may act as an adjuvant in humoral and cell-mediated immune responses in rodents.

1b. Silicone oils that are both linear and low molecular weight, *emulsified with antigen* do not act as adjuvants in rodents.

1c. Silicone oils that are low molecular weight and cyclic (D4) *emulsified with antigen* may act as adjuvants.

APPENDIX D, at 2. However, "[d]irect attempts to demonstrate that immunization with these agents emulsified with 'auto-antigens' or given in the absence of antigens failed to show evidence of autoimmune disease despite obvious disease induction by Freund's adjuvant," except in a genetic strain of rat developed to have a high susceptibility of developing arthritis. *Id.* Thus, *in rodents only,* "enhanced immune responses are not found if the antigen is not emulsified with the silicone agents * * *." *Id.* at 2–3 (citations omitted).

Dr. Stenzel–Poore further stated that "[f]orming the conclusion that elicitation of autoimmune and/or inflammatory disease occurs in women with SBI based on the evidence that silicone gel acts as an adjuvant *when emulsified with antigen* is **unsupported by the data** since peer-reviewed studies failed to show evidence of any autoimmune-mediated disease." APPENDIX D, at 3. Although "[t]he scientific methodology used in the aforementioned studies is generally sound,"

Dr. Gershwin's opinion regarding the adjuvant properties of silicone gel *requires a substantial leap of faith* since it is undetermined from these studies whether silicone gel breast implants would lead to adjuvant actions, much less autoimmune responses or systemic inflammation; indeed, studies designed to test this hypothesis argue

Spiera, H., and Kerr, L.D. *Scleroderma Following Silicone Implantation: A Cumulative Experience of 12 Cases.* RHEUMATOLOGY 20:958–961 (1993).
Spiera, H. *Immunological Reactions to Silicone Implants.* CLIN. IMMUNOLOGY 1[6] (1994).
Steenland, K., and Goldsmith, D., *Silica Exposure and Autoimmune Diseases.* AMER. J. OF INDUS. MED. 28:603–608 (1995).
Sun, L., *et al. Silicone in the Blood and Capsule of Women with Breast Implants.* FIFTH WORLD BIOMATERIALS CONGRESS, TORONTO, CANADA (1996).
Teuber, S.S., *et al. Serum Silicon Levels Are Elevated in Women with Silicone Gel Implants.* Potter, M., and Rose, N., eds., IMMUNOLOGY OF SILICONES 210:59–65 (1996).
Teuber, S.S., *et al. Anti–Collagen Autoantibodies Are Found in Women with Silicone Breast Implants.* J. OF AUTOIMMUNITY 6[3]:367–377 (June 1993).
Teuber, S. *Remission of Sarcoidosis Following Removal of Silicone Gel Breast Implants.* INTL. ARCH. ALLERGY IMMUNOLOGY 105:404–407 (1994).

Uretsky, B. *Augmentation Mammoplasty Associated with Severe Systemic Illness.* ANNALS OF PLASTIC SURG. 3[3]:445–447 (Nov. 1977).
Vasey, F. *Observations on Women with Breast Implants.* J. FLA. MED. ASSN. 82:5 (May 1995).
Vasey, F. *Clinical Findings in Symptomatic Women with Silicone Breast Implants.* SEMINARS IN ARTHRITIS AND RHEUMATISM 24[1], Supp. 1 (Aug. 1994).
Vasey, F. *Prospective Clinical Status Comparison Between Women Retaining Gel Breast Implants vs. Women Removing Breast Implants.* Abstract presented at the American College of Rheumatology Annual Meeting (1996).
Young, V.L., *et al. HLA Typing in Women with Breast Implants.* PLASTIC & RECONSTR. SURG. 96[7]:1497–1520 (Dec. 1995).

45. The studies Dr. Kemple relies on are essentially the same as those Dr. Gershwin relies upon.

46. See generally Dr. Stenzel–Poore's Report at APPENDIX D.

against such an outcome. Thus, the position of Dr. Gershwin is not well-supported by the data available in the published scientific literature nor is it derived from valid conclusions of the studies cited above.* Id.* (emphasis added).

With regard to T-cell stimulation, Dr. Stenzel–Poore opined that "[t]he view that SBIs stimulate antigen-specific T cell mediated responses in vivo is not well substantiated by the experimental studies reported in the literature." APPENDIX D, at 4. Moreover, although "[s]everal studies have been performed attempting to establish a link between silicone breast implantation in women and silicone-specific T-cell responses," "these studies have a number of methodological shortcomings and thus should not form the basis of an opinion." *Id.* at 5. As a result,

those opinions of Dr. Gershwin regarding the role of silicone gel breast implants in stimulating specific T cell immunity and thereby providing a plausible mechanism of autoimmune induction are not upheld by the literature discussed above. The position of Dr. Gershwin is simply not well-supported by studies available in the published scientific literature nor is it derived from appropriate conclusions regarding the studies cited above.

*Id.* at 8.

Dr. Stenzel–Poore also examined the literature regarding changes in natural killer cell function. She noted that "[c]hanges in natural killer (NK) cell function have been reported to be associated with silicone gel exposure in rodents and humans." APPENDIX D, at 9. Such an association could be significant because "changes in NK cells have also been associated with increased susceptibility to pathogens and tumor formation." *Id.* However, "[g]iven the concerns raised by the degree of irreproducibility and fluctuations in time and dose-dependency [in the silicone gel/NK cell studies], conclusions made regarding the suppressive effect of silicone gel on NK function based on these studies are premature." *Id.* Moreover, "although the data indicate that 50% of symptomatic women with implants had lower NK activity prior to removal of the implant, it is misleading since the degree of variation is not shown in

the implanted women, or in women without implants. It is invalid to conclude that silicone-gel breast implants in women lead to a depressed NK cell activity that is reversible with explanation." *Id.* at 10.

Finally, in evaluating the studies evaluating the development of immune system cancer in response to silicone, Dr. Stenzel–Poore stated that "Dr. Gershwin's opinions regarding the development of immune system cancers in women with silicone breast implants is unwarranted" from the current studies, which are all animal studies. APPENDIX D, at 11. "There is no conclusive evidence to date that this model of tumor formation in mice has any human correlate." *Id.*

 I agree with and accept Dr. Stenzel–Poore's assessments of Dr. Gershwin's scientific methodology in light of legal standards for *Daubert* hearings. As a preliminary matter, I note that most if not all of the studies that Dr. Gershwin and Dr. Kemple rely upon are animal studies (generally involving rodents), case reports or collections of case reports, and/or studies involving crystalline silica. Extrapolations of animal studies to human beings are generally not considered reliable in the absence of a scientific explanation of why such extrapolation is warranted. *See Viterbo v. Dow Chemical Co.,* 826 F.2d 420 (5th Cir.1987) (excluding the evidence where there was only a single animal study of picloram and it showed a link to a disease completely different than plaintiff's diseases); *Richardson v. Richardson–Merrell, Inc.,* 857 F.2d 823, 830 (D.C.Cir.1988) (excluding animal studies of Bendectin because of the overwhelming body of contrary epidemiological evidence and the admissions of the expert that animal studies merely raise a suspicion of causation in humans); *Lynch v. Merrell–National Laboratories,* 830 F.2d at 1194 (excluding animal studies of Bendectin where they stood in the face of significant contrary epidemiological data); *Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d at 1360 (excluding testimony where the record failed to make clear how the animal studies were sufficient to show that Bendectin causes birth defects more probably than not). Plaintiffs offer no explanation of why extrapolations from the rodent

studies their experts rely upon to humans are warranted here.

█ Similarly, case reports and case studies are universally regarded as an insufficient scientific basis for a conclusion regarding causation because case reports lack controls. *Casey v. Ohio Medical Products,* 877 F.Supp. 1380 (N.D.Cal.1995); *Muzzey v. Kerr–McGee Chemical Corp.,* 921 F.Supp. 511, 519–20 (N.D.Ill.1996); *In re Three Mile Island Litigation Cases Consolidated II,* 911 F.Supp. 775, 795–96 (M.D.Penn.1996); *Grimes v. Hoffmann–LaRoche, Inc.,* 907 F.Supp. 33, 35 n. 2 (D.N.H.1995). Therefore, these cannot be the basis of an opinion based on scientific knowledge under *Daubert.*

Third, as will be discussed below, studies based on crystalline silica cannot support the testimony of plaintiffs' experts because plaintiffs make no showing that silicone breast implants are associated with the presence of crystalline silica in women. In other words, the purported disease-causing agent in the silica studies has not been show to be scientifically relevant regarding the purported disease-causing agent—namely, silicone gel—in these cases.

Finally, *Daubert's* establishment of the court as gatekeeper requires that proffered scientific expert opinions that make too great a leap of faith from the scientific knowledge currently available be excluded. As discussed above, an evaluation of whether scientific methodology is valid for *Daubert* purposes should include an examination of how the proffered conclusions relate to the bases upon which the expert relies. The court's neutral technical advisor has advised that Dr. Gershwin—and, by implication, Dr. Kemple, who relies on most if not all of the same studies as Dr. Gershwin—has made too great a leap from the underlying data to his conclusions. In other words, those conclusions are themselves not the result of the faithful application of valid scientific methodology. Therefore, defendants' motions to exclude Dr. Gershwin's and Dr. Kemple's testimony on these issues is GRANTED.

### D. Chemistry

Plaintiffs offer Dr. Christopher Batich as an expert in chemistry to testify that: (1) silicone migrates out of breast implant capsules; (2) there is an increase in surface area of silicone from gel breast implants to which the body reacts over time; (3) silicone changes in the body and forms bioreactive silanol groups on its surface; (4) silicone degrades into silica in the body; and (5) there is similar surface chemistry in all siloxics (silicones, silicates, and silicas) that make the siloxics reactive in humans. In addition, plaintiffs offer Dr. Harold Alexander, a biomaterials engineer, to testify that: (1) silicone microdroplets and/or particles are released from breast implants through gel bleed or rupture and have a high potential to cause inflammatory reactions in body tissues, and (2) the small size of silicone microdroplets and/or particles allows them to migrate through the body via microphages and other migrating cells, and their low molecular weight allows them to diffuse through tissue.

█ The court's technical advisor for polymer chemistry, Dr. Ronald McClard, carefully reviewed the question of whether the scientific evidence supports Dr. Batich's and Dr. Alexander's proffered testimony that silicone degrades to silica *in vivo.*[47] In reviewing the plaintiffs' main scientific support for silica-induced biological reactions, a paper published by B. Razzaboni and P. Bolsaitis in *Environmental Health Perspectives,*[48] Dr. McClard stated that:

> The Razzaboni article * * * clearly attempts to offer a biochemical explanation for the silica-caused hemolytic process. This article seems scientifically sound. If silicones are converted to silica then this article seems relevant to the issue at hand. *I am unaware that any of the papers that I reviewed clearly demonstrated the conversion of silicone to silica (most likely amorphous forms thereof),* though the process seems possible given the known chem-

47. See generally Dr. McClard's report at APPENDIX E.

48. Razzaboni, B., and Bolsaitis, P. *Evidence of an Oxidative Mechanism for the Hemolytic Activity of Silica Particles.* ENVTL. HEALTH PERSPECTIVES 87:337–341 (1990).

istry of silicon. *The link between silicones and the Razzaboni article is a prospective one.*

APPENDIX E, at 11 (emphasis added). In other words, the opinions plaintiffs' experts proffer regarding the *in vivo* degradation of silicone to silica are currently unsupported by the scientific literature. As with the immunological/toxicological conclusions discussed above, plaintiffs' experts again make too great a leap of faith in their proffered testimony that silicone gel from breast implants degrades to silica. This is especially true for any testimony that silicone gel degrades *in vivo* to crystalline, as opposed to amorphous, silica. Therefore, I hereby GRANT defendants' motions as pertains to such testimony.

In addition, because there is no scientifically valid evidence to support the conclusion that silicone gel degrades to silica in the human body, any other immunological or toxicological studies involving the inhalation, ingestion, or absorption of crystalline silica cannot "fit" the issue of whether silicone breast implants can cause signs or symptoms of disease in women. Therefore, as discussed above, I must also exclude testimony based on this evidence under the "fit" prong of *Daubert I* and *Daubert II*.

Dr. McClard also had several strong reservations about the other chemical studies upon which Dr. Batich and Dr. Alexander rely. Nevertheless, Dr. McClard consistently reported that these studies are supported by valid scientific reasoning and methodology. Moreover, while plaintiffs' experts' opinions are, in his view, "controversial," he concluded that those opinions are generally scientifically valid in that they properly may be derived from the chemical studies:

> It's a bit like two doctors looking at a chest X-ray (having both agreed that a chest X-ray was the correct diagnostic procedure to use) and disagreeing, sometimes heatedly, over the interpretation of a shadow on the film and perhaps how long the exposure should have been. I have no doubt that all of the chemical studies examined in

these hearings are based on appropriate methods, whether or not there are serious questions about fine points of technique or far-reaching conclusions. Indeed some of the work is inadequately documented and of clearly debatable value, but that is really not for me to decide, to be sure.

APPENDIX E, at 12.

I find Dr. McClard's exposition of the numerous methodological flaws in the other chemical studies troubling. Nevertheless, I need not decide whether this evidence is admissible on the basis of valid scientific methodology because the evidence now does not "fit" plaintiffs' case, as *Daubert I,* 509 U.S. at 594, 113 S.Ct. at 2797, and *Daubert II,* 43 F.3d at 1315, require. Testimony as to how silicone behaves chemically inside the human body cannot, in itself, establish that silicone gel breast implants cause signs and symptoms of disease in women in the absence of any epidemiological, rheumatological, or immunological/toxicological evidence linking those breast implants to disease. Thus, such testimony no longer logically advances a material aspect of the proponent party's case. *Daubert II,* 43 F.3d at 1315. Therefore, I hereby GRANT defendants' motions to exclude the testimony of Dr. Batich and Dr. Alexander.

**E. Differential Diagnosis**

Plaintiffs have offered Dr. Robert Bennett, M.D., both to testify that silicone gel breast implants can cause disease in women and to testify as a case-specific expert in *LeaAnn Hall v. Baxter Healthcare.*[49] Dr. Bennett is plaintiff Hall's treating physician and is prepared to testify, on the basis of differential diagnosis, that plaintiff Hall suffers from systemic sclerosis sine scleroderma, manifested by her pulmonary fibrosis, as a result of having silicone gel breast implants.

As has been noted, the issue before me in this *Daubert* hearing is silicone gel's ability to cause disease in women with breast implants. Courts, however, have recognized two levels of causation: general causation

---

**49.** *LeaAnn D. Hall v. Baxter Healthcare Corp.,* Case No. 92–182–JO.

(*i.e.*, whether silicone gel can cause disease in anyone) and specific causation (*i.e.*, whether silicone gel breast implants caused disease in this plaintiff). *In Re: Silicone Gel Breast Implants Products Liability Litigation,* 887 F.Supp. 1469, 1477 (N.D.Ala.1995); *Jones v. United States,* 933 F.Supp. 894, 900 (N.D.Cal.1990); *DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d at 958; *Rutigliano v. Valley Business Forms,* 929 F.Supp. 779, 783 (D.N.J.1996).

Differential diagnosis is a patient-specific process of elimination that medical practitioners use to identify the "most likely" cause of a set of signs and symptoms from a list of possible causes. However, differential diagnosis does not by itself *prove* the cause, even for the particular patient. Nor can the technique speak to the issue of general causation. Indeed, differential diagnosis *assumes* that general causation has been proven for the list of possible causes it eliminates:

> The process of differential diagnosis is undoubtedly important to the question of "specific causation." If other possible causes of an injury cannot be ruled out, or at least the possibility of their contribution to causation minimized, then the "more likely than not" threshold for proving causation may not be met. *But, it is also important to recognize that a fundamental assumption underlying this method is that the final, suspected "cause" remaining after this process of elimination must actually be capable of causing the injury.* That is, the expert must "rule in" the suspected cause as well as "rule out" other possible causes. And, of course, expert opinion on this issue of "general causation" must be derived from scientifically valid methodology.

*Cavallo v. Star Enterprise,* 892 F.Supp. 756, 771 (E.D.Va.1995) (emphasis added), *aff'd on this ground, rev'd on other grounds*—100 F.3d 1150 (4th Cir.1996).

Testimony regarding specific causation in a given patient is irrelevant unless general causation is established. *DeLuca,* 911 F.2d at 958; *Jones,* 933 F.Supp. at 900; *Rutigliano,* 929 F.Supp. at 783; *Grimes,* 907 F.Supp. at 38. *Hopkins v. Dow Corning Corp.,* 33 F.3d 1116 (9th Cir.1994), does not require a different conclusion for differential diagnosis. First, nothing in *Hopkins* indicates that any witness used differential diagnosis to establish *any* level of causation, let alone both general and specific causation.[50] Second, even if the expert's medical examination of the plaintiff in *Hopkins* were a differential diagnosis (and that is far from clear), it was not, as would be the case here, the *only* evidence of causation proffered. Although the court concluded "that Hopkins' experts based their opinions on the types of scientific data and utilized the types of scientific techniques relied upon by medical experts in making determinations regarding toxic causation where there is no solid body of epidemiological data to review," *id.* at 1124, this data was collective and included: toxicological experience; reviews of medical records; reviews of Dow's studies; "general scientific knowledge of silicone's ability to cause immune disorders as established by animal studies and biophysical data"; published scientific studies; personal research; "participation in a preliminary epidemiological study involving over 200 women"; animal studies; clinical experience; "preliminary results of an epidemiological study"; medical literature; *and* an examination of the plaintiff. *Id.* at 1125. Most of this information, as this *Daubert* hearing has demonstrated, would have been offered to establish general causation—that is, the issue of whether silicone gel breast implants can cause disease in anyone.

Finally, the *Hopkins* court, because of the timing of the case, was reviewing a pre-*Daubert* district court decision to admit the

---

50. Indeed, it is difficult to discern from the *Hopkins* opinion how exactly the causal connection was made. In March 1979, one of Hopkins's treating physicians, Dr. Stephen Gospe, "diagnosed plaintiff with mixed connective tissue disease (MCTD)." *Hopkins,* 33 F.3d at 1118. However, neither Dr. Gospe nor plaintiff's physician, Dr. Pelfini, could provide information to her regarding a causal connection between silicone breast implants and her disease. *Id.* at 1119. Indeed, "[n]one of plaintiff's physicians informed her that the ruptured implant could be responsible for the connective tissue disease from which she suffered." *Id.* Apparently, plaintiff initially made the causal connection herself after she "learned from her mother that a possible connection between the ruptured implants and the immune disorder might exist." *Id.* at 1119, 1121.

expert testimony. As a result, the district court had reached that decision on a record not shaped by *Daubert*'s elucidation of the court's gatekeeping function, nor did the Ninth Circuit delve into the methodology underlying the scientific data upon which Hopkins' experts relied. Because I have done so and have excluded all proffered testimony regarding general causation, Dr. Bennett's testimony now stands in isolation—an evidentiary predicament substantially different from that in *Hopkins*.

Plaintiffs have consistently claimed that this court has jumped the gun in stating that plaintiffs cannot make out a prima facie case. Plaintiffs assert that they have more evidence to present at trial in the nature of differential diagnosis as well as pursuing their theory of "bioplausibility." The fact of the matter is that plaintiffs cannot resort to these purported additional arrows in their legal quiver because neither differential diagnosis nor their bioplausibility theory can make out a prima facie case to prove specific causation of a systemic disorder or particular signs and symptoms absent proof of general causation. Moreover, plaintiffs cannot use Dr. Bennett's testimony, by itself, as part of their proof of general causation because a single differential diagnosis is a scientifically invalid methodology for such a purpose. Therefore, I must exclude Dr. Bennett's testimony for all cases to the extent that plaintiffs proffer it to prove general causation.

▮▮▮ Nor is Dr. Bennett's testimony admissible to prove specific causation in LeaAnn Hall's case, and for two reasons. General causation issues aside, an expert must rule out other potential causes of the patient's condition in order for differential diagnosis testimony to be admissible. *Conde v. Velsicol Chemical Corp.*, 24 F.3d 809, 814 (6th Cir.1994); *Paoli II*, 35 F.3d at 759. Here, Dr. Bennett has not testified as to how he eliminated other potential causes of Ms. Hall's disease. Moreover, his conclusion is inconsistent with the epidemiology for classical diseases. Therefore, his testimony is un-

reliable and exclusion of it is warranted on that basis. *See Conde v. Velsicol Chemical Corp.*, 24 F.3d at 814 (upholding the district court in excluding doctors' opinions purporting to link plaintiff's health problems to chlordane exposure when they failed to exclude other potential causes for the symptoms and their theories were inconsistent with the scientific literature).

In addition, in the absence of proof of general causation, Dr. Bennett's testimony regarding his differential diagnosis does not "fit" LeaAnn Hall's case because there will be no evidence that silicone gel breast implants are a legitimate possible cause of Ms. Hall's disease.[51] Therefore, for all of the above reasons, I hereby GRANT defendants' motions to exclude the testimony of Dr. Bennett.

## V. CONCLUSION

For the reasons stated above, those portions of defendants' motions in limine (## 69, 70, 72, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, and 95 (filed in Group 2)) that seek exclusion of any expert testimony concerning a general causal link between silicone gel breast implants and ACTD or any systemic illness or syndrome are GRANTED. The remaining portions of the above-listed motions are MOOT, with leave to refile as necessary in further pretrial proceedings.

In light of these rulings, the court will sever plaintiffs' local injury claims[52] from their claims for ACTD or any systemic illness or injury. The cases that do proceed to trial will do so on a much more restricted basis than Judges Weinstein and Baer may even contemplate in the New York litigation.[53] Specifically, I will exclude as irrelevant any testimony or evidence of the following: ACTD; any systemic illness or syndrome or autoimmune disorder of any kind; any emotional distress claims arising out of any alleged fear of developing any

---

**51.** This conclusion would hold for any proffer of differential diagnosis plaintiffs may offer in the future without supporting proof of general causation.

**52.** In addition to what is explicitly excluded here, *see* also discussion *supra* note 3.

**53.** *See* discussion above.

systemic disease or injury or fear of cancer.[54]

Finally, as stated earlier, I will defer the effective date of this decision pending the reports of the national Rule 706 panel, and likewise will defer plaintiffs' motion to incorporate the panel members as witnesses. Nonetheless, I wish to make it abundantly clear that while I will evaluate the Rule 706 panel reports before finalizing my decision, I am unlikely to amend these findings and conclusions absent substantial and compelling developments in the scientific arena.

I am mindful that this opinion goes farther in evaluating and in eliminating plaintiffs' claims than any other opinion in breast implant litigation pending in this country. However, litigation over the ability of silicone gel breast implants to cause disease in women has been chaotic in its results, in part because, as *Hopkins* demonstrates, the interjection of the *Daubert* standards into the screening process for proposed scientific evidence has substantially heightened the scrutiny through which such evidence must pass. In my opinion, *Daubert I* and *Daubert II* and their progeny command this disposition.

Postscript: It should be noted, as a matter of case management in mass toxic tort litigation, that at the outset of proceedings after remand from the MDL, counsel for all sides presented an all-day "tutorial" to the court on the complex science involved in these cases. The tutorial demonstrated the need for and prompted the court to appoint the technical advisors. It should also be noted that Judge Sam Pointer appointed Dr. Richard Jones to serve with Professor Margaret Berger, Chair, on the national Rule 706 selection panel.

### APPENDIX A

Jonathan M. Hoffman, OSB # 75418
MARTIN, BISCHOFF, TEMPLETON LANGSLET & HOFFMAN
3100 First Interstate Tower
1300 SW Fifth Avenue
Portland, OR 97201–5667

Telephone: (503) 224–3113
Fax: (503) 224–9471

Mary A. Wells
WELLS, ANDERSON & RACE LLC
1700 Broadway, Suite 1850
Denver, CO 80290
Telephone: (303) 830–1212
Fax: (303) 830–0898

Kelly P. Corr
BOGLE & GATES
Two Union Square, 51st Floor
601 Union Street
Seattle, WA 98101
Telephone: (206) 682–5151
Fax: (206) 621–2660

Of Attorneys for Defendants,
BAXTER HEALTHCARE CORPORATION
and BAXTER INTERNATIONAL INC.

IN THE UNITED STATES
DISTRICT COURT

FOR THE DISTRICT OF OREGON

LeaAnn DeGraw Hall, Plaintiff,

v.

Baxter Healthcare Corporation,
et al., Defendants.

Case No. CV 92–182–JO–LEAD
94–892–JO
94–903–JO
94–907–JO

PROPOSED QUESTIONS REGARDING METHODOLOGY UTILIZED BY PLAINTIFFS' EXPERT ORGANIC CHEMIST, CHRISTOPHER BATICH, Ph.D.

Defendants, Baxter Healthcare Corporation and Baxter International Inc., Bristol–Myers Squibb, and 3M, propose the following questions regarding the methodology utilized by plaintiffs' expert organic chemist, Christopher Batich, M.D.:

---

**54.** This list is not exhaustive. To the extent any plaintiff claims injuries that are not plainly local in nature, the court will rule on the admissibility of evidence of those claimed injuries as the need arises.

## QUESTION 1

Are Dr. Batich's opinions that silicone degrades into silica in the human body supported by scientifically reliable methodologies?

## QUESTION 2

Even if it is biologically plausible that silicone degrades in the human body, is that sufficient evidence to support scientifically a conclusion that silicone breast implants cause "atypical" connective tissue disease as described by Drs. Gershwin, Bennett, or Kemple?

## QUESTION 3

Does the potential rate of error associated with the methodology employed by Dr. Batich render unreliable his conclusion that silicone degrades to silicates or silica in the human body?

## QUESTION 4

Is Dr. Batich qualified to opine that silicone degradation results in disease in implanted women?

## QUESTION 5

Does the methodology employed by Dr. Batich support his conclusion that silicone degrades to silanol groups, converts to silica, and results in disease in implanted women?

## QUESTION 6

Is any portion of Dr. Batich's opinion that silicone gel degrades into silica which leads to disease in implanted women based on speculation, hypotheses, or assumptions?

## QUESTION 7

Does the underlying methodology in the Garrido Nuclear Magnetic Resonance (NMR) spectroscopy studies, and the conclusions therein, relied upon by Dr. Batich, support his conclusion that silicone degrades to silicates or silica resulting in disease in implanted women?

## QUESTION 8

What "fit" (or relevancy) do the Batich opinions have if the opinions of Drs. Gershwin, Bennett, and Kemple are not founded on accepted scientific methodology?

DATED this 16th day of August, 1996.

MARTIN, BISCHOFF, TEMPLETON, LANGSLET & HOFFMAN

By: /s/ Jonathan Hoffman
 Jonathan Hoffman, OSB # 75418

WELLS, ANDERSON & RACE

By: /s/ Mary Wells
 Mary Wells, Pro Hac Vice

 Of Attorneys for Defendants,
 BAXTER HEALTHCARE CORPORATION
 and BAXTER INTERNATIONAL INC.

TOOZE, SHENKER, HOLLOWAY & DUDEN

By: _____
 Paul Duden, OSB # 66035

 Of Attorneys for Defendant,
 BRISTOL–MYERS SQUIBB

MILLER, NASH, WIENER, HAGER & CARLSEN, LLP

By: _____
 William Crow, OSB # 61018

 Of Attorneys for Defendant,
 MINNESOTA, MINING & MANUFACTURING COMPANY (3M)

Jonathan M. Hoffman, OSB # 75418
MARTIN, BISCHOFF, TEMPLETON LANGSLET & HOFFMAN
3100 First Interstate Tower
1300 SW Fifth Avenue
Portland, OR 97201–5667
Telephone: (503) 224–3113
Fax: (503) 224–9471

Mary A. Wells
WELLS, ANDERSON & RACE LLC
1700 Broadway, Suite 1850
Denver, CO 80290
Telephone: (303) 830–1212
Fax: (303) 830–0898

Kelly P. Corr
BOGLE & GATES
Two Union Square, 51st Floor
601 Union Street
Seattle, WA 98101
Telephone: (206) 682–5151
Fax: (206) 621–2660

Of Attorneys for Defendants,
BAXTER HEALTHCARE CORPORATION
and BAXTER INTERNATIONAL INC.

IN THE UNITED STATES
DISTRICT COURT

FOR THE DISTRICT OF OREGON

Leaann DeGraw Hall, Plaintiff,

v.

Baxter Healthcare Corporation,
et al., Defendants.

Case No. CV 92–182–JO–LEAD
94–892–JO
94–903–JO
94–907–JO

PROPOSED QUESTIONS REGARDING METHODOLOGY UTILIZED BY PLAINTIFFS' BIOMATERIALS EXPERT, HAROLD ALEXANDER, Ph.D.

Defendants, Baxter Healthcare Corporation and Baxter International Inc., Bristol–Myers Squibb, and 3M, state that plaintiffs have failed to satisfy their burden of proof concerning the admissibility of the testimony of Dr. Harold Alexander. Plaintiffs did not submit any briefing in opposition to defendants' motion to exclude the testimony of this witness, nor did plaintiffs submit an affidavit from any expert supporting the methodology utilized by this witness in forming his opinions. Therefore, defendants request that this Court grant their motion *in limine* and exclude the testimony of Dr. Alexander.

To assist the Court in making its decision, defendants propose that the following questions be considered regarding the methodology utilized by Dr. Alexander.

### QUESTION 1

Based upon his own research, as well as the generally accepted definition of biocompatibility, is it scientifically sound for Dr. Alexander to conclude that silicone as used in silicone breast implants is not biocompatible?

### QUESTION 2

Is the methodology utilized in Dr. Alexander's research regarding silicones associated with an unreasonably high rate of error?

### QUESTION 3

Is Dr. Alexander's research regarding silicones consistent with the published scientific literature on the biocompatibility of silicones?

### QUESTION 4

Based upon his research as well as the generally accepted biocompatibility testing methodology standards, is it scientifically sound for Dr. Alexander to conclude that silicone has not been adequately tested for biocompatibility?

DATED this 16th day of August, 1996.

MARTIN, BISCHOFF, TEMPLETON, LANGSLET & HOFFMAN

By: /s/ Jonathan Hoffman
 Jonathan Hoffman, OSB # 75418

WELLS, ANDERSON & RACE

By: /s/ Mary Wells
 Mary Wells, Pro Hac Vice

Of Attorneys for Defendants,
 BAXTER HEALTHCARE CORPORATION
 and BAXTER INTERNATIONAL INC.

TOOZE, SHENKER, HOLLOWAY & DUDEN

By: _____
 Paul Duden, OSB # 66035

Of Attorneys for Defendant,
 BRISTOL–MYERS SQUIBB

MILLER, NASH, WIENER, HAGER & CARLSEN, LLP

By: _____
 William Crow, OSB # 61018

Of Attorneys for Defendant,
 MINNESOTA, MINING & MANUFACTURING COMPANY (3M)

Jonathan M. Hoffman, OSB # 75418
MARTIN, BISCHOFF, TEMPLETON LANGSLET & HOFFMAN
3100 First Interstate Tower
1300 SW Fifth Avenue
Portland, OR 97201–5667

Telephone: (503) 224–3113
Fax: (503) 224–9471

Mary A. Wells
WELLS, ANDERSON & RACE LLC
1700 Broadway, Suite 1850
Denver, CO 80290
Telephone: (303) 830–1212
Fax: (303) 830–0898

Kelly P. Corr
BOGLE & GATES
Two Union Square, 51st Floor
601 Union Street
Seattle, WA 98101
Telephone: (206) 682–5151
Fax: (206) 621–2660

Of Attorneys for Defendants,
BAXTER HEALTHCARE CORPORATION
and BAXTER INTERNATIONAL INC.

IN THE UNITED STATES
DISTRICT COURT

FOR THE DISTRICT OF OREGON

LeaAnn DeGraw Hall, Plaintiff,

v.

Baxter Healthcare Corporation,
et al., Defendants.

Case No. CV 92–182–JO–LEAD
94–892–JO
94–903–JO
94–907–JO

PROPOSED QUESTIONS REGARDING METHODOLOGY UTILIZED BY PLAINTIFFS' EXPERT PATHOLOGIST, NANCY HARDT, M.D.

Defendants, Baxter Healthcare Corporation and Baxter International Inc., Bristol–Myers Squibb, and 3M, state that plaintiffs have failed to satisfy their burden of proof concerning the admissibility of the testimony of Dr. Nancy Hardt. Plaintiffs did not submit any briefing in opposition to· defendants' motion to exclude the testimony of this witness, nor did plaintiffs submit an affidavit from any expert supporting the methodology used by this witness in forming her opinions. Therefore, defendants request that this Court grant their motion *in limine* and exclude the testimony of Dr. Hardt.

To assist the Court in making its decision, defendants propose that the following questions be considered regarding the methodology utilized by Dr. Hardt:

## QUESTION 1

Have plaintiffs established by the greater weight of the evidence that Dr. Nancy Hardt's opinion, that silicone migrates through the breast capsule, is based on valid scientific methodologies?

## QUESTION 2

Given that Dr. Nancy Hardt has not examined tissue slides from any portion of the anatomy of the four *Andrews* plaintiffs other than the breast capsule, is her opinion that silicone has migrated outside the breast capsule in these women based on accepted scientific or medical practices or methodologies?

## QUESTION 3

Is any portion of Dr. Hardt's opinions as described in her witness statement based on speculation, hypotheses, or assumptions?

## QUESTION 4

Is Dr. Hardt qualified to testify as to any alleged chemical interaction between silicone and protein?

DATED this 16th day of August, 1996.

MARTIN, BISCHOFF, TEMPLETON, LANGSLET & HOFFMAN

By: /s/ Jonathan Hoffman
　　Jonathan Hoffman, OSB # 75418

WELLS, ANDERSON & RACE

By: /s/ Mary Wells
　　Mary Wells, Pro Hac Vice

　　Of Attorneys for Defendants,
　　BAXTER · HEALTHCARE CORPORATION
　　and BAXTER INTERNATIONAL INC.

TOOZE, SHENKER, HOLLOWAY & DUDEN

By: ——————————————
　　/s/Paul Duden, OSB # 66035

　　Of Attorneys for Defendant,
　　BRISTOL–MYERS SQUIBB

MILLER, NASH, WIENER, HAGER & CARLSEN, LLP

By: _____
William Crow, OSB # 61018

Of Attorneys for Defendant,
MINNESOTA, MINING & MANU-FACTURING COMPANY (3M)

Michael L. Williams, OSB # 78426
Gayle L. Troutwine, OSB # 83106
Kathleen M. Dailey, OSB # 88188
Kathryn A. Stebner, OSB # 93126
WILLIAMS & TROUTWINE, P.C.
1001 S.W. Fifth Avenue, Suite 1900
Portland, Oregon 97204
(503) 295–2924

Of Attorneys for Plaintiffs

IN THE UNITED STATES
DISTRICT COURT

FOR THE DISTRICT OF OREGON

In re Breast Implant Litigation Pending in the United States District Court, District of Oregon (Group 1)

Case Nos.
Group 1: 92–182–JO LEAD
94–892–JO
94–903–JO
94–907–JO

PLAINTIFFS' PROPOSED QUESTION REGARDING NMR TECHNOLOGY AND THE PUBLISHED PEER-REVIEWED STUDIES OF DR. GARRIDO AND OTHERS

Plaintiffs propose the following question regarding nuclear magnetic resonance (NMR) technology:

**QUESTION**

Is nuclear magnetic resonance (NMR) technology, as used by Leoncio Garrido and his colleagues and other groups conducting research on silicone, a scientifically valid method to identify and monitor the presence of silicon compounds in tissue and blood and to detect changes in the chemical composition of silicone after it has been introduced into animals and humans when:

A. Results have been published in three different peer-reviewed journals on eight different occasions between 1991 and 1995, as follows:

1. Garrido, L., Mark, J.E., Sun, C.C., Ackerman, J.L., Chang, C., *NMR Characterization of Elastomers Reinforced With In Situ Precipitated Silica*, 24(14) MACROMOLECULES, 4067–72 (1991).

2. Pfleiderer, B., Ackerman, J.L., Garrido, L., *In Vivo $^1H$ Chemical Shift Imaging of Silicone Implants*, 29(5) MAGNETIC RESONANCE IN MEDICINE 656–6549 (1993).

3. Garrido, L., Pfleiderer, B., Papisov, M.; Ackerman, J.L., *In Vivo Degradation of Silicones*, 29(6) MAGNETIC RESONANCE OF MEDICINE, 839–843 (1993).

4. Pfleiderer, B., Ackerman, J.L., Garrido, L., *In Vivo Localized Proton NMR Spectroscopy of Silicone*, 30 MAGNETIC RESONANCE IN MEDICINE 149–154 (1993).

5. Pfleiderer, B., Ackerman, J.L., Garrido, L., *Migration and Biodegradation of Free Silicone Gel–Filled Implants after Long–Term Implantation*, 30 MAGNETIC RESONANCE IN MEDICINE 534–543 (1993).

6. Garrido, L., Pfleiderer, B., Jenkins, B.G., Hulka, C.A., Kopans, D.B., *Migration and Chemical Modification of Silicone in Women with Breast Prostheses*, 31 MAGNETIC RESONANCE IN MEDICINE 328–330 (1994).

7. Pfleiderer, B., Xu, P., Ackerman, J.L., Garrido, L., *Study of Aging of Silicone Rubber Biomaterials with NMR*, 29 J.BIOMEDICAL MATERIALS RESEARCH 1129–140 (1995).

8. Pfleiderer, B., Garrido, L., *Migration and Accumulation of Silicone in the Liver of Women with Silicone Gel–Filled Breast Implants*, 33(1) MAGNETIC RESONANCE IN MEDICINE 8–17 (1995).

B. Additional abstracts have been published or presented to colleagues at scientific conferences, as follows:

1. Garrido, L., Pfleiderer, B., Ackerman, J.L., Moore, J., *Characterization of Biomaterials with NMR*, Materials Research Society Symposium Proceedings, 217:49–54 (1991).

2. Pfleiderer, B., Moore, J., Ackerman, J.L., Garrido, L., *Study of the Aging Pro-*

cess of PDMS Implants In Vivo and Ex Vivo by Nuclear Magnetic Resonance Spectroscopy and Imaging, 33([1]) POLYMER PREPRINTS (published by the American Chemical Society) 767–768 (1992).

3. Garrido, L., Pfleiderer, B., Ackerman, J.L., Brady, T.J., Detection of Silicone Migration and Biodegradation with NMR, Abstract Presented at the National Institutes of Health Immunology of Silicones Workshop, Bethesda, Maryland, Mar. 13–14, 1995.

C. Data is the result of a collaborative effort of multiple scientists at the NMR Center, Department of Radiology, Massachusetts General Hospital and Harvard Medical School;

D. Data is the result of numerous tests run on animal and human tissue and blood samples;

E. Other scientists in the field, including those who work for the Center for Devices and Radiological Health, FDA, use almost identical methods to identify silicone in tissue and blood; [1,2]

F. Local NMR specialist, Dr. David Peyton, from Portland State University agrees that Dr. Garrido is most likely seeing a real silicone signal, even in the one study that is being questioned by Dr. Peter Macdonald.[3]

G. Only one paper exists that criticizes a single conclusion made by Dr. Garrido's group when they used a single NMR technique [4] to identify silicone levels in the blood but which does not address any other conclusions made, the appropriateness of NMR techniques to identify molecule structure in general [5] or other NMR techniques used by Dr. Garrido in identifying or analyzing silicone in any other circumstance; [6] and has

1. Mukundan, S. Jr., Dixon, W.T., Kruse, B.d., Monticciolo, D.L., Nelson, R.C., MR Imaging of Silicone Gel–Filled Breast Implants In Vivo with a Method That Visualizes Silicone Selectively, 3(5) JOURNAL OF MAGNETIC RESONANCE IMAGING 713–717 (1993). This article concluded that using STIR (short-inversion-time inversion-recovery) technique combined with a radio-frequency pulse frequently used for water suppression in spectroscopy was a successful method to identify silicone leakage in tissue. This technique is substantially similar to what Garrido describes as [1]H NMR.

2. Rajan, S.S., Clauw, D.J., Grossman, L.W., Myers, K.J., Patt, R.H., Breath–Hold MRS for the Detection of Silicone Migration to the Liver, Abstract Presented at the Proceedings of the Society of Magnetic Resonance and the European Society for Magnetic Resonance in Medicine and Biology, Nice, France, Aug. 19–25, 1995. This abstract concluded that MRS (a single-voxel proton spectroscopy technique) was a valid and efficient way to obtain a liver spectrum. This technique is substantially similar to what Garrido describes as [1]H NMR.

3. Testimony of Dr. David Peyton (In re Breast Implant Litigation Pending in the U.S. Dist. Court, Dist. of Oregon (Groups 1, 2, and 3, Transcript of Pre–Trial Proceedings, Aug. 7, 1996, at 605, 608, 617).

4. The only technique and question addressed by Macdonald, P., et al. in Failure of $^{29}Si$ NMR to Detect Increased Blood Silicon Levels in Silicone Gel Breast Implant Recipients, 67(20) ANALYTICAL CHEMISTRY 3799–3801, 3799 (1995): is $^{29}Si$ NMR a scientifically valid technique to detect the pres-

ence of silicone in the blood of women with breast implants?

5. Dr. Peter Macdonald admits that NMR is a proper technique to determine the structure of molecules. Testimony of Dr. Peter Macdonald (In re Breast Implant Litigation Pending in the U.S. Dist. Court, Dist. of Oregon (Groups 1, 2, and 3, Transcript of Pre–Trial Proceedings, Aug. 7, 1996, at 550) ("Testimony of Dr. Peter Macdonald"). He goes on to say that through the NMR technique a signal or spectrum is created and "from this so-called NMR spectrum we can draw conclusions regarding the structure of the molecule that we put in the NMR spectrometer." Id. at 552. Hence, all that Dr. Macdonald is actually criticizing is the conclusions Dr. Garrido and his group made, rather than the methods used to identify the structure of the molecules in question.

6. The use of AA in quantifying the concentration of silicon in the blood of women with breast implants has been criticized. "[T]he difference between values between AA and NMR could be due to the fact that Macdonald's study "is flawed by improper experimental design" in that "part or all of the silicone may be lost during the [AA] preparations steps, drying & oxidation & prior to detection by AA. The analysis of blood by NMR does not require sample preparation and all silicon compounds present in the blood are measured at the same time." Garrido, L., Ackerman, J.L., Re: Do Patients with Silicone–Gel Breast Implants Have Elevated Levels of Blood Silicon Compared with Control Patients? (letter to the editor) 35(4) ANNALS OF PLASTIC SURGERY 441–442 (1995).

only used one set of samples in attempting to confirm the work of Dr. Garrido and his colleagues;

H. Even the study which allegedly brings Dr. Garrido's methodology into question confirms Dr. Garrido's ultimate conclusions.[7]

DATED this 13th day of July, 1996.

Respectfully Submitted,

WILLIAMS & TROUTWINE, P.C.

/s/ [Signature]

Michael L. Williams, OSB # 78426
Gayle L. Troutwine, OSB # 83106
Kathleen M. Dailey, OSB # 88188
Kathryn A. Stebner OSB # 93126
Of Attorneys for Plaintiffs

Mike L. Williams, OSB # 78426
Gayle L. Troutwine, OSB # 83106
Kathleen M. Dailey, OSB # 88188
Kathryn A. Stebner, OSB # 93126

WILLIAMS & TROUTWINE, P.C.

1001 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: (503) 295–2924

Of Attorneys for Plaintiffs

Pursuant to L.R. 120–1(c), a complete list of all counsel submitting this document for filing appear on the signature page to this motion.

It should also be noted that Dr. Macdonald doesn't consider himself an expert in AA spectroscopy. "Well, I—I state openly, I am not an expert in atomic absorption spectroscopy." Testimony of Dr. Peter Macdonald at 600.

7. Although Dr. Macdonald, et al. could not obtain the exact same levels of blood silicon in their experiment using both Si NMR and atomic absorption (AA) spectroscopy, they reached the same conclusion on the levels that Dr. Macdonald, et al. could obtain: "somewhat higher values [of blood silicon levels] were found in patients with implants" than in the control patients. Macdonald, P., et al. *Failure of $^{29}Si$ NMR to Detect Increased Blood Silicon Levels in Silicone Gel Breast Implant Recipients*, 67(20) Analytical Chemistry 3799–3801, 3799 (1995).

Dr. Macdonald also admits, "[e]arlier studies from Dr. Peters and Dr. Smith, at the University of Toronto in which I was not involved, but with which I am familiar, they found that there was a significantly higher level of silicon in the blood of breast implant patients … about twice as much." Testimony of Dr. Peter Macdonald at 580.

IN THE UNITED STATES
DISTRICT COURT

FOR THE DISTRICT OF OREGON

In re Breast Implant Litigation Pending in the United States District Court, District of Oregon (Group 1)

Case Nos.
Group 1: 92–182–JO–LEAD;
94–892–JO
94–903–JO;
94–907–JO

PLAINTIFFS' PROPOSED QUESTIONS REGARDING CHEMISTRY AND PLAINTIFFS' EXPERT CHEMIST

Plaintiffs propose the following questions regarding chemistry and expert chemist, Christopher D. Batich, Ph.D.

### QUESTION 1

Have plaintiffs established by the greater weight of evidence that Dr. Batich used a scientific methodology to arrive at his conclusion that silicone liquid, in the form of microdroplets, as well as isolated small molecules, diffuse through the thin silicone elastomer and migrate throughout the body, by using the following methodology?

A. Reviewing the medical literature that demonstrates silicone fluids injected into animals are picked up by macrophages and migrate throughout the body? (Ex. C, # 1, 2, 3)

B. By reviewing the medical literature on migration of silicone in women:

(1) Dr. Nancy Hardt's studies; (Ex. A # 100, 162, 163)

(2) Dr. Garrido's studies on migration in animals; Ex. C, # 4, 5, 6, 7, 8)

(3) Dr. Garrido's studies on migration in women; (Ex. A, # 3, 6)

(4) The FDA abstract confirming migration of silicone to the liver of women using NMR techniques; (Ex. A, # 80)

(5) Published studies showing elevated levels of silicon in tissue and blood of implanted women. (Ex. A, # 97, 98, 166, 167; Ex. C, # 9)

C. By reviewing internal Dow Corning reports showing migration of silicone in animals to distant parts of the body; (Ex. C, # 10; Ex. B, Le78.DC, La68, K087, Cu85, Re67, Tr88)

D. By conducting his own studies showing that silicone leaves the implant and migrates to the brains of animals; (Ex. C, # 11)

E. By reviewing the literature indicating that the 80% liquid constituting the bulk of the silicone gel materials inside an implant steadily depolymerizes, forming new low molecular weight silicone chains as the earlier formed ones bleed out and diffuse into the body; (Ex. C, # 13; Ex. B, MC87–DC)

F. By conducting his own peer-reviewed, published gel bleed study? (Ex. C, # 12)

## QUESTION 2

Have plaintiffs established by the greater weight of the evidence that Dr. Batich used scientific methodology to arrive at his conclusion that silicone is chemically changed in the body in ways that would make it more biologically active?

A. By reviewing internal Dow Corning studies on metabolism of silicone compounds in animals? (Ex. C, # 14, 15)

B. By reviewing published reports in the scientific literature, and sworn expert testimony of Dow Corning chemists, on the degradation of silicones into silica in the environment? (Ex. C, # 16, 17; Ex. B, An94–Dc; Ex. B, Vo82, Ge82 & Ma83)

C. By reviewing published reports in the scientific literature showing that silicone physical properties decline over time when exposed to the body's environment? (Ex. A, # 18; Ex. C, # 22, 23)

D. By reviewing internal Dow Corning studies showing that in people who accidentally inhaled vapors of silicone, the methyl groups were chemically removed before the material was excreted in urine? (Ex. B, An80–Dc)

E. By conducting his own experiment with his masters student, Mr. DePalma, using contact angle measurements to estimate the rate of change to a hydrophilic surface, (i.e., rate of formation of silanol groups on silicone surfaces in the body), and by reviewing the Dow Corning (Kennan) study which confirmed the DePalma data? (Ex. C, # 20, 21)

F. By reviewing studies which show that the toxic effects of both crystalline and amorphous silica derive from the surface chemistry of silanol group formation on particles inside cells, indicating that there is no qualitative difference, only a quantitative difference, between the cellular toxicity of amorphous and crystalline silica? (Ex. A, # 30, 40, 45, 115, 112; Ex. B, Zh87a, Le78dc, Ra90)

G. By conducting his own research to conclude that the surface area of silicone microdroplets exposed to the body's chemical machinery greatly increases over time? (Ex. A, # 45)

H. By reviewing published, peer reviewed studies demonstrating silicone degradation in animals? (Ex. B FE70, FE67; Ex. C, 19)

I. By reviewing published, peer-reviewed articles containing evidence of silicone degradation in *in vitro* experiments, animals and humans? (Ex. A # 43, 169; Ex. B Ga93a, COc76, SP80–dc)

Respectfully submitted, this 13th day of August, 1996.

WILLIAMS & TROUTWINE, P.C.

By /s/ [Signature]
 Michael L. Williams OSB # 78426
 Gayle L. Troutwine, OSB # 83106
 Kathleen M. Dailey, OSB # 88188
 Kathryn A. Stebner, OSB # 93126
 Of Attorneys for Plaintiffs

## EXHIBIT A

1. Smalley, D.L.;, D.R.; Hall, M.F.; Stevens, M.V.; Hanissian, A.; "Immunologic Stimulation of T Lymphocytes by Silica After Use of Silicone Mammary Implants", *The FASEB Journal,* 9:424–427 (March 1995).

2. Ciapetti, G.; Granchi, D.; Stea, S.; Cenni, E.; Schiavon, P.; Giuliane, R.; Pizzoferrato, A.; "Assessment of Viability and Proliferation of In Vivo Silicone–Primed Lymphocytes after In Vitro Re–Exposure to Silicone", *Journal of Biomedical Materials Research,* 29:583–590 (1995).

3. Ojo–Amaize, E.A.; Conte, V.; Bin, H–C; Brucker, R.F.; Agopian, M.S.; Peter, J.B.; "Silicone–Specific Blood Lymphocyte Response in Women with Silicone Breast Implants", *Clinical and Diagnostic Laboratory Immunology,* 1(6):689–695 (November 1994).

4. Narini, P.P.; Semple, J.L.; Hay, J.B.; "Repeated Exposure to Silicone Gel Can Induce Delayed Hypersensitivity", *Plastic and Reconstructive Surgery,* 96(2):371–380 (August 1995).

5. Wolf, L.E.; Lappe, M.; Peterson, E.D.; Ezrailson, E.G.; "Human Immune Response to Polydimethylsiloxane (Silicone): Screening Studies in a Breast Implant Population", *The FASEB Journal,* 7:1265–1268 (October 1993).

6. Heggers, J.; Kossovsky, N.; Parsons, R.W.; Robson, M.C.; Martin, E.; Pelley, R.P.; Raine, T.J.; "Biocompatibility of Silicone Implants", *Annals of Plastic Surgery,* 2(1):38–45 (July 1983).

7. Kossovsky, N.; Heggers, J.P.; Parsons, R.W.; Robson, M.C.; "Analysis of the Surface Morphology of Recovered Silicone Mammary Prostheses and Discussion by Anderson, J.M.", *Plastic and Reconstructive Surgery,* 71(6):795–804 (June 1983).

8. Kossovsky, N.; Heggers, J.P.; Robson, M.C., "Experimental Demonstration of the Immunogenicity of Silicone–Protein Complexes", *Journal of Biomedical Materials · Research,* 21:1125–1133 (1987).

9. Kossovsky, N.; Heggers, J.P.; Robson, M.C.; The Bioreactivity of Silicone", *CRC Critical Review of Bioreactivity,* 3(1):53–85 (1987).

10. Kossovsky, N.; Freiman, C.J.; Stassi, J.B.; Mena, E.; "Cytokine Expression in Response to Biomaterials", *Immunomethods,* 343–49 (1993).

11. Kossovksy, N.; "Death of the Non–Specific Foreign Body Reaction", *Trends in Polymer Science,* 1(7):190–191 (1993).

12. Kossovsky, N.; Freiman, C.J.; "Silicone Breast Implant Pathology", *Archives of Pathology and Laboratory Medicine,* 118:686–693 (July 1994).

13. Kossovsky, N.; Gelman, A., Hnatyszyn, H.J.; Rajguru, S.; Mena, E.A., Crowder, J.; Torres, M.; Zemanovich, G.; "Abstract—Adjuvant Effect of Silicone on the Formation of Anti–Insulin and Anti–Fibronectin Antibodies", *Presentation at the American College of Rheumatology Meeting,* No. 668 (1994).

14. Kossovsky, N.; Freiman, C.J.; "Review–Physicochemical and Immunological Basis of Silicone Pathophysiology", *Journal of Biomaterials Science Polymer Edition,* 7(2):101–113 (1995).

15. Kossovsky, N.; Heggers, J.P.; Parson, R.W.; Robson, M.C.; "Acceleration of Capsule Formation Around Silicone Implants in a Guinea Pig Model with Discussion by Anderson, J.M.", *Plastic and Reconstructive Surgery,* 73(1):91–96 (January 1984).

16. Kossovsky, N.; Zeidler, M.; Chun, G.; Nguyen, A.; Rajguru, S.; Stassl, J.; Gelman, A.; Sponsler, E.; "Surface Dependent Antigens Identified by High Binding Avidity of Serum Antibodies in a Subpopulation of Patients with Breast Prostheses", *Journal of Applied Biomaterials*, 4:281–288 (1993).

17. McDonald, A.H.; Medical College of Wisconsin; Weir, K.; Sanger, J.R.; "Silicone–Induced T Cell Proliferation in Mice", *Current Topics in Microbiology and Immunology—Immunology of Silicones*, Potter, M. and Rose, N.; Editors, No. 210, Springer–Verlag, Heidelberg, pgs. 189–198, 1996.

18. Potter, M.; Morrison, S.; Wiener, F.; Zhang, S.K.; Miller, F.W.; "Induction of Plasmacytomas with Silicone Gel in Genetically Susceptible Strains of Mice", *Journal of the National Cancer Institute*, 86(14):1058–1065 (July 1994).

19. Claman, H.; Robertson, A.D.; "Antinuclear Antibodies and Breast Implants", *Western Journal of Medicine*, 160:225–228 (1994).

20. Bar–Meir, E.; Teuber, S.S.; Line, H.C.; Alosacie, L.I.; Goddard, G.; Terybery, J.; Barka, N.; Shen, B.; Peter, J.B.; Blank, M.; Gershwin, M.E.; Shoenfeld, Y.; "Multiple Autoantibodies in Patients with Silicone Breast Implants", *Journal of Autoimmunity*, 8:267–277 (1995).

21. Teuber, S.S.; Yoshida, S.H.; Gershwin, M.E.; "Immunopathologic Effects of Silicone Breast Implants", *Western Journal of Medicine*, 162(5):418–425 (May 1995).

22. Rowley, M.J.; Cook, A.D.; Teuber, S.S.; Gershwin, M.E.; "Antibodies to Collagen: Comparison Epitope Mapping in Women with Silicone Breast Implants, Systemic Lupus Erythematosus and Rheumatoid Arthritis", *Journal of Autoimmunity*, 7:775–789 (1994).

23. Yoshida, S.H.; Teuber, S.S.; German, J.B.; Gershwin, M.E.; "Immunotoxicity of Silicone: Implications of Oxidant Balance Towards Adjuvant Activity, *Fd.Chem.Tox.*, 32(11):1089–1100 (1994).

24. Yoshida, S.H.; Chang, C.C.; Teuber, S.S.; Gershwin, M.E.; "Silicon and Silicone: Theoretical and Clinical Implications of Breast Implants", *Regulatory Toxicology and Pharmacology*, 17(1):3–18 (February 1993).

25. Yoshida, S.; Gershwin, M.E.; "Autoimmunity and Selected Environmental Factors of Disease Induction", *Seminars in Arthritis and Rheumatism*, 22(6):339–419 (June 1993).

26. Yoshida, S.H.; Swan, S.; Teuber, S.; Gershwin, M.E.; "Silicone Breast Implants: Immunotoxic and Epidemiologic Issues", *Life Sciences*, 56(16):1299–1310 (1995).

27. Dobke, M.K.; Svahn, J.K.; Vastine, V.L.; Landon, B.N.; Stein, P.C.; Parsons, C.L.; "Characterization of Microbial Presence at the Surface of Silicone Mammary Implants", *Annals of Plastic Surgery*, 34(6):563–571 (June 1995).

28. Su, C.W.; Dreyfuss, D.A.; Krizek, T.J.; Leoni, K.J.; "Silicone Implants and the Inhibition of Cancer with Discussion by Brody, G.S.", *Plastic and Reconstructive Surgery*, 96(3):513–520 (September 1995).

29. BLANK

30. Shanklin, D.R.; Smalley, D.L.; "Quantitative Aspects of Cellular Responses to Silicone", *International Journal of Occupational Medicine and Toxicology*, 4(1):99–111 (1995).

31. Robinson, G.O.; Bradley, E.L.; Wilson, D.S.; "Analysis of Explanted Silicone Implants: A Report of 300 Patients", *Annals of Plastic Surgery*, 34(1):1–6 (January 1995).

32. deCamara, D.L.; Sheridan, J.M.; Kammer, B.A.; "Rupture and Aging of Silicone Gel Breast Implants", *Plastic and Reconstructive Surgery*, 21(5):828–834 (April 1993).

33. Vojdani, A.; Brautbar, N.; Campbell, A.; "Immunologic and Biologic Markers for Silicone", *Journal of Toxicolo-*

*gy and Industrial Health,* 10(½):25–42 (1994).

34. Hess, E.V.; "Editorial—Environmental Lupus Syndromes", *British Journal of Rheumatology,* 34(7):597–599 (1995).

35. Goldblum, R.M.; Pelley, R.P.; O'Donnell, A.A.; Pyron, D.; Heggers, J.P.; "Antibodies to Silicone Elastomers and Reactions to Ventriculoperitoneal Shunts", *The Lancet,* 340:510–513 (1992).

36. Pfleiderer, B.; Garrido, L.; "Migration and Accumulation of Silicone in the Liver of Women with Silicone Gel–Filled Breast Implants", *Magnetic Resonance in Medicine,* 33:8–17 (1995).

37. Garrido, L.; Pfleiderer, B.; Papisov, M.; Ackerman, J.L.; "In Vivo Degradation of Silicones", *Magnetic Resonance in Medicine,* 29(6):839–843 (June 1993).

38. Pfleiderer, B.; Ackerman, J.L.; Garrido, L.; "Migration and Biodegradation of Free Silicone Gel–Filled Implants after Long–Term Implantation", *Magnetic Resonance in Medicine,* 30:534–543 (1993).

39. Garrido, L.; Pfleiderer, B.; Jenkins, B.G.; Hulka, C.A.; Kopans, D.B.; "Migration and Chemical Modification of Silicone in Women with Breast Protheses", *Magnetic Resonance in Medicine,* 31:328–33– (1994).

40. Picha, G.J.; Goldstein, J.A.; "Analysis of the Soft–Tissue Response to Components used in the Manufacture of Breast Implants: Rat Animal Model", *Plastic and Reconstructive Surgery,* 87(3):490–500 (March 1991).

41. Claman, H.N.; Robertson, A.D.; "Antinuclear Antibodies in Apparently Healthy Women with Breast Implants", *Current Topics in Microbiology and Immunology—Immunology of Silicones,* Potter, M. and Rose, N.; Editors, No. 210, Springer–Verlag, Heidelberg, pgs 265–268 (1996).

42. Hill, S.L.; Landaver, G.; Rose, N.R.; "The Adjuvant Effect of Silicone Gel and Silicone Elastomer Particles in Rats", *Current Topics in Microbiology and Immunology—Immunology of Silicones,* Potter, M. and Rose, N.; Editors, No. 210, Springer–Verlag, Heidelberg, pgs. 123–137 (1996).

43. Garrido, L.; Bogdanova, A.; Cheng, L.L.; Pfleiderer, B.; Todareva, E.; Ackerman, J.L.; Brady, T.J.; "Detection of Silicone Migration and Biodegradation with NMR", *Current Topics in Microbiology and Immunology—Immunology of Silicones,* Potter, M. and Rose, N.; Editors, Springer–Verlag, Heidelberg, pgs. 49–58 (1996).

44. Meyers, C.A.; Scheibel, R.S.; Forman, A.D.; "Persistent Neurotoxicity of Systemically Administered Interferon–Alpha", *Neurology,* 41:672–676 (1991).

45. Batich, C.; Depalma, D.; Marotta, J.; Latorre, G.; Hardt, N.S.; "Silicone Degradation Reactions", *Current Topics in Microbiology and Immunology—Immunology of Silicones,* Potter, M. and Rose, N.; Editors, Springer–Verlag, Heidelberg, pgs. 13–23 (1996).

46. Alving, C.R.; Wassef, N.M.; Potter, M.; "Antibodies to Cholesterol: Biological Implications of Antibodies to Lipids", *Current Topics in Microbiology and Immunology—Immunology of Silicones,* Potter, M. and Rose, N.; Editors, No. 210, Springer–Verlag, Heidelberg, pgs. 181–186 (1996).

47. Felix, K.; Janz, S.; Pitha, J.; Williams, J.A.; Mushinski, E.B.; Bornkamm, G.W.; Potter, M.; "Cytotoxicity and Membrane Damage In Vitro by Inclusion Complexes Between Gamma–Cyclodextrin and Siloxanes", *Current Topics in Microbiology and Immunology–Immunology of Silicones,* Potter, M.; and Rose, N.; Editors, No. 210, Springer–Verlag, Heidelberg, pgs. 93–99, 1996.

48. Raso, D.S.; Green, W.B.; Vesely, J.J.; Willingham, M.C.; "Light Microscopy Techniques for the Demonstration of Silicone Gel", *Archives of Pathology &*

**1426**

*Laboratory Medicine,* 118:984–987 (1994).

49. Langer, A.M.; Nolan, R.P.; "Physicochemical Properties of Quartz Controlling Biological Activity", *Silica, Silicosis, and Cancer—Surface Properties,* pgs. 125–135.

50. Nicholson, J.J.; Wong, G.E.; Frondoza, C.G.; Rose, N.R.; "Silicone Gel and Octmethylcyclotetrasiloxane Potentiate Antibody Production to Bovine Serum Albumin in Mice", *Current Topics in Microbiology and Immunology—Immunology of Silicones,* Potter, M. and Rose, N.; Editors, No. 210, Springer–Verlag, Heidelberg, pgs. 139–144, 1996.

51. Pavol, M.A.; Meyers, C.A.; Rexer, J.L.; Valentine, A.D.; Mattis, P.J.; Talpaz, M.; "Pattern of Neurobehavioral Deficits Associated with Interferon Alfa Therapy for Leukemia", *Neurology,* 45:947–950. (May 1995).

52. Naim, J.O.; Ippolito, K.M.L.; Lanzafame, R.J.; van Oss, C.J.; "Induction of Type II Collagen Arthritis in the DA Rat Using Silicone Gel as Adjuvant", *Current Topics in Microbiology and Immunology—Immunology of Silicones,* Potter, M. and Rose, N.; Editors, No. 210, Springer–Verlag, Heidelberg, pgs. 106–111, 1996.

53. Wall, W.; Martin, L.; Fritzler, M.J.; Edworthy, S.; "Letter—Non-fasting Chylomicronaemia in Breast Implant Patients", *The Lancet,* 345:1380 (May 27, 1995).

54. Harbut, M.; "Speaker Abstract—An Occupational Medicine Approach to the SBI Patient", *Presentation at Conference Sponsored by The Institute for Occupational & Environmental Medicine,* Cobo Hall, Detroit MI (September 28, 1995).

55. Boley, W.F.; LeVier, R.; "Immunological Enhancing Activities of Organosilicon Compounds and Nonfunctional Fluids", *Dow Corning Internal Study,* (October 1974).

56. Lake, R.S.; Radonovich, M.F.; "Action of Polydimethylsiloxanes on the Reticuloendothelial System of Mice: Basic Cellular Interactions and Structure–Activity Relationships", *Dow Corning Internal Study,* (October 30, 1975).

57. Haustein, U.F.; Ziegler, V.; "Environmentally Induced Systemic Sclerosis–Like Disorders", *International Journal of Dermatology,* 24(3):147–151 (April 1985).

58. Haustein, U.F.; Ziegler, V.; Hermann, K.; Mehlhorn, J.; Schmidt, C.; "Silica–Induced Scleroderma", *Journal of the American Academy of Dermatology,* 22(3):444–448 (March 1990).

59. Koeger, A–C; Marre, J–P; Rozenberg, S.; Gutmann, L.; Bourgeois, P.; "Maladies Auto–Immunes Apres´ Expositions Inhabituelles a' la Silice ou aux Silicones", *Ann.Med.Interne.,* 143(3):165–170 (1992).

60. Burrell, R.; "Immunological Aspects of Silica", *Health Effects of Synthetic Silica Particulates,* pages 82–93. Symposium sponsored by ASTM Committee E–34 on Occupational Health and Safety and the Industrial Health Foundation, Spain, Nov. 5–6, 1979.

61. Naim, J.O.; Lanzafame, R.J.; van Oss, C.J.; "The Adjuvant Effect of Silicone–Gel on Antibody Formation in Rats", *Immunological Investigations,* 22(2):151–161 (1993).

62. Naim, J.O.; Ippolito, K.M.L.; Lanzafame, R.J.; van Oss, C.J.; "The Effect of Molecular Weight and Gel Preparation on Humoral Adjuvancy of Silicone Oils and Silicone Gels", *Immunological Investigations,* 24(3):537–547 (1995).

63. Naim, J.O.; Lanzafame, R.J.; van Oss, C.J.; "The Effect of Silicone–Gel on the Immune Response", *Journal of Biomaterial Science Polymer Edition,* 7(2):123–132 (1995).

64. Ojo–Amaize, E.A.; Lawless, O.J.; Peter, J.B.; "Abstract—Elevated Plasma concentrations of Interleukin—1 Beta and Interleukin—1 Receptor Antagonist in Women with Silicone Breast Implants" (1995).

65. Sun, L.; Alexander, H.; Lattarulo, N.; Blumenthal, N.; Wu, J.; Ricci, J.; Chen, G.; "Conformational Change and Denaturation of Proteins by Cyclic Silicone", Abstract submitted to the Fifth World Biomaterials Congress, May 29–June 2, 1996, Toronto.

66. Rosenstreich, D.L.; Farrar, J.J.; Dougherty, S.; "Absolute Macrophage Dependency of T Lymphocyte Activation by Mitogens", *Journal of Immunology*, 116:131–139 (1976).

67. Hedfors, E.; Holm, G.; Pettersson, D.; "Activation of Human Peripheral Blood Lymphocytes by Concanavalin A Dependence of Monocytes", *Clinical Experimental Immunology*, 22:223–229 (1975).

68. Bradley, S.G.; White, K.L. Jr.; McCay, J.A.; Brown, R.D.; Musgrove, D.L.; Wilson, S.; Stern, M.; Luster, M.I.; Munson, A.E.; "Immunotoxicity of 180 Day Exposure to Polydimethylsiloxane (Silicone) Fluid, Gel and Elastomer and Polyurethane Disks in Female B6C3F1 Mice", *Drug and Chemical Toxicology*, 17(3):221–269 (1994).

69. Campbell, A.; Brautbar, N.; Vojdani, A.; "Suppressed Natural Killer Cell Activity in Patients with Silicone Breast Implants: Reversal Upon Explanation", *Toxicology and Industrial Health*, 10(3):149–154 (1994).

70. Kyle, R.A.; "Benign' Monoclonal Gammopathy—After 20 to 35 Years of Follow–Up" *Mayo Clinic Proceedings*, 68:26–36 (1993).

71. Diamond, D.J.; Szalay, P.; Symer, D.; Hao, P.; Shin, H.S.; Dintzis, H.M.; Reinherz, E.L.; Siliciano, R.F.; "Major Histocompatibility Complex Independent T Cell Receptor–Antigen Interaction: Functional Analysis Using Fluorescein Derivatives", *Journal of Experimental Medicine*, 174:229–241 (July 1991).

72. Ganju, R.K.; Smiley, S.T.; Bajorath, J.; Novotny, J.; Reinherz, E.L.; "Similarity Between Fluorescein–Specific T–Cell Receptor and Antibody in Chemical Details of Antigen Recognition", *Proceeding of the National Academy of Sciences, USA*, 89:11552–11556 (December 1992).

73. Bommer, J.; Ritz, E.; Waldherr, R.; Gastner, M.; "Letter—Silicone Cell Inclusions Causing Multi–Organ Foreign Body Reaction in Dialysed Patients", *The Lancet*, p. 1314 (June 13, 1981).

74. Leong, A.S.-Y.; Disney, A.P.S.; Gove, D.W.; "Letter—Refractile Particles in Liver of Haemodialysis Patients" *The Lancet*, p. 889–890 (April 18, 1981).

75. Kenik, J.; Radiographs of silicone synovitis in R first metatarsophalangeal joint 4 years after silastic arthroplasty, submitted as a clinical image to *Arthritis and Rheumatism*, October 1995.

76. Granchi, D.; Cavedagna, D.; Ciapetti, G.; Stea, S.; Schiavon, P.; Giulani, R.; Pizzoferrato, A.; "Silicone Breast Implants: The Role of Immune System on Capsular Contracture Formation", *Journal of Biomedical Materials Research*, 29:197–202 (1995).

77. Goldsmith, J.R.; Goldsmith, D.F.; "Fiberglass or Silica Exposure and Increased Nephritis or ESRD (End–Stage Renal Disease), *American Journal of Industrial Medicine*, 23873–881 (1993).

78. Steenland, K.; Brown, D.; "Mortality Study of Gold Miners Exposed to Silica and Nonasbestiform Amphibole Minerals: An Update with 14 More Years of Follow-up", *American Journal of Industrial Medicine*, 27:217–229 (1995).

79. Ueki, A.; Yamaguchi, M.; Ueki, H.; Watanabe, Y.; Ohsawa, G.; Kinugawa, K.; Kawakami, Y.; Hyodoh, F.; "Polyclonal Human T–Cell Activation by Silicate In Vitro", *Immunology*, 82:332–335 (1994).

80. Rajan, S.S.; Clauw, D.J.; Grossman, L.W.; Myers, K.J.; Patt, R.H.; "Breath–Hold MRS for the Detection of Silicone Migration to the Liver", Abstract presented at Proceedings of

1428

the Society of Magnetic Resonance and the European Society for Magnetic Resonance in Medicine and Biology. August 19-25, 1995, Nice, France.

81. Yoshino, S.; "Silicone-Induced Arthritis in Rats and Possible Role for T Cells", *Immunobiology*, 192:40-47 (1994).

82. Duvic, M.; Moore, D.; Menter, A.; Vonderheid, E.C.; "Cutaneous T-Cell Lymphoma in Association with Silicone Breast Implants", *Journal of the American Academy of Dermatology*, 32(6)939:942 (June 1995).

83. Young, V.L.; Nemecek, J.R.; Schwartz, B.D.; Phelan, D.L.; Schorr, M.W.; "HLA Typing in Women with Breast Implants", *Plastic and Reconstructive Surgery*, 96(7):1497-1520 (December 1995).

84. Cuellar, M.L.; Gluck, O.; Molina, J.F.; Gutierrez, S.; Garcia, C.; Espinoza, R.; Silicone Breast Implant-Associated Musculoskeletal Manifestations", *Clinical Rheumatology*, 14(6):667-672 (1995).

85. Leong, A. S-Y; Gove, D.W.; "Pathological Findings in Silicone Spallation In Vitro Studies", *Pathology*, 15:189-192 (1983).

86. Thomsen, J.L.; Christensen, L.; Nielsen, M.; Brandt, B.; Breiting, V.B.; Felby, S.; Nielsen, E.; "Histologic Changes and Silicone Concentrations in Human Breast Tissue Surrounding Silicone Breast Prostheses", *Plastic and Reconstructive Surgery*, 85(1):38-41 (January 1990).

87. Sluis-Cremer, G.K.; Hessel, P.A.; Nizdo, E.H.; Churchill, A.R.; Zeiss, E.A.; "Silica, Silicosis, and Progressive Systemic Sclerosis", *British Journal of Industrial Medicine*, 42:838-843 (1985).

88. Winding, O.; Christensen, L.; Thomsen, J.L.; Nielsen, M.; Breiting, V.; Brandt, B.; "Silicon in Human Breast Tissue Surrounding Silicone Gel Prostheses", *Scandinavian Journal of Plastic and Reconstructive Surgery*, 22:127-130 (1988).

89. Gedalia, A.; Cuellar, M.L.; Espinoza, L.R.; "Skin Rash and Anti-Ro/SS-A Antibodies in an Infant From A Mother With Silicone Breast Implants", *Clinical and Experimental Rheumatology*, 13:521-523 (1995).

90. Klockars, M.; Koskela, R-S.; Jarvinen, E.; Kolari, P.J.; Rossi, A.; "Silica Exposure and Rheumatoid Arthritis: A Follow Up Study of Granite Workers 1940-81", *British Medical Journal*, 294:997-1000 (April 18, 1987).

91. Koeger, A-C; Lang, T.; Alcaix, D.; Milleron, B.; Rozenberg, S.; Chaibi, P.; Arnaud, J.; Mayaud, C.; Camus, J-P; Bourgeois, P.; "Connective Tissue Disease Associated with Silicone Alveolitis Due to Silicone Spray. A Prospective Series", *Abstract presented at the American College of Rheumatology Annual Meeting*, October 1995, San Francisco, ACR Supplement, 8(9), Abstract No. 1136.

92. Wilson, S.D.; Munson, A.E.; "Silicone-Induced Modulation of Natural Killer Cell Activity", *Current Topics in Microbiology and Immunology—Immunology of Silicones*, Potter, M. and Rose, N.; Editors, No. 210, Springer-Verlag, Heidelberg, pgs. 199-208 (1996).

93. Silverman, S.; Vescio, R.; Silver, D.; Renner, S.; Weiner, S.; Berenson, J.; "Silicone Gel Implants and Monoclonal Gammopathies: Three Cases of Multiple Myeloma and the Prevalence of Multiple Myeloma and Monoclonal Gammopathy of Undetermined Significance", *Current Topics in Microbiology and Immunology—Immunology of Silicones*, Potter, M. and Rose, N.; Editors, No. 210, Springer-Verlag, Heidelberg, pgs. 367-374 (1996).

94. Garland, L.L.; Ballester, O.F.; Vasey, F.B.; Benson, K.; Moscinski, L.C.; Farmelo, M.J.; Rodriguez, M.J.; Rapaport, D.P.; "Multiple Myeloma in Women with Silicone Breast Implants. Serum Immunoglobulin and Interleukin-6 Studies in Women at Risk", *Cur-*

*rent Topics in Microbiology and Immunology—Immunology of Silicones,* Potter, M. and Rose, N.; Editors, Springer–Verlag, Heidelberg, pgs. 361–366 (1996).

95. Rabkin, C.S.; Silverman, S.; Tricot, T.; Garland, L.L.; Ballester, O.; Potter, M.; "The National Cancer Institute Silicone Implant/Multiple Myeloma Registry", *Current Topics in Microbiology and Immunology—Immunology of Silicones,* Potter, M. and Rose, N.; Editors, Springer–Verlag, Heidelberg, pgs. 385–387 (1996).

96. Potter M.; Morrison, S.; "Plasmacytoma Development in Mice Injected with Silicone Gels", *Current Topics in Microbiology and Immunology—Immunology of Silicones,* Potter, M. and Rose, N.; Editors, Springer–Verlag, Heidelberg, pgs. 397–407 (1996).

97. Peters, W.; Smith, D.; Lugowski, S.; McHugh, A.; Baines, C.; "Do Patients with Silicone–Gel Breast Implants Have Elevated Levels of Blood Silicon Compared with Control Patients?", *Annals of Plastic Surgery,* 34(4):343–347 (April 1995).

98. Peters, W.; Smith, D.; Lugowski, S.; McHugh, A.; MacDonald, P.; Baines, C.; "Silicon and Silicone levels in Patients with Silicone Implants", *Current Topics in Microbiology and Immunology—Immunology of Silicones,* Potter, M. and Rose, N.; Editors, No. 210, Springer–Verlag, Heidelberg, pgs. 39–48 (1996).

99. O'Hanlon, T.P.; Ikada, S.; Love, L.A.; Dick, G.; Young, V–L; Miller, F.W.; "Immunohistopathology and T Cell Receptor Gene Expression in Capsules Surrounding Silicone Breast Implants", *Current Topics in Microbiology and Immunology—Immunology of Silicones,* Potter, M. and Rose, N.; Editors, No. 210, Springer–Verlag, Heidelberg, pgs. 237–242 (1996).

100. Hardt, N.S.; Emery, J.A.; Latorre, G.; Batich, C.; Winter, W.E.; "Macrophage–Silicone Interactions in Women with Silicone Breast Prostheses", *Current Topics in Microbiology and Immunology—Immunology of Silicones,* Potter, M. and Rose, N.; Editors, Springer–Verlag, Heidelberg, pgs. 245–252 (1996).

101. Hennekens, C.H.; Lee, I–H; Cook, N.R.; Hebert, P.R.; Karlson, E.W.; LaMotte, F.; Manson, J.E.; Buring, J.E.; "Self–Reported Breast Implants and Connective–Tissue Diseases in Female Health Professionals", *JAMA,* 275(8):616–621 (February 28, 1996).

102. Sanchez–Guerrero, J.; Colditz, G.A.; Karlson, E.W.; Hunter, D.J.; Speizer, F.E.; Liang, M.H.; "Silicone Breast Implants and the Risk of Connective–Tissue Diseases and Symptoms", *The New England Journal of Medicine,* 332(25):1666–1670 (June 22, 1995).

103. Gabriel, S.E.; O'Fallon, M.; Kurland, L.R.; Beard, C.M.; Woods, J.E.; Melton, L.J.; "Risk of Connective–Tissue Diseases and Other Disorders after Breast Implantation", *The New England Journal of Medicine,* 330(24):1697–1702 (June 16, 1994).

104. Steenland, K.; Goldsmith, D.F.; "Silica Exposure and Autoimmune Diseases", *American Journal of Industrial Medicine,* 28:603–608 (1995).

105. Sanchez–Roman, J.; Wichmann, I.; Salaberri, J.; Varela, J.M.; Nunez–Roldan, A.; "Multiple Clinical and Biological Autoimmune Manifestations in 50 Workers After Occupational Exposure to Silica", *Annals of Rheumatic Diseases,* 52:534–538 (1993).

106. Bridges, A.J.; Anderson, J.D.; Burns, D.E.; Kemple, K.; Kaplan, J.D.; Lorden, T.; "Autoantibodies in Patients with Silicone Implants", *Current Topics in Microbiology and Immunology—Immunology of Silicones,* Potter, M. and Rose, N.; editors, No. 210, Springer–Verlag, Heidelberg, pgs. 277–290 (1996).

107. Marosok, R.; Washburn, R.; Indorf, A.; Solomon, D.; Sherertz, R.; "Contribution of Vascular Catheter Material to the Pathogenesis of Infection: De-

pletion of Complement by Silicone Elastomer In Vitro", *Journal of Biomedical Materials Research,* 30(2):245–250 (February 1996).

108. Borenstein, D.; "Siliconosis: A Spectrum of Illness", *Seminars in Arthritis and Rheumatism,* 24(1) (Supplement 1):1–7 (August 1994).

109. Solomon, G.; "A Clinical and Laboratory Profile of Symptomatic Women with Silicone Breast Implants", *Seminars in Arthritis and Rheumatism,* 24(1) (Supplement 1):29–37 (August 1994).

110. Freundlich, B.; Altman, C.; Sandorfi, N.; Greenberg, M.; Tomaszewski, J.; "A Profile of Symptomatic Patients With Silicone Breast Implants: A Sjogrens-like Syndrome", *Seminars in Arthritis and Rheumatism,* 41(1) (Supplement 1):44–53 (August 1994).

111. Conrad, K.; Mehlhorn, J.; Lüthke, K.; Dörner, T.; Frank, K–H.; "Systemic Lupus Erythematosus After Heavy Exposure to Quartz Dust in Uranium Mines: Clinical and Serological Characteristics", *Lupus,* 5:62–69 (1996).

112. Daniel, L.N.; Mao, Y.; Williams, AO.; Saffiotti, U.; "Direct Interaction Between Crystalline Silica and DNA—A Proposed Model for Silica Carcinogenesis", *Scandinavian Journal of Work and Environmental Health,* 21(suppl 2):22–26 (1995).

113. Katzin, W.E.; Feng, L–J; Abbuhl, M.; Klein, M.A.; "Phenotype of Lymphocytes Associated with the Inflammatory Reaction to Silicone Breast Implants", *Clinical and Diagnostic Laboratory Immunology,* 3(2):156–161 (March 1996).

114. Shen, G–Q; Ojo–Amaize, E.A.; Agopian, M.S.; Peter, J.B.; "Silicate Antibodies in Women with Silicone Breast Implants: Development of an Assay for Detection of Humoral Immunity", *Clinical and Diagnostic Laboratory Immunology,* 3(2):162–166 (March 1996).

115. Shi, X.; Dalal, N.S.; Hu, X.N.; Vallyathan, V.; "The Chemical Properties of Silica Particle Surface in Relation to Silica–Cell Interactions", *Journal of Toxicology and Environmental Health,* 27:435–454 (1989).

116. Ganczarczyk, L.; Urowitz, M.; Gladman, D.; "Latent Lupus", *Journal of Rheumatology,* 16(4):475–478 (1989).

117. Liang, MH; Karlson, E.; "Editorial: Prevalence of SLE: Higher or Lower?" *Lupus* (1995) 4, 421–422.

118. Calvo–Alen, J.; Alarcon, G.S.; Burgard, S.L.; Burst, N.; Bartolucci, A.A.; Williams, H.J.; "Systemic Lupus Erythematosus: Predictors of its Occurrence Among a Cohort of Patients with Early Undifferentiated Connective Tissue Disease: Multivariate Analyses and Identification of Risk Factors", *Journal of Rheumatology,* 23(3):469–475 (1996).

119. Takigawa, T.; Yasuda, H.; Kikkawa, R.; Shigeta, Y.; Saida, T. Kitasato, H.; "Antibodies Against GM1 Ganglioside Affect K+ and NA+ Currents in Isolated Rat Myelinated Nerve Fibers", *Annals of Neurology,* Vol. 37:440–441 (April 1995).

120. Carbotte, R.; Denburg, S.; Denbury, J.; "Cognitive Deficit Associated with Rheumatic Diseases: Neuropsychological Perspectives", *Arthritis and Rheumatism,* 38:1363–1364 (1994).

121. Shoaib, B.O.; Patten, B.; "Human Adjuvant Disease: Presentation as a Multiple Sclerosis-like Syndrome," *Southern Medical Journal,* Vol. 89, No. 2 (1996).

122. Levine, S.; Sowinski, R.; "Enhancement of Allergic Encephalomyelitis by Particle Adjuvants Inoculated Long Before Antigen", *American Journal of Pathology,* Vol. 99, No. 2 (1980).

123. Shoaib, B.O.; Patten, B.; Calkins, D.; "Adjuvant Breast Disease: An Evaluation of 100 Symptomatic Women with Breast Implants or Silicone Fluid Injections", *Keio Journal of Medicine,* 43(2):79–87 (1994).

124. Sanger, J.; Chalam, R.K.; Komorowski, R.; Yousif, N.J.; Motlorb, H.; "Short-term Effect of Silicone Gel on Peripheral Nerves: A Histologic Study" *Plastic and Reconstructive Surgery*, p. 931–942 (May 1992).

125. Kemple, K.; Pestronk, A.; "Abstract— Antiglycolipid Antibodies in Symptomatic Women with Silicone Breast Implants" Presented at the American College of Rheumatology Annual Meeting, October 1995, San Francisco CA, *ACR Supplement*, 8(9) (September 1995).

126. Davis, J.; Campagana, J.; Perrillo, R.; Chriswell, L.; "Clinical Characteristics of 343 patients with Breast Implants", Abstract presented at the *American College of Rheumatology* annual meeting. UCSF of San Francisco, California, (October, 1995).

127. Prange, R.; Boksenbaum, S.J.; Erblich, J.; Silverman, S.L.; "Preliminary Neuropsychological Findings on a Subgroup of Silicone Breast Implanted Women", presented at the *National Institute of Health*, Cedar Sinai Medical Center and UCLA School of Medicine, (1995).

128. Suter, C.; Westmoreland, B.; Sharbrough, R.; Hermann, R. Jr.; "Electroencephalographic Abnormalities and Interferon Encephalopathy: A Preliminary Report", *Mayo Clinical Practice Case Report*, (December, 1984).

129. Ojo-amaize, Lawless, O.; Peter, J.; "Elevated Plasma Concentrations of Interleukin–1beta and Interleukin–1 Receptor Antagonist in Women with Silicone Breast Implants" Abstract.

130. Smedley, H.; Katrak, M.; Sikroa, C.; Wheeler, T.; "Neurological Effects of Recombinant Human Interferon", *British Medical Journal*, Vol. 286 (1993).

131. R.B. Schiffer, Weitkamp, L.R.; Ford, C.; Hall, W.J.; "A Genetic Marker on Family History Study of the Upstate New York Multiple Sclerosis Cluster", *Neurology*, (February, 1994); 44:329–333.

132. Aoki, Sirai, Sakamoto et al., "A Case of Silicosis Associated with Polymyositis and Benign Monoclonal Gammopathy", *RYUMACHI* (Japan), Oct. 1988, 28(5) P. 373–8;

133. Fukata, Tamai, Nagai et al., "A Patient with Hereditary Spherocytosis and Silicosis who Developed an IgA(λ) Monoclonal Gammopathy", *JPN. J. MED.*, February 1987, Vol. 26, No. 1; and

134. Fukata, Matsubayashi and Nagato, "Monoclonal Gammopathies Associated with Silicosis", *RINSHO KETSUEKI* (Japan), Jan. 1983, 24(1), P. 9–17.

135. Bedu, O.; Gay, J.; Rouffy, J.; Loeper, J.; "Action of Silicon on Cultured Lymphocytes", *Med.Sci.Res.*, 19:317–318 (1991).

136. Erasmus, L.D.; "Scleroderma in Gold–Miners on the Wit–Watersrand with Particular Reference to Pulmonary Manifestations", *South African Journal of Laboratory and Clinical Medicine*, No. 3; 3:209–231; (September 1957).

137. Cowie, R.L.; Dansey, R.D.; "Features of Systemic Sclerosis (Scleroderma) in South African Goldminers", *South African Medical Journal*, 77:400–402 (April 21, 1990).

138. Haustein, U.F., Ziegler, V.; "Environmentally Induced Systemic Sclerosis-like Disorders", *International Journal of Dermatology*, 24:147–151 (April 1985).

139. Craighead, J.E.; Kleimerman, J.; et al.; Members of the Silicosis and Silicate Disease Committee Niosh; "Diseases Associated With Exposure to Silica and Nonfibrous Silicate Minerals", *Arch.Pathol.Lab.Med.*, 112:673–720 (July 1988).

140. Klockars, M.; Koskela, R–S; Järvinen, Kolari, P.J.; Rossi, A.; "Silica Exposure and Rheumatoid Arthritis: A follow Up Study of Granite Workers 1940–81", *British Medical Journal*, 294:997–1000 (1987).

1432

141. Wagner, M.M.F.; Wagner, J.C.; "Lymphomas in the Wister Rat After Intrapleural Inoculation of Silica", *Journal of the National Cancer Institute,* 49:81–91 (1972).

142. Guidotti, T.L.; Coley, B.D.; Goldsmith, D.F.; "Silica Exposure and Intrathoracic Lymphatic Changes", *Silica, Silicosis, and Cancer: Controversy in Occupational Medicine,* 2:147–155 (1986).

143. Wagner, M.M.F.; "Pathogenesis of Malignant Histiocytic Lymphoma Induced by Silica in a Colony of Specific–Pathogen–Free Wistar Rats", *Journal of the National Cancer Institute,* 57:509–518 (1976).

144. Wagner, M.M.F; Wagner, J.C.; Davies, R.; Griffiths, D.M.; "Silica–Induced Malignant Histiocytic Lymphoma: Incidence Linked With Strain of Rat and Type of Silica", *British Journal of Cancer,* 41:908–917 (1980).

145. Groff, G.D.; Schned, A.R.; Taylor, T.H.; "Silicone–Induced Adenopathy Eight Years After Metacarpophalangeal Arthroplasty", *Arthritis and Rheumatism,* 24:1578–1581 (1981).

146. Kircher, T.; "Silicone Lymphadenopathy: A complication of Silicone Elastomer Finger Joint Prostheses", *Human Pathology,* 11:240–244 (1980).

147. Benjamin, E.; Ahmed, A.; Rashid, A.T.M.F.; Wright, D.H.; "Silicone Lymphadenopathy: A Report of Two Cases, One With Concomitant Malignant Lymphoma", *Diagnostic Histopathology,* 55:133–141 (1982).

148. Digby, J.M.; "Malignant Lymphoma With Intranodal Silicone Rubber Particles Following Metacarpophalangeal Joint Replacements", *The Hand,* 14:326–328 (1982).

149. Koeger, A–C; Lang, T.; Alcaix, D.; Milleron, B.; Rozenberg, S.; Chaibi, P.; Arnaud, J.; Mayaud, C.; Camus, J–P.; Bourgeois, P.; "Silica–Associated Connective Tissue Disease", *Medicine,* 74(5):221–227 (1995).

150. Sluis–Cremer, G.K.; Hessell, P.A.; Hnizdo, E.; Churchill, A.R.; "Relationship Between Silicosis and Rheumatoid Arthritis", *Thorax,* 41:596–601 (1986).

151. Current Report, Silica (Crystalline), *Occupational Safety & Health Reporter,* pp. 1033–1036 (December 10, 1995).

152. Davis, G.S.; "Immunologic Aspects of Pneumoconioses in Asbestosis and Silicosis", *Immunologically Mediated Pulmonary Disease,* 4:111–155 (1991).

153. BLANK

154. Niezborala, M.; Garnier, R.; "Allergy to Complex Platinum Salts: A Historical Prospective Cohort Study", *Occup.Environ.Med.,* 53:252–257 (1996).

155. McGhan Medical Corporation, Polymer Coated Mammary Implant Program, general information, (197?). Bates No. 034661, 034662.

156. Williams, P.R.; "Cloraplatanic Acid in the E–Town Platinum 2 Process Review and Current Issues (Dow Corning Internal Memorandum, Midland, Michigan, June 22, 1983).

157. Harbut, M.R.; Churchill, B.C.; Green, M.A.; "Asthma in Patients With Breast Implants: Report of a Case Series", Submitted for publication (1994)—not yet accepted.

158. Harvard, P.; Shanker, M.B.; Bonds, J.R.; "Agents Causing Other Respitory Diseases", chapter ——, *Occupational Environmental Disease,* (Mosby, 19??).

159. Biagini, R.E.; Bernstein, I.L.; Gallagher, J.S.; Moorman, W.J.; Brooks, S.; Gann, P.H.;—"The Diversity of Reaginic Immune Responses to Platinum and Palladium Metallic Salts", *J. Allergy Clin.Immunology,* 76(6):794–802, (December 1985).

160. Merget, R.; Reineke, M.; Rueckmann, A.; Bergmann, E–M; Schultze–Werninghaus, G.; "Nonspecific and Specific Bronchial Responsiveness in Occupational Asthma Caused by Platinum Salts After Allergen Avoidance", *American Journal of Respiratory and*

*Critical Care Medicine,* 150:1146–1149 (1994).

161. Archer, C.; Gordon, D.A.; "Silica and Progressive Systemic Sclerosis (Scleroderma): Evidence for Workers' Compensation Policy", *American Journal of Industrial Medicine,* 29:533–538 (1996).

162. Emery, J.A.; Spanier, S.S.; Kasnic, Jr., G.; Hardt N.S.; "The Synovial Structure of Breast Implant Associated Bursae", *Modern Pathology,* 1994; 7:728–33.

163. Hardt, N.S.; Emery J.A.; Steinbach, B.G.; LaTorre G.; Caffee H.; "Cellular Transport of Silicone From Breast Prostheses". *Int. Journal of Occupational Medicine and Toxicology,* 1995; 4:127–133.

164. Love, L.A.; Weiner, S.R.; Vasey, F.B.; Crofford, L.J.; Oddis, C.V.; Starr, M.R.; Bridges, A.J.; Targoff, I.N.; Gurley, R.C.; Miller, F.W.; "Clinical and Immunogenetic Features of Women Who Develop Myositis After Silicone Implants", Abstract accepted for presentation; (1992).

165. Cuellar, M.L.; Espinoza, L.R.; Ochs, R.; Tan, E.M.; "Development of Monoclonal Gammopathy and Hypergammaglobulinemia in Silicone Breast Implant (SBI) Women after Long–Term Exposure", Abstract presented 2/1/96 to Southern Regional Meeting of the American Federation for Clinical Research, New Orleans, LA.

166. Sun, L.; Ricci, J.L.; Alexander, H.; Klein, A.; Lattarulo, N.; Blumenthal, N.C.; "Silicone in the Blood and Capsule of Women with Breast Implants", Fifth World Biomaterials Congress, Toronto, Canada (1996).

167. Lugowski, S.; Smith, D.C.; Semple, J.; Peters, W.; McHugh, A.; "Silcon levels in blood, breast milk and breast capsules of patients with silicone breast implants and controls", Fifth World Biomaterials Congress, Toronto, Canada (1996).

168. Nicholson, III, J.; Hill, S.L.; Frondoza, C.G.; Rose, N.R.; "Silicone Gel and Octamethylcyclotetrasiloxane [D4] Enhances Antibody Production to Bovine Serum Albumin in Mice", Fifth World Biomaterials Congress, Toronto, Canada (1996).

169. Stroman, P.W.; Alikacem, N.; Mayanloo, M.; Dorvil, J.C.,' Guidoin, R.; "In-Vivo MR Detection of Silicone Gel Degradation", Fifth World Biomaterials Congress, Toronto, Canada (1996).

170. Sun, L.; Alexander, H.; Latturulo, N.; Blumenthal, N.C.; Ricci, J.L.; Chen, G.; "Conformational Change and Denaturation of Proteins by Cyclic Silicone", Fifth World Biomaterials Congress, Toronto, Canada (1996).

171. Marotta, J.; LaTorre, G.; Batich, C.; Hardt, N.S.; Yu, L.; "Measurement of Silicon in Tissue Sites Both Adjacent to and Distant From Ruptured and Intact Silicone Breast Implants", Fifth World Biomaterials Congress, Toronto, Canada (1996).

172. Young, V.L.; Brandon, H.J.; Jerina, K.L.; Wolf, C.; Schorr, M.W.; "Failure Characteristics of Explanted Breast Implants", Fifth World Biomaterials Congress, Toronto, Canada (1996).

173. Collins, J.D.; Shaver, M.; Disher, A.; Miller, T.; "Silicone Breast Implant Scarring Brachial Plexus Neuropathy as Displayed by MRI" Abstract. *Department of Radiology Sciences,* UCLA School of Medicine, Los Angeles, California. [need date]

174. Silverman, B.G.; Brown, S.L.; Bright, R.A.; Kaczmarek, R.G.; Arrowsmith–Lowe, J.B.; Kessler, D.A.; "Reported Complications of Silicone Gel Breast Implants: An Epidemiologic Review", *Annals of Internal Medicine,* 124(8):744–756 (April 15, 1996). [Sci. 174]

Dr. Chris Batich

Aug., 1996

EXHIBIT B

EXHIBIT B
OUTLINE WITH REFERENCES
I. Silicone is released from breast implants into the body

 A. Rupture of gel implants
 1. PNS involvement (SA92)
 2. many papers, eg. (RO89), 38% ruptured
 3. gel depolymerized at 36 deg C, penetration 70–350 (MC87–dc)
 B. Gel bleed
 sweating of gel—contracture (WI83)
 implants in rats (GA93a)
 imaging $^{29}$Si (GA93b)
 in capsules (GA79)
 implants in rabbits (Habal + EPG) (HA93)
 UF/Lenny Yu
 sticky surfaces on explants (27%) (RO89)
 C. Also released from saline filled (low mol. wt. in envelope) (WI83)
 (VA79)
 "Grazing" caused by pectoralis muscle friction (KO83)
 Adjuvant effect in saline implant (HE92)
 in capsule (GA79)
 *erosion* of edges→leakage (gel too) (SC80)
 sheet used to treat burns (HA94)
 extraction of shell (2–6%) and bioresponse (CU85)
 D. Gel had much lower mol. wt. sol. (PE77)
 (ST77) (DU77)
II. Silicone is distributed to various organs from the capsule surrounding the implant
 A. Sub Q to throughout body (LA68–dc)
 B. Oral (Le73–dc),(LA68–dc)
 C. Molecular weight makes little difference (LA68)
 (FDA83)
 (KO87)
 D. Injection and implants in rats, to liver (GA93a)
 E. Histology in rats, likely to RE system (CU85)
 F. Below hexamers of PDMS, readily absorbed and distributed (LE78)
 G. Lungs pick-up 20% of breathed mist and excrete in urine in 8 (AN80) hrs. for 344 cs fluid (mainly D4)
 H. Sub–Q or peritoneal, thru RE system in mice (RE67)
 I. Lymphoadenopathy if ruptured (TR88)
 TEM shows in vacuoles
 J. Contrary Data
 vs. Garrido (MA95)
III. Silicone is biologically active
 A. Protein, Lipid ad/absorption (KO87)
 B. Thrombogenesis, worse when filled (OP94)
 C. Cell stimulation
 1. Monocyte/macrophage
 a. IL–1 production (MI89)
 b. interferon (p. 219 LA94d-dc)
 c. increased numbers (scores) (MA94)
 2. Fibroblast
 a. proliferation and collagen synthesis (MI89)
 (KO87)
 b. faster growth from sheet with D4, cf. 85 paper by Quinn on burns (HA94)
 c. cellularity (CU85)
 3. liver, 38% inc. in 2 wks of D4 (BI90)

D. calcification of capsule (PR83, VA79)
E. inflammatory response/capsule without steroid (FE84)
F. eye inflammation—gone in 24 hrs. (RO48–Dow)
 p351 "as with any good solvent, avoid repeat contact" ocular (NA91)
 toxicity (Nadamura and Refojo)
G. possible teratogen (FDA83 ?)
H. Adjuvant
 1. PDMS to SiO2 "a well known adjuvant" (GA93a)
 2. 10/10 ANA's in saline/silicone women (SH93)
 3. Plasma cells in one case (GA79)
 4. Cell-mediated immunologic response (KO87a)
 5. in women "Ab to PDMS"S [actually looks like to Alb] (WO93)
 6. D4 an adjuvant in mice 0.1 to 0.4ml/mouse (LA75–dc)
 (Lake's study) overt toxicity at 0.4 + most tests.
 7. Scleroderma reversal on removal very unusual. (SC92 p. 99)
 8. 10/4 with ANA's in silicone gel patients w. symptoms. (PR92)
 9. Gel an adjuvant, fluid not (DC) (MA93a)
 10. " " " " " (Naim) (NA93)
 11. Immunogenicity of silicone-protein complexes (KO87b)
 12. DNA changes in lymphocyte (DA92)
 13. Antigenicity of collagen augmented by silicone in mice. (TA92)
 14. D4 0.05ml. emulsion and BSA in rats 10" × saline, lasts 2
 mo. (BO74)
 15. sililized S aureus provoked reduced but lengthened immune
 response (IS73dc)
I. Capsule Formation
 1. Thicker for textured PDMS (BE92)
 2. B cells and others present (GA79)
J. Pharmaceutical use/activity
 1. brain dopamine increase from diphenyl D4 (DC patent) (BE74p)
 2. D4 is an agonist for reserpine (LE78)
 3. 2,6–cis and D4 incr. rat uterus (HA72–Dow)
K. Inhibition
 1. immune response (fluid) (NA93)
 2. allows bacteria in valve to grow (MA92)
L. Embolism (YU93)
M. Wt. loss in rabbits, hence spontaneous abortion (BI90)
N. dimethicone toxic to lice (LO79)
O. eosinophilia (as seen in autoimmun) (p225 LA94d-dc)
P. hepatomegly, enzyme induction in rats (ME89–dc)
Q. Potentiates infection depletes C3a (MA96)
IV. Composition changes in PDMS
A. Reactions (hydrolysis and oxidation)
 1. hydrophobic to hydrophilic (LE91p14), (BA92) ie us
 2. oral D4 in rats to MeSiO3 species in urine
 [crosslinking reaction?] (MA88–dc)
 oxidative removal of Me groups in D5 called "adverse effect"
 3. oxidation in rat livers to SiO2 (GA93a)
 4. environmental degradation, clays in rivers cause hydrolysis
 (Fe and Ca aid oxidation of Me groups) (MA83)
 also PDMS to silanols in soil then silica (AN94)
 DC lit.
 5. silicone compounds more reactive than carbon esp. to nucleo-
 philic attack (COc76,p 476)
 6. loss of Et group seen in rat urine (FE67), also breathed mist
 of D4 formed 20% in urine in 8 hrs and monomethyl
 silicon seen (demethylated in human) (AN80–dc)
 7. oxidation of Ph and CH3 in PhSilanes (FE70,SP80–dc)
 8. slow increase in sol in extracted elastomers under mild
 conditions (VO82)
 9. increased adhesion to polar surfaces (GE82)

 10. stress relaxation 25 deg, moist air (OS54)

 11. rupture increases with age (de93)

 12. RT hydrol. in dioxin/H2O if piperidine cat. (VO78)

 13. Ultrasound accelerates SiO bond cleavage (VO78,p85)

 14. Depolymerization at >1.75 ppm K at 36 deg C seen by penetration (Mc87–dc), normal gel is 100ppm K (WE70–dc)

 15. non-enzymatic hydrolysis if low mol wt pdms due to solubility (LE88–dc)

 16. yeast grow into and under pdms surface (NE93)

 B. Background on oxidation

 1. long lived oxidants in PMN's (WE83)

 2. oxidative burst by opsonized PEC + bact (GI85)

 C. Silanols

 1. conjugation

 a. stable in vivo (LE78–dc)

 b. surf silanols adsorb proteins in electrophoresis (TO90)

 2. reactivity

 a. for cryst. or amor. SiO2, inc. in SiOH gives inc. in cell lysis (RA90)

 b. bioactivity of silicones proportional to hydrolysis rate (LE78–dc)

 3. surface silanols

 a. toxicity of SiO2 depends on silanols (reduced after heating to 800 deg) (SH89, p 442)

 b. SiOH dep. on processing, not type of SiO2 (ZH87)

 c. scleroderma inc. with SiO2 exposure (CO87)

 d. all a-SiO2's c.4.9 OH's per nm2 (ZH87a)

 e. Si diols more reactive than C (LE78–dc)

 f. modification of surface changes react (LE91–dc,p12)

 g. catalase lowers hemolysis, more needed per OH (RA90)

 4. related silica phenomena not mentioning SiOH

 a.

V. Data not perfect

 A. variable mfg. and materials, FDA (CH91,p7)

 B. ETO release? (CH91,p9)

 C. elong. data discarded by DC if low (CO91)

 D. uncertain adjuvant study? (CR93)

 E. DC altered implant data (AP92)

 F. gel formulation is trial and error (Mc87–dc,p6)

---

## EXHIBIT B

Cited Literature:

AN80–dc
Annelin, R B
DC Toxicology Dept. Report
May 29, 1980
344 cs mist (mainly D4), breathed gave 20% in urine in human in 8 hrs, showed monomethyl silicone, hence demethylated.
Same general results in human milk (but more mono Me than di)

AN94–dc
anonymous
Materials News (DC literature)
Jul/Aug 94 p. 11
Degradability of silicone fluids
pdms goes to silanols in soil, then to silica

BE74p–dc
Bennett, D. and Levier, R.
US Patent 3,821,373 (June 28, 1974)
Organosilicone compositions in methods of treatment involving increasing the dopamine content of the brain (2,6–cis)

BE92
Bern, S. et al.
Biophysical and histologic properties of capsules formed by smooth and textured silicone

implants in the rabbit
Plas Recon Surg 89:1037–1042 (1992)
textured silicone surface forms thicker, more inflammatory
capsule than smooth surfaced saline implants (how does cell know?) [applied stress]

BI90–dc
Birdsall, A.
D4—US EPA Reports (a DC report/summary to Stark et al.)
Nov 5, 1990 (+related later reports)
14 day exposure to high oral levels of D4 in rats
data: 38% increase of liver wt., chronic inflammation
liver hyperplasia, not hypertrophy
conclusion: "no health risk"
also rabbit wt loss and spontaneous abortions

BL71
Blocksma, R
Experience with Pdms fluid in soft tissue augmentation
Plas Recon Surg 48:564–567
embolism problems, migration noted

BO74–dc
Boley, W. and LeVier, R.
Immunological enhancing activities of organosilicone compounds and non-functional fluids
DC report 4319
0.05 ml emulsion plus BSA in rat footpad, D4 $10^b6$ X saline, lasts 2 months

CA92
Callahan, Thomas (FDA report)
Significance of Dow Corning Studies Omitted From Their PMAs
June 24, 1992

CE93
Centeno, J. and Johnson, F.
Microscopic Identification of Silicone in Human Breast Tissue by IR-microscopy and X-ray
Applied Spectroscopy, vol 47, p. 341–345

? CH92
Chwirut, L.
Dow Corning Single and Double Lumen SILASTIC II and MSI Breast Prostheses
March 13, 1992

CH91
Chemistry Group Leader (FDA?)
Pharmacologist, Chemistry Group, DMMS, OST, HFZ–150
Pg. 10; September 20, 1991
variable production p7
ETO release p9

COc76
Cotton and Wilkinson
Advanced Inorganic Chemistry, 2nd ed.
silicon more reactive than carbon, esp. nucleophilic attack

CO87
Cowie, R.
Silica dust exposed mine workers with scleroderma (systemic sclerosis)
Chest 92:260–262
increased in gold miners

CO91
Coyne, Laurence
Dow Corning Single and Double Lumen Silastic II and Silastic MSI
Breast Protheses: In–Depth Review of Gel Bleed and Mechanical
testing Submitted in December 13 Amendment
December 20, 1991
elongation at b values discarded if low
hard to read data

CR93
Cruzas, Susan
Immunology Studies on Silicone Gel
March 22, 1993
FDA release mentions Naim and DC studies, uncertainties

CU85
anonymous Cox–Uphoff international report
Oct. 10, 1985
Characterization of C–U silicone elastomer shells
p17 shell extract (2–6%) c. 1000 mol wt, low bleed extracts

sometimes had aromatic residue from diPh + di-Me layer;

absorbs oil from gel and weakens (plasticization)

artifacts on surface
silicone lost from paraffin histology (not plastic)

less response (lymphocytes) to extracted shells

? DA81
Davies, R
Effects of Synthetic Silicas on Mouse Peritoneal Macrophages In Vitro
American Society for Testing and Materials 1981 pg 67–81

? DO91
Dow Corning Corporation
Pharmacologist, Chemistry Group, DMMS, OST, HFZ–150
pg 7, 9 September 20, 1991

DU77
Duncan, E
3M Memo: McGhan Mammary prostheses analysis
28 June 1977
Molecular weight distributions and percent solubles

? EP88
Epidemiology Branch
A review of the article titled "the Relationship Between Breast Cancer and Augmentation Mammaplasty...."
July 25, 1988

FE70
Fessenden, R Et al
Metabolic Fate of Phenyltrimethylsilane and Phenyldimethylsilane
Journal of Medical Chemistry 12 52– (1970)
Phenyl group oxidized, and Me group in Ph silanes

FE67
Fessenden, Ralph Et al
The Metabolic Fate of Come Silicon–Containing Carbamates
Journal of Medical Chemistry 10 810 (1967)
dealkylation a metabolic path for organosilicones in rat urine

GA79*
Gayou, R.
Histological comparison of contracted and non-contracted capsules
around silicone breast implants
Plas Recon Surg 63:700–707 (1979)
Si in most capsules, inc. saline, saw some plasma cells

GA93a
Garrido, Leoncio et al
In Vivo Degradation of Silicones [vinyl 7%]
Mag. Res. in Med. 29:839–843 (1993)
silicones not inert in rats, form SiO2, known adjuvant

GA93b
Garrido, Leoncic et al
Echo–Planar Chemical Imaging of Silicone Gel Prostheses
Mag. Res. Imaging 11:625–634 (1993)
shows gel bleed (14–28% extractable), can see rupture

GA93c
?
Garrido, L
Mag.Res. in Med. p. 53
Human livers

GA94
Gabriel, S. et al.
Risk of connective-tissue diseases and other disorders after breast implantation
NEJM 330:1697–1749
only morning stiffness effect, did not look at age of implant,
did look at classical forms of scleroderma etc.

GE82
Gent A and Vondracek P
Spontaneous adhesion of silicone rubber
J Appl Polym Sci 27:4357–4364
crosslinked rubber slowly adheres to polar surface with time,
accelerated by moisture, due to hydrolysis

GI85
Ginsburg, I. et al
Chemiluminescence and superoxide generation by leukocytes
stimulated by polyelectrolyte-opsonized bacteria
Inflammation 9:245–271
oxidative burst background

HA72 (DOW)
Hayden, J and Barlow, S
Toxicology and Appl. Pharm. 21 p68–79
Structure activity relationships of Organosilanes on the female reproductive system.
2,6–cis active (+4), D4 active (+1+)

HA94
Haggard, W; Lemmons, J
Response of normal dermal and keloid scar fibroblasts to cyclic siloxanes

Trans Soc Biomat 20th meeting, p147
D4, D5 etc most common low mol wt released
caused altered fibroblast growth

HA93
Habal M., . . . Goldberg
Evaluation of silicone gel mammary prostheses in a rabbit implant model
Trans soc biomat. 19th meeting,
2–12 mg pdms per gm of tissue in capsule

* * *move to "M" * * * MA93a
Malczewaki, R et al
A Humoral Adjuvant Study in the Rat of Dow Corning Silicone Gel
Preparations and Mammary Gel Bleed
September 1, 1993
confirms Naim's results, gel is an adjuvant, fluid not

HE92*
Heredero, F. and Semper, E.
Polyarthralgia after augmentation mammaplasty with saline-filled implants
Eur J Plas Surg 15:1–8 (1992)
ANA's and pain resolved after removal

IL79
Iler, Ralph
The Chemistry of Silica
Pg. 753, 764, 768, 769, 770, 774, and 776; 1979
p770: exposure in open wound very bad but unlikely

IS73dc
Isquith, A.
Exploratory antigen modification
proj. 0833–01
exhibit D in silicone toxicity symposium (Texas Oct. 1994)
sililated S aureus provoked lowered but longer (X2) immune resp.

JO73
Jolles, P and Parf A
Chemical and Biological Basis of Adjuvants
Springer 1973
p70 reported in 1958, Ab to autologous RBC's with adjuvant, did not cause persisting disease

KH93
Khan, M. et al.
Evaluation of . . . .for sustained release of antigen

Int. J Pharmaceutics 90:255–262 (1993)
continuous release of BSA antigen much more effective than 3X bolus.

KO83
Kossovsky, Nir et al.
Analysis of the surface morphology of recovered b. implants
Plast. and Recon. Surg. v.71, 795–802
cells embedded in shell; rubbing or grazing

KO87a
Kossovsky, Nir et al.
Bioreactivity of silicone
CRC Crit Rev Biocompatibility 3:53–85 (1987)
cell mediated immunological reaction, lit review, inhibits also
silanol groups can interact with protein

KO87b
Kossovsky N, Heggers J and Robson M
Experimental demonstration of the immunogenicity of silicone-protein complexes
J Biomed Mat Res 21:1125–1133
p1131 silica free high surface area fluid

KL93
Klykken, P Et Al
A Humoral Adjuvancy Study of Dow Corning Silicone Fluids Alone
(360 Fluid, 20 cs, 7–2317, 1000 cs) and DOW CORNING 360 Fluid,
20 cs, Mixed with Dow Corning Mammary Gel (Q7–2159A) or McGhan
Mammary Gel in the Rat.
March 9, 1993; Pg 9

KL94–dc
Klykken, P. et al.
Humoral adjuvancy study of D4, gel bleed, sheared gel, etc. DC report 3–29–94
sheared gel amarked adjuvant, bleed and D4 not so

LA68
Lacefield, R. et al (Stark)
Biological distribution of PDMS (restricted report)
DCC Report # 3323, June 3, 1968
D4 and linear in bile, brain, fat and liver

LA75–dc
Lake, R. and Radonovich, M
Action of PDMS on the reticuloendothelial system of mice: basic
cellular interactions and structure/activity relationships

DC report 4509, Oct 30, 1975
Fig 1 shows lowest dose (0.1ml) gave adjuvant effect (IF after endotoxin), overt toxicity at 0.4ml, most tests at 0.4ml.
Max effect at 2 days
L3, L4, D4, D5: incr. interferon production after endotoxin
decr. c-particle clearance larger than 5–dms units, caused eosinophilia

? LA94d–dc
Lake, Robt. depo
April 20, 1994
p160 in 70's DCC worked with Beecham to develope adjuvant
p219 D4 stimulates MPh to produce interferon
p219 D6, L6 and above cause eosinophilia, cf autoimmune dis.

Le73–dc
LeBeau, J. and S. Girwunski (Dow–Corning)
Primate Absorption and Elimination Balance Studies Studies
Including Pulmonary, Urinary, biliary and fecal excretion of 2,6–cis and D4
Soc of Toxicology, March 19, Abstract # 18
p13
absorbed and passed thru the liver, excreted in urine and air

LE78–dc
LeVier, R., et al.
The Pharmacology of silanes and siloxanes from 'Biochemistry of silicon and related problems' ed. G. Bendz and I. Lindquist, Plenum pub. 1978
p480 silanols stable in vivo
481 inertness required for biomat.
486 below hexamers of pdms absorbed
487 antifoams absorption and excretion
499 silicone diol more reactive
501 activity related to ease of hydrolysis (silanol formation)
507 rapid distribution, reversible sequestering in tissues
*496 D4 is agonistic to reserpine

LE88–dc
Levier letter 1–2–88 revised 1–20–88 (DCC–010006223)
possible immunotox study.
We have known DMS's of low mol wt have extensive in vivo

degradation dependent on non-enzymatic hydrolysis if siloxane is sufficiently soluble in water.

LE91

LeVier, Robt.
"Shanklin Manuscript"
May 14, 1991
DC report(?) to Jack Fisher, M.D.
attack on some submitted paper?
p12 surf adsorp. on $SiO_2$ decreases bioactivity
p14 superoxide may oxidize off a Me group
 surface becomes hydrophilic, then hydrophobic
p15 "no in vivo mechanism that can reduce the chain length."
 [hydrolysis and also redistribution]

LO79P
Lover, Myron et al (Block Drug Co.)
Siloxane Toxicants (patent)
simethicone toxic to lice

? MA83
Mahone, L. et al.
Method for qualitative and quantitative characterization of waterborne organosilicones
Env.Tox. and Chem. 2:307–313
Clay in rivers causes hydrolysis, Fe and Ca cause oxidation

MA88 -dc
Malczewski, R.M. et al.
An assessment of the $MeSiO_{3/2}$ content of feces and urine obtained 24 hours after oral Administration of D4 to Rats
Dow–Corning Study. (internal) Aug 17, 1988

? MA92
Marshall, Wilm, and Leggett, J.
Misdiagnosis, a timely reminder
Ann Plast Surg 29:444–445
valve stems of double lumen HS implants had coag. neg Staph
 showed palindromic rheumatism resolved when removed

MA94
Malczewski, RM et al
Comparative histology study of cellular responses to common implant materials
Trans soc biomat. 20th meet p 436
all low level responses to 120 days

Pdms fluids caused significantly higher macrophage scores

* * *move to right spot* * *MA66
Martellock A (Wayne state U)
The hydrolytic degradation of silicone polymers
Int. Conf in Elastoplastics Technology March 24, 1966
t, T, acids, bases cause hydrolysis, mol wt equilibration, see some cross-linking (Si–C cleavage p5)

MA95
McDonald, Peter et al (u. Toronto)
Anal.Chem. v.67, p3799–3801
Si-29 sensitivity for Garrido's work too low to detect Si in liver (DC funded)
Mc87–dc

MA96
Marosok, R. et al.
Contribution of vascular catheter material to the pathogenesis of infection: Depletion of complement by silicone elastomer in vitro
J Biomed.Mat.Res. v30, 245–250
quotes Sherertz paper showing PDMS worse than PU, PTFE, PVC for infection in catheters.

McCoy, Sharon
DC report 0058 April 1, 1987
Potassium >1.75 ppm causes depolymerization of gel at 36 deg C
cured at 160 deg, penetration spec 70–320, trial and error used to formulate gel

Mc88
McCauley
effects of pdms on fibroblast growth
Surg.Forum v39, 632–633
tissue culture effects

ME87
Medtox Project
Analysis of Internal Safety Studies Relevant Health Care
Materials and Products
pg. 4, 10, 11, 12, 25, 33, and 35; February 23, 1987
p 11 bolus gives 1–2 weeks response
p12 prolonged response may promote autoantibodies

ME89–dc
Mehendale, H.

Evaluation of the liver microsomal enzyme induction potential of D5
DC file no. 3724–10
April 17, 1989
2000mg/kg orally in rats, hepatomegly, induction of drug metabolizing enzymes (similar to phenobarbitol), reversed upon cessation

? MI36
Miller, J. et al.
The Physiological Response of Peritoneal Tissue to Certain Industrial and Pure Mineral Dusts
U.S. Public Health Repts 51:1677–99: December 4, 1936

MI89
Miller, k. et al. (Jim Anderson)
IL1–like activity due to implants ...
JBiomedMatRes v23, 1007–1026
Polymer surfaces change growth and IL–1 production

NA66
Nash, T. et al.
Physio-chemical properties of silica in relation to its toxicity
Nature 210 p 259–261
long known that silicic acid reacts with proteins/lipoproteins
large H-donor molecules are tanning agents (eg. silicic acid)
stronger interaction with phospholipids than proteins

NA93
Naim, J., Lanzafame and van Oss
The adjuvant effect of silicone-gel on antibody formation in rats
Immunological investigations 22, 151–161 (1993)
c 1mg gel strong adjuvant, fluid weaker and inhibits immune response in rats.

NA91
Nakamura, K.: Refojo, M. et al.
Ocular toxicity of Low-molecular weight components of silicone and flurosilicone oils
Investigative Ophthalmology and visual science 32:3007–3020
D4 causes severe inflammation and edema in eye

NE93
Neu, T. et al.
Biodegradation of medical grade silicone rubber used in voice protheses: SEM study

Biomat. v14, 459–463
yeast grow under surface of PDMS and 700 microns into surface.

OP94
Oppelt, William
deposition
Jan. 11, 12, 1994
static developed during dipping which attracted particles which stuck to shell

OS54
Osthoff R. et al (GE)
Chemical stress relaxation of PDMS
JAmerChemSoc 76:4659–4663
moist air at 25 deg

(move) RA90a
Randurangi, R. et al.
Surface and bulk infrared mikes of crystalline and amorphous
silica particles: study of the relation of surface structure to cytotoxicity of respirable silica.
Environ Health Perspect 86:327–36
more silanols for both crystalline and amorphous, more cell lysis

PE77–dc
Peters, S.
Mammary Gel Review, Part II
Oct. 20, 1977
much extractable

? PF93
Pfleiderer, Bettina et al (and Garrido)
In Vivo H Chemical Shift Imaging of Silicone Implants
1993
can detect Si at .5%, see none in nodes at 3 or 6 months

? PF93
Pfleiderer, Bettina et al
In Vivo Localization Proton NMR Spectroscopy of Silicone
Mag.Res. in Med. 30:149 (1993)

? PF93
Pfleiderer, Bettina
Migration and Biodegradation of Free Silicone from Silicone Gel–Filled Implants after Long–Term Implantation
July 7, 1993

PR92
Press, R. et al

Antinuclear autoantibodies in women with silicone breast implants
The Lancet 340:1304–1307
10 of 11 patients with autoimmune symptoms had ANA's

RA90
Razzaboni, B. et al. (MIT)
Evidence of an oxidative mechanism for the hemolytic activity of silica particles
Environmental Health Perspectives 87, 337–341
more catalase needed for crystalline $SiO_2$ than amorp. to reduce hemolysis. Propose $H_2O_2$ production by silanols, reaction with Cu or Fe to produce OH rad. ref 6 (Nolan) shows SiOH hemolysis
relation. SiOH known to react with $C=O$ in proteins.

RE67
Rees, Thomas et al. (NYU)
Visceral response to subcutaneous and Intraperitoneal injections of silicone in mice
Plas Rec Surg vol 39, p402–410
DC's MDX 4–4011 pdms fluid went thru RE system (nodes, spleen etc.), nice histology

? RE78
Research Veterinary Medical Officer
Pathology Report on Monkeys Exposed to Amorphous Silica–F
September 6, 1978

RO48–Dow
Rowe, V. et al.
Toxicological Studies on certain commercial silicones and . . .
J Ind Hygene and Tox v30, 332

RO89
Rolland C et al. (Quebec)
Nondestructive investigations of 97 excised mammary pros.
J Biomed.Mat res 23, p285–298
sticky surfaces, 38% ruptured, memory folds, deposits

SA88 and SA73
Saunders, k.j.
Organic Polymer Chemistry
Chapman and Hall
p. 397 process of equilibration for mixtures of siloxanes
p. 408 oxidation of Me group above 150 C in air increases fluid
viscosity (cross-linking), -CH3 to -CH2OOH

to SiO + CH2O
(p. 365 in SA73)

SA92
Sanger, J et al.
Gel infiltration of Nerve.
Plast rec surg 89, p949

SC(57?)
Schepers G W et al
Biological action of Degussa submicron amor-
phous silica dust (Dow Corning Silica)
A.M.A. Archives of Industrial Health 16:125–
146
a–SiO2 toxic, effects resolve when exposure
stops (breathing)
surface highly variable

SC92
Scheer, Robt. and O'Connor, Kathleen
The Cosmetic Surgery Revolution
Summit Pines Press (1992)
p 99 reversal of scleroderma on removal very
unusual

SC80*
Schmidt, G
Mammary implant shell failure
AnnPlasSurg 5:369–371 (1980)
shell of gel and saline types erode

SH89
Shi, X. et al.
The chemical properties of silica particle sur-
face in relation to silica-cell interactions
J Toxicology and Environ.Health 27:435–454
silanols cause cell lysis, few years acute, 20–
30 yrs chronic

SH93*
Shoaib, B. and Patten, B
Systemic disease in women following the in-
sertion of saline
breast implants
Southern med ass abstract, Oct 1993
10/10 ANA's plus other neuropathies

SP80–dc
Spielvogel, D. and Robinson, R.
Metabolism of D4 in monkey [oral delivery]
DC report Dec 10
about 75% recovered in urine and feces as
HO(Me2Si)nOH, n=1,2,3
p3 refers to 2,6 cis study showing PhSi(OH)3
formed

ST77
Stutheit, Jan
GPC Study of Mammary Bleed Silicones
American Hospital Supply Corp. study
Sept 23 report to Tom Talcott/Heyer–Schulte,
all 4 types showed much D4 mol wt and also
10,000 mol wt

ST83–dc, vol I and II
Stark, F
FDA Advisory Panel Hearing on Mammary
Prothesis Classification
January 26–27, 1983
vol I: no C–14 detected in CO2, hence no
loss of Me
p25 more oil added to make more responsive
implant 1976
vol II: small cyclics teratogen at high dose

TA92
Takayama E et al.
Is injectable collagen truly safe?
J Laryngology and Otology 106:704–708
collagen becomes antigenic when mixed with
silicone

TE93
Teuber, S., et al.
Anti-collagen autoantibodies are found in
women with silicone breast implants
J Autoimmunity 6:367–377 (1993)
35% of implant women had anti native type
II collagen, all developed symptoms after 2
years

TR88
Truong, L. et al.
AmerJSurgPath 12, 484–491
Silicon lymphoadenopathy with implantation,
shows TEM of vacuoles

TO90
Towns, J and Regnier, F
J Chrom v516, 69–78
SiOH groups on silica tubes need blocking to
prevent protein adsorption

VA79
Vargas, A
Shedding of silicone particles from inflated
breast implants
PlasReconSurg 64:252–253
particles containing Si–C bonds by IR on
implant

VO78
Voronkov, M. et al
The Siloxane Bond

Consultants Bureau (Plenum), NY
p148 at room temp., in homogeneous medium, hydrolysis goes if trace catalyst present (HC1, or piperidine, etc.) for D3,Me6Si2O p. 85 ultrasound accelerates SiO cleavage

VO82
Vondracek P. and Gent A.
Slow decomposition of silicone rubber
JApplPolymSci 27:4517–4523
sol content slowly increases in wet air (after extraction), NH3
accelerates this hydrolysis, also stress relaxation, ref 4 to human body induced changes?

WE70–dc
Wetters, J.
Mammary problems
DC memo to Burdick et al., Feb. 4, 1970
normal gel has 100 ppm K (cf. Mc87–dc)

WE83
Weiss, S. et al.
Long-lived oxidants generated by human neutrophils
Science 222:625–628
superoxide, H2O2, HOCl, hydroxyl radical, chloramines formed

WI83
Wilflingseder, P et al.
Tissue reations . . .
Minerva Chirugia 38, 877
gel bleed

WO93
Wolf, L. et al
Human immune response to pdms: screening studies in a breast implant population
FASEB Journal 7:1266–1268 (1993)
says Ab to pdms (IgG), but looks like Ab to albumin

YU93
Yu-min Chen et al.
Silicone fluid-induced pulmonary embolism
Am Rev Respir Dis 147:1299–1302
3 new cases, one death, review of other cases, one fibrosis

ZH87a
Zhuravlev, L.
Concentration of hydroxyl groups on the surface of amorphous silicas
Langmuir 3:316–318
all a-SiO2's have c. same OH surface conc of

c. 4.9 OH's per square nm; surface H2O lost at 175 C, leaving silanols.

ZI92
Zimmer, M
Teratology Studies

DEPOS

FR94D
Frank, Curt
June 27, 1994
hard to remove low molecular weight cyclics

LA94D
Lake, Robt. (Ph.D. PSU 1970, microbiology, now at Lorillard)
vol 1, April 20
p143 impaired phagocytosis of MPh affects whole cell network
p160 DC worked with Beecham to develop silicone adjuvant
p219 D4 stimulated MPh directly —> interferon

D6 and L6 —> eosinophilia

p225 eosinophilia —> immune complex disease, autoimmunity
June 13, 1996

## EXHIBIT C

1. Andrews, J.; "**Cellular Behavior to Injected Silicone Fluid: A Preliminary Report,**" *Plast.Recon.Surg.,* 38(6):581 (1966).

2. Ben–Hur, N.; Ballantyne, D.; Rees, T.; and Seidman, I.; "**Local and Systemic Effects of Dimethylpolysiloxane Fluid in Mice,**" *Plast.Recon.Surg,* 39(4):423 (1967).

3. Failes, J.; Faulborn, J.; Erb, P.; "**The Phagocytosis of Silicone Oils of Different Viscosities by Peritoneal Macrophages in the Mouse,**" *Klin.Mbl.Augenheilk,* 184:450 (1984).

4. Pfleiderer, B.; Moore, J.; Ackerman, J.L.; Garrido, L.; "**Study of the Aging Process of PDMS Implants In Vivo and Ex Vivo by Nuclear Magnetic Resonance Spectroscopy and Imaging,**" *Polymer Preprints,* 33(1):767–768 (1992).

5. Garrido, L.; Pfeiderer, B.; Papisov, M.; Ackerman, J.L.; "**In Vivo Degradation**

of Silicones," *Magnetic Resonance in Medicine,* 29(6):839–843 (1993).

6. Pfleiderer, B.; Ackerman, J.L.; **"In Vivo Localized Proton NMR Spectroscopy of Silicone,"** *Magnetic Resonance in Medicine,* 839–843 (1993).

7. Pfleiderer, B.; Ackerman, J.L.; **"Migration and Biodegradation of Free Silicone Gel–Filled Implants after Long–Term Implantation,"** *Magnetic Resonance In Medicine,* 30:534–543 (1993).

8. Pfleiderer, B.; Zu, P.; Ackerman, J.L.; Garrido, L.; **"Study of Aging of Silicone Rubber Biomaterials with NMR,"** *Biomedical Materials Research,* 29:1129–1140 (1995).

9. Teuber, S.S.; Saunders, R.L.; Halpern, G.M.; Brucker, R.F.; Conte, V.; Goldman, B.D.; Winger, E.E.; Wood, W.G.; Gershwin, M.E.; Abstract—**"Elevated Serum Silicon Levels in Women with Silicone Gel Breast Implants,** *Biological Trace Element Research,* 121–130 (1994).

10. Zimmer, M.A.; Bejarano, M.A.; **"Octamethylcyclotetrasiloxane—An Investigation of Hepatic Weight increases,"** Plaintiffs' Exhibit LeVier 7, GEG 032621–032634.

11. Marotta, J.; LaToree, G.; Batich, C.; Hardt, N.S.; Yu, L.; **"Measurement of silicon in Tissue Sites Both Adjacent to and Distant from Ruptured and Intact Silicone Breast Implants,"** Presented at the Fifth World Biomaterials Congress, May 29–June 2, 1996, Toronto, Canada.

12. Yu, L.T.; Latoree, G.; Marotta, J.; Batich, C.; Hardt, N.S.; **"In Vitro Measurement of Silicone Bleed From Breast Implants,"** *Plast. and Recon. Surg.,* 756–764 (1996).

13. Smith, A.L.; *The Analytical Chemistry of Silicones,* John Wiley & Sons, Inc., Vol. 112, p. 13. (1991).

14. Malczewski, R.M.; Varaprath, S.; Bolger, C.L.; Report 92: **"A Study of the Excretion of MeSIO$^{3/2}$ Moieties After**

Oral Administration of D$^5$," *Internal Dow Corning Study,* (10/25/88).

15. Spielvogel, D.E.; Robinson, R.J.; **"Report: Metabolism of Octamethylcyclotetrasiloxane in the Monkey,"** *Internal Dow Corning Study,* 12/10/80

16. Lentz, C.W.; **"It's safe to use silicone products in the environment,"** *Industrial Research & Development,* 139–143 (1980).

17. Stark, F.O.; **MDL Deposition of Forest O. Stark,** pp. 279–80; 464–65 (3/8/94).

18. Wolf, C.J.; Brandon, H.J.; Young, V.L.; Jerina, K.L.; Srivastava, A.P.; **"Chemical, Physical and Mechanical Analysis of Explanted Breast Implants,"** *Current Topics in Microbiology and Immunology—Immunology of Silicones,* Potter, M. and Rose, N.; Editors, No. 210, Springer–Verlag, Heidelberg, pgs. 25–37 (1996).

19. LeVier, R.R.; Bennett, D.R.; Hunter, M.J.; **"Chapter VII. Effects of Oral 2, 6–cis–Diphenylhexamethyl–cyclotetrasiloxane on the Reproductive System of the Male Macaca Mulatta,"** Bioscience Research and Development Laboratory, Dow Corning Corporation.

20. DePalma, D.; **"Surface Hydrolysis of Polydimethylsiloxane (Silicone Elastomer),"** Thesis presented to the Graduate School, University of Florida, 1–95 (1992).

21. Kennan, J.J.; Peters, Y.A.; Swarthout, D.E.; Owen, M.J.; Namkanisorn, A.; Chaudhury, M.K.; **"Effect of Saline Exposure to the Surface and Bulk Properties of Medical Grade Silicone Elastomers,"** Dow Corning Corporation and Lehigh University.

22. Robinson, O.G.; **"Rate of Rupture of Silicone Prostheses: Excerpts from a Study of Over 3000 Personal Cases and Twenty–Five Years Excerpts,"** Presented at the Symposium on Reoperative Aesthetic Surgery of the Face and Breast, Naples, Florida, (March 18, 1992).

23. de Camera, D.L., et al.; **"Rupture and Aging of Silicone Gel Breast Im-**

plants," *Plastic & Reconstructive Surgery,* 91(5):828–834 (1993).

## CERTIFICATE OF SERVICE

I hereby certify that I served a true and complete copy of the foregoing **PLAINTIFFS' PROPOSED QUESTIONS REGARDING CHEMISTRY AND PLAINTIFFS' EXPERT CHEMIST,** on opposing counsel at the address indicated below:

Paul R. Duden

Tooze Shenker Duden Creamer Frank & Hutchinson

333 S.W. Taylor Street

Portland, OR 97204–2496

>Attorney of Record for BRISTOL–MYERS SQUIBB COMPANY MEDICAL ENGINEERING CORPORATION

Bill Crow, Esq.

Miller Nash, et al.

Suite 3500

111 SW 5th Ave.

Portland, OR 97204

>Attorney of Record for MINNESOTA MINING & MANUFACTURING CO.

Jonathan Hoffman

Martin, Bishoff et al

Suite 3100

1300 SW 5th Ave.

Portland, OR 97201

>Attorney of Record for BAXTER HEALTHCARE CORPORATION AND BAXTER INTERNATIONAL INC.

via hand delivery on this 13th day of August, 1996.

**WILLIAMS & TROUTWINE, P.C.**

By/s/ [Signature]
**Michael L. Williams OSB # 78426**
**Gayle L. Troutwine, OSB # 83106**
**Kathleen M. Dailey, OSB # 88188**
**Kathryn A. Stebner, OSB # 93126**
Of Attorneys for Plaintiffs

---

i. Federal Judicial Center. *Reference Manual on Scientific Evidence.* 1994, p 2.

## APPENDIX B

September 10, 1996

ROBERT E. JONES
U.S. District Judge

NELY L. JOHNSON
Circuit Judge, Multnomah County, State of Oregon

Room 702
United States Courthouse
620 S.W. Main
Portland, Oregon 97205

Herewith are my answers to the general questions you set forth in your letter of August 16, 1996 to the court-appointed Rule 104 experts in the pending breast implant cases. I've reviewed the epidemiological testimony and have viewed the video-taped closing arguments provided by the attorneys for the plaintiffs and for the defense in all four of the areas—epidemiology, immunology/toxicology, rheumatology, and chemistry. In addition, I've reviewed the suggested questions put forth by the plaintiffs and the defense in the area of epidemiology. As previously instructed I will generally restrict my opinions to testimony in the area of epidemiology.

Before I address the specific questions put forth in your letter I'd like to submit a general statement after observing the process and reviewing the material provided. It is clear to me that the expert witnesses in the area of epidemiology, especially the two epidemiologists whose testimony I witnessed—Dr. Goldsmith and Dr. Ory—generally base their proffered opinions on sound scientific data. In fact they both, at least in part, based their opinions on assessments of the same set of scientific studies. At issue is whether the reasoning or methodology underlying their testimony is scientifically valid.[i] And that assessment is complicated because of a clash between the culture of science and the culture of the legal system.

The culture of science is by its nature both conservative and collaborative. Its function is to produce general "truths"—in the case of epidemiology, truths about disease causality. The legal system brings a culture that is by its nature adversarial, with the intention of

producing particularistic "truths"—truths about a single set of events in a case before the court. The latter truths must emerge out of an adversarial process. Each of these cultures includes a set of beliefs and values and a normative structure that defines the rules of practice and, to a large extent, the nature of the appropriate language to be used in its discourse.

When I say that the culture of epidemiology is conservative, I mean conservative within its basic function, that of investigating diseases in order to determine the causes of those diseases. As described in the testimony before the court, scientists first look, using a variety of techniques, for associations between possible causal factors and diseases in human populations. And then, using increasingly more rigorous research designs, they seek to make increasingly more certain statements about the causal link between the factor(s) under investigation and the studied disease.

Because disease processes in human beings are so complex, the scientific process is complex and the norms of science protect against premature assertions of causality. In addition to the complexity of the disease process, there are two major sources of variation within this scientific process that increase the complexity of the process and increase the appropriateness of a conservative approach. The first source of variation derives from variability in human physiology. For example, if a single person's blood pressure is carefully measured time after time, a set of measurements will be observed that includes some variation. That variation is caused by a bit of variation in the measurement and a great deal of natural variation in the underlying biological process. A second source of variation is sampling variation. For example, if blood pressure is measured in a number of samples of 100 subjects and averaged for each set of 100 people, the averages of the samples will vary, within a range. The sampling variation derives from the fact that the universe from which the sample is drawn is made up of people with a wide range of

average blood pressures and drawing samples of 100 from that universe will result in samples made up of people with different average blood pressures. Of course, over the years statistical techniques have developed that allow scientists to estimate and account for some of this variation.[ii]

The conservative nature of epidemiology reflects more than the natural variation in physiological processes and in its measurement. It reflects, in addition, the complexity of disease processes and the variety of potential biases that can enter individual studies. These and other factors make if very difficult to determine definitive causality in human populations.

In the American criminal justice system the odds are stacked against delivering an incorrect guilty verdict for an innocent defendant. Similarly, in epidemiological science the odds are stacked against incorrectly rejecting the "null hypothesis" that is tested in all experiments—namely, that there is no relationship between the suspected causal factor and the disease. An investigator must be prepared to say that a finding of a positive association shown in a single experiment would have happened by chance alone less than five times in 100 similar experiments. That is the scientific analogue of "beyond a reasonable doubt." And there are other similar conservative forces that pervade the process.

Because of the nature of the system, the language used within epidemiological discourse is also very conservative. During the testimony of Dr. Goldsmith I asked some questions of Dr. Goldsmith about his level of certainty concerning the causal link between SBI and atypical connective tissue disease in implanted women. He was relatively cautious in his response, a caution that was picked up by Ms. Wells in her final arguments. I was probing Dr. Goldsmith on that matter to provide some clarification on a point that had been raised early in the testimony by the Court. I probed Dr. Rosenbaum on a similar point during his testimony. The process of epidemiological inquiry can be characterized by the formation of a suspicion of causality, followed by slow and

**ii.** See further discussion on this point in David H. Kaye and David A. Freedman "Reference Guide on Statistics", *Reference Manual on Scientific Evidence*, pp 331–414.

careful, sometimes agonizing, movement along a continuum from a zero level of certainty about causality toward, but rarely to, a level of absolute certainty. The language that epidemiologists and other scientists use to describe their level of certainty is a very conservative language, one that generally understates their degree of certainty about an association between a factor and a disease and about a causal link between those factors.

The reason that I dwell on this point is that it is clear to me that when expert witnesses testify within the culture of the adversarial judicial process, they construct their opinions on a base of science, but they easily depart from the norms of science in the language they use to offer their opinions. While they are cautious and conservative as they state opinions in formal scientific discourse, in the court room they describe their views in far stronger and more certain language then they would use in presenting a paper at a scientific meeting or a journal article in a peer-reviewed publication. Having said that, I'll move to the specific questions, but will refer to this problem as I answer them.

*1. Is the expert's opinion supported by scientific reasoning and methodology that is generally accepted in the expert's particular scientific community or otherwise qualified as stated in Daubert II, as quoted?*

*2. Is the expert's opinion based upon scientifically reliable data?*

As I stated above, I believe that both Dr. Ory's and Dr. Goldsmith's opinions are based on scientifically valid data. In fact, both of their epidemiological opinions are based on the same set of scientific studies. It is also clear, however, that they have arrived at somewhat different positions as a result of different, but legitimate, interpretations of the results of those 16 epidemiology studies.

Dr. Ory reads the studies cited and concludes: "These 16 studies constitute a very strong body of evidence that silicone breast implants do not cause classical connective tissue diseases." [iii] That is an opinion that could be supported by scientific reasoning and methodology when an epidemiologist reads the studies. Further, Dr. Ory later agreed with the following question put by counsel: "The bottom line, Dr. Ory, is that it is your opinion that as to both classical disease and as to symptoms, it is more likely than not that breast implants don't cause that?" [iv] I believe that Dr. Ory used valid scientific reasoning to arrive at that conclusion, especially since this question included the modifier "more likely than not."

On the other hand, Dr. Goldsmith also used valid scientific reasoning and methodology when he concluded that the 16 epidemiological studies are not appropriately designed or sufficiently powered to answer definitively the question of atypical connective tissue disease. [v] Similarly, his opinion at that same juncture of his testimony, assessing the impact of the Hennekens study on the question of the link between SBI and typical diseases, is also a scientifically based opinion, although differing to a large degree from Dr. Ory's opinion on the same topic.

The language question I raised above comes to the fore when Dr. Goldsmith is pushed to state an opinion about the causal relationship between SBI and atypical connective tissue disease. Dr. Goldsmith testifies that "We are trying to—we are trying to frame a hypothesis to test." [vi] This causes Mr. Schachtman to comment, in the defense closing argument tape on immunology and toxicology, that the plaintiff's expert's position is "merely a hypothesis—not proven—not science." [vii] That represents a serious misunderstanding of what is intended by Dr. Goldsmith's statement. In fact, Dr. Goldsmith's statement is at the heart of science. Inter-

iii. *Transcript of Pretrial Hearings*, August 6, 1996, p 291.

iv. *Transcript of Pretrial Hearings*, August 6, 1996, p 299.

v. *Transcript of Pretrial Hearings*, August 6, 1996, pp 163–165.

vi. *Transcript of Pretrial Hearings*, August 6, 1996, p 166.

vii. About minute 23:00 of that tape.

preted through the eyes of an epidemiologist, Dr. Goldsmith is saying that work in the area has progressed to the point that his confidence in the notion of an association has moved far enough away from zero that he and others have begun to make a serious investment in studying the problem. That is to say, even if the level of confidence in an association or in causality hasn't reached the level of 50% certainty, he has begun to take the possibility of an association seriously.

In another example of language that would be considered somewhat extreme in scientific circles, Dr. Rosenbaum departs, to a large degree, from scientifically-based opinion with his epidemiological assessment that "the epidemiology is fairly cogent that silica and silicosis [sic] are not associated with autoimmune diseases." [viii] That statement is at odds with the way some, or perhaps most, epidemiologists would assess the literature. Perhaps the difference arises because Dr. Rosenbaum is not basically an epidemiologist. But it is a serious assertion, because a great deal of the bioplausibility argument made by Dr. Goldsmith depends upon a different reading of the epidemiological literature concerning inhaled silica. I believe that most epidemiologists would interpret the inhaled silica literature more like Dr. Goldsmith's interpretation, although **their** would be sufficient disagreement about other aspects of the bioplausibility argument.

*3. If epidemiological studies have not been done or are inconclusive, what other data, such as animal studies, biophysical data, clinical experience in the field, medical records, differential diagnosis, preliminary studies, general scientific knowledge, and medical literature can justify, to a reasonable medical probability, a conclusion concerning the cause of the syndrome or disease at issue?*

I don't know the precise legal meaning of "a reasonable medical probability," but I do know that physicians need to treat patients in a clinical context, even when there are not sufficient epidemiological studies to provide explicit guidance. I think physicians do

achieve a level of reasonable medical probability, doing the best they can in an uncertain situation. They use all of the sources of information at their disposal, including animal studies, case reports, small or inclusive epidemiological studies, expert opinions, conversations with respected colleagues and, most importantly, their own clinical experience and judgment. In order to achieve a differential diagnosis, they need to formulate some theory that appears to them to possess biological and clinical plausibility given the specific clinical circumstances, the nature of the signs and symptoms, and the likely diagnostic alternatives available in a given case.

The clinician certainly pays attention to the question of biological plausibility of competing alternative explanations. That is the reason we are hearing so much about the epidemiology of inhaled silica in this case. Since there isn't sufficient epidemiological data on SBI, the clinicians will be more likely to accept the notion of a causal link between SBI and atypical connective tissue disease if they can consider another clinical situation where there was an analogous chain of events that resulted in a similar disease pattern, and where a plausible link can be drawn between the biology of the two situations.

This link is particularly important to the physicians because they are not dealing with the general scientific question "What causes disease in women?"; they are dealing with the particularistic clinical question "What is causing disease in this particular woman?" Those are very different questions. And the physician must draw some working causal model in the case of a single patient, even in the face of a great deal of uncertainty. The scientist has the luxury of reporting that there isn't yet sufficient data to draw a conclusion. That luxury isn't available to the clinician, because the decision to do nothing in a clinical situation is selecting a specific course of action.

In a similar manner, the scientist uses all of the same sources to begin to formulate alternative scenarios concerning disease causality and to use preliminary studies to move along the continuum of certainty away from zero. When a sufficient level of certainty is

viii. *Transcript of Pretrial Hearings,* August 5, 1996, p 292.

reached about one or the other of the scenarios, the scientist formulates the likely candidates in the form of a testable hypothesis and seeks the resources necessary to test the hypothesis. But that is not done lightly because it is difficult to gather the necessary research resources for complex tests of causality, so usually a research program is designed of successively complex and expensive research projects.

*4. Do the methodology and data support the expert's conclusions?*

*5. Does the scientific data relied upon by the expert apply to the syndrome or disease in issue in these cases? For instance, are epidemiological studies directed at other typical or classical diseases relevant to an atypical disease?*

As can be inferred from my answers to question 1, I believe there is sufficient scientific data upon which to base the opinions both of Dr. Goldsmith and Dr. Ory, the principal epidemiology witnesses, and I believe it would be appropriate to accept both of their testimonies. The studies prior to the Hennekens et al. study did not produce much evidence of a causal relationship between SBI and any specific disease or set of symptoms. Dr. Goldsmith is probably correct in his assessment that these 15 studies each had sufficiently serious design flaws to limit the likelihood that they would show a significant relationship between SBI and disease. But on the other hand, Dr. Ory has an appropriate scientific basis for his assessment that it is possible to look at the 15 studies together and come to a reasonable scientific conclusion that were there a relatively high-level causal link between SBI and connective tissue disease one would have expected stronger evidence of that link to have emerged from one or another of the studies.

And it is even possible for reasonable epidemiologists to arrive at diametrically opposed conclusions, as do Drs. Ory and Goldsmith, with regard to the Hennekens study, especially since it is a single study and it is somewhat dangerous to put too much weight on the findings from any one study. But I do tend to pay more attention to the findings

of that study then do either Dr. Hennekens or Dr. Ory. That study is significant because of its size and because of its findings. Included among the 400,000 women studied were more than 10,000 who reported having breast implants and nearly 12,000 who reported experiencing connective-tissue disease between 1962 and 1991. The study produces some convincing evidence of small, but significant increased risks of connective tissue diseases among women with breast implants, when no other large study had ever documented that risk. The point estimate of the increased risk of connective-tissue disease (excluding non-specific disease) was 24%, which I do not find intuitively "reassuring" as did Hennekens et al. In addition to the overall finding, they reported increased risks (all at borderline significance but with relative risks approaching 2.0 in some of the cases) of each of a set of specific diseases including RA, dermatomyositis, Sjogren's syndrome, scleroderma, and a group of other specific connective-tissue diseases.

Question 5 raises two issues that **most** be addressed with this study. The first has to do with the question of whether the relative risk of 1.24 can be disregarded because it is less than a relative risk of 2.0. The second question is whether a study directed at typical or classical diseases is relevant to an atypical disease.

With regard to the question of the relative risk of less than 2.0, it is true that under a preponderance standard a relative risk of 2.0 is critical, since a relative risk of greater than 2.0 can be interpreted to mean that disease in an individual patient will have been more than 50% likely to have been caused by the factor in question. Consequently in *Daubert v. Merrell, Dow Pharmaceuticals, Inc.*, the question was raised whether children of mothers who took Bendectin during pregnancy were more than twice as likely to develop limb reduction birth defects as were children of mothers who didn't.

From a scientific point of view it is not appropriate to disregard relative risks of less than 2.0. First of all, relative risk is a term that applies to a population, not to an individual. While it is possible to estimate the average increased risk for members of a

population, it is really not appropriate to assume that each individual in a population actually had a similar risk. It is much more appropriate to believe that the average increased risk is made up of a wide range in individual risks in the population, just as an average blood pressure is made up by averaging across individuals with a range of blood pressures.

However, the more important reason for considering the 1.24 relative risk in the Hennekens study comes into play in answering the second part of the question, concerning the relevance of findings from a study investigating typical disease for the consideration of atypical disease. The answer to this question depends upon bioplausibility and on the extent to which there have been analogous situations in which an increased risk of typical disease is linked with an increased risk of atypical disease. If a scientist had reason to believe that there truly was a relative risk of 1.24 among women with SBIs for typical connective tissue disease, he or she would take the significance of that risk seriously. Hennekens himself points out that the magnitude of the relative risk alone does not predict the magnitude of the public health problem, it is only a measure of the strength of the association between an exposure and disease and provides information that can be used to judge whether a valid observed association is likely to be causal.[ix] The number of exposed cases and the incidence of the disease must be taken into consideration in estimating the magnitude of the problem.

The extent to which certainty about a causal link for typical disease would provide evidence for atypical disease would depend upon a biologically plausible link between the two situations. For example, if it could be shown that in inhaled silica exposure there was a certain increased risk of typical disease and a significantly larger increased risk of atypical disease, a physician (and perhaps even an epidemiologist) might reasonably surmise that a 1.24 relative risk of typical disease in SBI provides a basis to believe that there is

an even larger risk of atypical disease. And if that pattern can be shown to have occurred in other kinds of silicone exposure, as Mr. Williams began to assert in closing argument and in rebuttal, the apparent link would become stronger. I'm not suggesting that an irrefutable case has been made for that pattern. I'm simply pointing out the circumstances under which a finding like that of the Hennekens study would provide evidence for the causal link to atypical disease at a relative risk even greater than that for typical disease.

*Summary*

In summary, I believe that both Dr. Ory's and Dr. Goldsmith's opinions are supported by scientific reasoning and methodology that is generally used in the epidemiology field. I believe the only way one can ultimately assess the significance of the epidemiological data in this case is through relatively complex integration of that information with the scientific testimony from the other fields.

/s/ Merwyn R. Greenlick

Merwyn R. Greenlick, Ph.D.

712 NW. Spring

Portland, OR 97229

### APPENDIX C

Robert F. Willkens, M.D.

Internal Medicine Rheumatology 1229 Madison Street, #1490 Seattle WA 98104 (206)386 6860

FAX(206)386 6740

September 8 1996

Robert E. Jones
U.S. District Judge
Nely L. Johnson
Circuit Judge, Multnomah County
For the District of Oregon
United States Courthouse, Room 702
Portland, Oregon 97205

Judges Jones and Johnson,

In response to the charge to me to determine whether the expert's opinions are supported

---

ix. Hennekens, C.H., J.E. Burning, *Epidemiology in Medicine*, Little, Brown and Company, 1995, p 93.

by reasoning and methodology that is scientifically valid I hope to limit my evaluation to the clinical rheumatologic facets of the testimony. It is my understanding of the criteria, established as a result of the Dabert II hearings, that general acceptance in the scientific community may be important but the reliability of the methodology may not necessarily be linked to what is generally accepted; but that methods accepted by a minority in the scientific community may be accepted. I am also guided by the necessity of the party proffering the evidence must explain the expert's methodology and demonstrate in some *objectively variable way* that the expert has chosen a reliable scientific method and followed it faithfully.

The scientific methodology of arriving at a hypothesis by **observation,** in the matter of symptoms in patients who have previously undergone silicon breast implantation would seem appropriate and incontestable. A clinician considers the history of the development of symptoms, performs a physical examination, obtains laboratory studies and other information about a patient with various technological studies such as x-rays, electrocardiograms and additional studies in establishing a diagnosis. But in arriving at a specific diagnosis he must consider all those conditions which might present with some or all of the findings and finally the diagnostician selects the diagnosis which best fits the findings on the basis of common knowledge. This process is called differential diagnosis. Cardinal elements of arriving at a correct diagnosis are *objective* determinations in any of the facets of the examination. (DeGown & DeGown, 1969). In arriving at a diagnosis the physician is encouraged to employ the principle called the *Law of Parsimony* that encourages the choice of a single disease to explain the patient's disease manifestations. This "law" must be applied cautiously since the experienced clinician recognizes the likelihood of multiple disorders contributing to the patient's symptoms. The clinician must then differentiate, if he can, the patient's symptoms as unique to a disease which he designates as being present.

Drs. Gershwin, Kemple, and perhaps Dr. Bennett can be criticized in the matter of their **hypothesis** since first of all they failed to consistently demonstrate unique objective physical finding among the patients they examined Local chest wall findings seen in conjunction with complication of the implants placement or wear were seen but it is contention of those proposing criteria for a systemic disorder (SSRD) associated with SBI that these local symptoms do not need to be present to develop the SSRD. I will discuss the laboratory findings of antinuclear antibodies and other serologic findings subsequently.

The atypical syndrome being formulated by Dr. Gershwin, Kemple, and members of the Silicone–Related Syndrome Study *(Research)* Group is not generally recognized by most members of the rheumatology community. The majority of the components of that syndrome are already part of either the fibromyalgia or chronic fatigue syndrome. (Wolfe 1994, Buchwald 1996). To be sure, SBI is one of the proposed major unique criteria for that disorder. But it is possible to have the coexistence of FMS with SSRD and both of these disorders, if distinct, may be part of what some authors have called *stress related disorders.* (Crofford & Demitrack, 1996). The authors of the proposed criteria may concur with the possibility of comorbidity with fibromyalgia and chronic fatigue syndrome since FMS and CFS are not exclusionary as are many of the connective tissue disorders. I would single out breast and chest pain, capsular contracture, and improvement after explantation as unique from FMS among the symptom complex proposed. It has been pointed out in criticism of explanation as indicative of justification of the immune character of the SBI that "improvement in condition following explanation actually argues against an autoimmune effect operating. Once established, progression of an autoimmune condition is not normally dependent upon the continuing presence of the initiating factor (Gott & Tinkler 1994)." Further, Yoshida et al (1993) citing improvement in patients following implant removal as evidence that implants can cause harm, ignore the lack of controlled

studies, the placebo effect of surgery, and the anecdotal nature of their report.

In view of the data presented at these hearings regarding local reaction to silicone, capsular rupture, and scarring, I think these symptoms are creditable as representing a local foreign body reaction. In reviewing the MSS about unique types of foreign body reaction to silicone, I must defer to the immunopathologist. I would however report that xiphodynia (a kind of chest pain) is often seen with fibromyalgia and the musculoskeletal symptom complex seen as part of *affective spectrum disorder.* (Hudson & Pope 1994).

This raises another issue about which I questioned Dr. Kemple at the time of his testimony. He responded to my questions about the psychological evaluation of his patients implying that he has not routinely applied any testing to assess emotional dysfunction. Stress related syndromes such as the affective spectrum disorders have a symptom pattern similar in many criteria of the proposed SSRD. Hudson and Pope are psychiatrists, who, for example have defined a group of illnesses seen in association with psychiatric disorders, particularly mood and anxiety disorders, which they have included under the title of affective spectrum disorder.

Three lines of evidence supporting the Hudson and Pope in this association are:

1. Frequent depressive and anxiety symptomatology and high rates of mood and anxiety disorders have been reported in FMS and syndromes of chronic fatigue and chronic muscle pain.
 a. Studies using psychological test or rating scales have reported abnormalities among FMS patients similar to those found in mood and anxiety disorders.
2. Patients with mood and anxiety disorders frequently exhibit myalgia and fatigue. Muscle tension, aches, or soreness is one of the criteria for the diagnosis of generalized anxiety disorder in the Diagnostic and Statistical Manual of Mental Disorders Fourth Edition, Revised (DMS–IV–R) (American Psychiatric Association, 1987).
3. Family studies have suggested a possible genetic link between fibromyalgia and mood disorders.

Plaintiffs attorneys have stressed the forthcoming meeting of the Silicone–Related Syndrome Study Group at the national meeting of the American College of Rheumatology as a milestone in the recognition of this new disorder. I enclose correspondence of Michael E. Reed, Attorney for the ACR, to Dr. Stuart Silverman, dated August 1, 1996, disavowing any implication of ACR endorsement of this group simply because of its meeting in Orlando. Also enclosed is a definition of what constitutes a Study Group which is provided to me by Sherrie Cathcart, Executive Secretary of the Education Council of the Meetings Committee of the ACR. The actual numbers of ACR members necessary to establish one of these groups is about fifty.

The meeting of the Silicone–Related Syndrome (Research) Group in Orlando is to present a proposed set of criteria which have been distributed at these hearings. The acceptance and testing of the criteria will require a formal evaluation with testing against appropriate control groups. (Feinstein, 1979). If an atypical connective disease can be distinguished by *testing* from such disorders as FMS, CFS, and early undifferentiated connective tissue disease such criteria can be used to further the understanding of the natural history of the symptom complex. It can also aid in its treatment, estimate its prognosis, but not necessarily define its causation (Willkens, 1984). For example, notwithstanding the distinction of Reiter's Syndrome from four other disorders by a criteria study, its *causation* in a given individual remains speculative. Reiter's syndrome, is a disorder that occurs in genetically predisposed persons following exposures to infections with one of a number of organisms and perhaps to traumatic events.

It may be reasonable to *hypothesize* a disorder related to a reaction to SBI on the basis of the history and physician examinations of women presenting with the constellation of symptoms enumerated by Drs. Gershwin and Kemple. The lack of consistent

objective findings is problematic as many of the symptoms of the proposed complex are not specific and *are subjective.* **Testing of this hypothesis** in case control and cohort studies is imperative. The observations made **must be repeated by others** and must demonstrate consistency and a temporal relationship to the presumed cause.

The temporal relationship and latency of occurrence of any new disease could well be guided by disorders that have been recognized with in the last generation. AIDS can have a long latency but is often recognized early in its development by multiple symptoms once HIV is detected. Similarly, the eosinophilia-myalgia syndrome was quickly recognized because of it epidemic proportions and distinctive presentation.

I have carefully reviewed the provisional criteria for the SSRD and have made *comments* about each of the criteria as shown:

### Criteria for Systemic Silicone Related Disease (SSRD)

#### Inclusionary Criteria

Presence of silicone gel filled breast implant—current or in the past

Presence of local disease

 capsular contracture

 documented rupture

 chest wall pain

 persistent breast pain unrelated to menses

 axillary adenopathy

 entrapment neuropathy or thoracic outlet syndrome

 immune related skin rash (petechiae, teleangiectasia or poikiloderma not related to sun exposure on chest wall)

 immmune granuloma in histopathology of the capsule

#### Plus The Following Criteria

3 Major
2 major and 4 minor
1 major and 7 minor

#### Major

Symmetrical myalgia with 4–11 tender points

 *Tender points are one of the important criteria for the diagnosis of fibromyalgia (FMS)—those FMS criteria call for 11 of 18 specific locations to be tender to 4 kgm of pressure.*

Chronic fatigue—6 months of longer

 *This a symptom common not only to chronic fatigue syndrome but to fibromyalgia, depression and many forms of musculoskeletal disease.*

Cognitive dysfunction

 *This is a vague and problematic area in which much investigation is taking place in both CFS and FMS. A recent editorial and an article in the Journal of Neurology, Neurosurgery, & Psychiatry which dealt with sophisticated neuroimaging emphasized the overlap of depression with chronic fatigue syndrome and that in studies where proper controls were used so specifically different findings could be applied to CFS. (Cope 1996).*

Objective sicca complex

 *Abnormal Schimer tests can occur after the administration of many medicines, abnormal Rose Bengal staining can occur after various forms of injury, salivary scintigrams, sialograms, and even abnormal lib biopsies can be non-specifically abnormal and the pathologist often request clinical correlation before making a positive interpretation.*

#### Minor

local pain after the onset of systemic disease if BI is polyurethane arthralgia

 *This is common to many musculoskeletal disorders.*

enthesopathy

 *This is a manifestation of many musculoskeletal disorders such as tendonitis.*

subjective sicca complex

 *Dry eyes, dry mouth, dry vagina—so often seen in a variety of disorders.*

cerebello-vestibular dysfunction—Physical Exam or by electrophysiologic testing

 *Dizziness is a very frequent and difficult symptom and occurs often in the*

*setting of many illness and states of apprehension and depression.*

non scarring alopecia

*Hair loss occurs with many illnesses where changes in hormonal interactions are disturbed.*

Raynaud' phenomenon

*The great majority who individuals with these colar changes in their extremities turn out not to have demonstrable systemic disease.*

photosensitive skin rash

*This is influenced by many factors—especially drugs which are in common use.*

improvement of 2 major or 1 major and 4 minor within 18 mos of explantation

positive ANA

elevated ESR

abnormal quantitative immunoglobins

Differential diagnosis

The authors of these SSRD criteria might counter my *reservations* about individual components of the criteria and emphasize the grouping of findings they describe as minor and major as essential to making a diagnosis. The criteria for fibromyalgia and chronic fatigue syndrome are listed below. They are prominent considerations in the presence of the symptoms included in the SSRD.

**Diagnostic Criteria of Fibromyalgia (Goldernberg)**
Chronic widespread pain
Presence of 11 of 18 tender points on examination
**Characteristic Features**

| | |
|---|---|
| Fatigue | Sleep disturbance |
| Stiffness | Paresthesias |
| Headache | Irritable bowel syndrome |
| Raynaud's-like symptoms | Anxiety |
| | Depression |

### Criteria for Chronic Fatigue Syndrome

1. Fatigue for more than 6 months causing significant impairment of normal activities not resolving with bed rest

2. Neurocognitive and neuropsychiatric symptoms

 New symptoms may include depression but exclude phenotypically characteristic conditions such as bipolar disorder, schizophrenia and substance abuse.

3. Musculoskeletal symptoms most commonly meeting the criteria for fibromyalgia.

Drs Greshwin and Kimple have made a hypothesis, after the observation of SBI patients, that SBI has been a cause of the patients symptom complex. Heretofore, this is not generally accepted in the scientific community as cause and effect relationship. Dr. Gershwin's hypothesis has some of its basis in his animal and immunologic research on anticollegen antibodies and assessment of lymphocyte subsets. These areas of research were performed with reasonable standards, but with limited controls, and published in peer reviewed journals. However, the relevance of anticollagen antibodies to diseases seen in man is moot. Type II collagen has been used to induce a disease in animals which has similarity to rheumatoid arthritis. Type II Collagen also has been used to treat rheumatoid arthritis on the basis of the hypothesis that oral administration can induce tolerance. One small study using Type II collagen is reported which equated improvement in patients with rheumatoid arthritis by the decreased used of other therapies that were in place at the start of collagen therapy (Tretham 1994). But this too is an area shrouded in controversy and question with considerable reservation by the rheumatology community. Further, the transposition of animal findings to human disease has been notably problematic and no animal model to match the disorder proposed by the SSRD criteria has been demonstrated.

It is necessary for other physicians to see, *test,* and *retest* this hypothesis in the context of clinical controls. Anecdotal reports have appeared in the peer reviewed literature describing patients with many of the symptoms which have been grouped by Dr. Gershwin. I must confess to not having read all of these but am relying upon the judgment of the 1994 report of the Medical Devises of the United Kingdom when they state of these anecdotal reports, "they are bedeviled by the probability of selection bias, subjective rather than objective results and a lack of agreed criteria, not simply for disease diagnosis but also for definition of a positive laboratory finding."

One must ask if, in the current climate of this litigation and its wide spread recognition, it is possible to test a hypothesis for which there is limited specific objective finding. None of the criteria that have been raised are singly sufficient to satisfy rigid scientific prescription. The scatter of overlap for antinuclear antibody positivity, immunoglobulin levels, and erythrocyte sedimentation rate (ESR) elevation are too imprecise upon which to make an objective diagnosis. It may be necessary to await a more specific objective finding or laboratory abnormality to fulfill the axioms of science. I would like to examine the laboratory findings described among patients with symptoms.

### GENETIC TYPING

This is an important area of continuing research, not only with respect of SBI, but with prevalent disorders seen in our population. It may ultimately enable us to identify predisposition of an individual to many environmental vectors. I am particularly interested in this area and currently involved in a project that involves the determination of the genome of a tribe Native Americans shown to have an increased prevalence of rheumatoid arthritis with Dr. Leroy Hood. Dr. Hood was recruited to chair the Department of Biotechnology at the University of Washington.

The intriguing possibility that a subset of women with SBI can be culled from all those having implants who were susceptible to connective tissue disease by genetic typing has been addressed by a number of scientists. Young and colleagues (Young, 1995) evaluated four groups of women for the presence of specific alleles DR53 and DQ2. The findings were that symptomatic women with SBI had a greater prevalence of DR53 (68%) than asymptomatic women (37%). Female volunteers were positive for this allele at 52% and 31 women with fibromyalgia had a 65% prevalence. The numbers are perhaps too small for generalizations. I believe the science was good but not consistent with earlier work.

Jane Morse had previously evaluated a group of women with symptoms following SBI, several of whom had recognized connective disorders, and failed to find elevations of DQ2. She found decreases in CD2 and CD8. The nomenclature and designations are changing in this exciting area of science but she essentially showed decreases in DQ2. Love and colleagues also suggested muscle symptoms may occur in women with another genotype DQA1*0102. This last investigation has not been repeated or confirmed by others.

All of this is in an area which may be fruitful in anticipating susceptibility to disease but at this time the Young and Morse data conflict and the numbers are too small to draw meaningful conclusions. DQ2 and particularly DR53 occur with a high prevalence in the general population and make correlations with specific disease problematic. Once again the findings of similar genotypes among patients with FMS and SBI patients confounds the problems of separating those groups of patients both clinically and with genetic and biomarkers.

### ANTINUCLEAR ANTIBODIES

In the matter of **antinuclear antibodies** occurring in women with SBI the report of Claman and Robertson has been held as evidence of more frequent occurrence of these antibodies in implanted women. Claman's definition of positivity is a dilution of four tubes (1:256) and his methodology, poorly described in his publication in the Western Journal of Medicine, allegedly uses standard Hep–2 commercially provided cells. Dr. Claman is an excellent investigator and has been interested in scleroderma. This MS, published in a regional journal, was based on a presentation at the Western Association of Physicians (WAP). The WAP is a prestigious organization of senior physicians and I presume that this MS was invited and would have had limited critical peer review. Claman has not published much in the area of antinuclear antibodies recently and the quoted MS is actually the last he has published as listed in my MEDLINE search. The numbers of patients tested by Claman is small and the resulting data is at variance with three other series of SBI who were evaluated for ANA positivity (Gabriel et al, Sanchez–Guerrero, and Peters et al.). Curiously the

numbers of patients without disease who are ANA negative are surprisingly few, also at variance with the usual background positivity of this test. It is to be noted that the percentage of SBI who were positive was not statistically different from patients with fibromyalgia syndrome (FMS). Eng Tan, a former President of the American College of Rheumatology, has reevaluated a group of sera from Japan and confirmed the presence of ANAs described in 1984. Most of the small number of patients in that group had scleroderma. In this MS he describes evaluating 300 sera, received from Dr. Espinsoa of Tulane University, from patients with symptoms suggestive of some connective tissue disease Tan writes, "When 170 patients with fatigue were further analyzed, 46/170 (27%) fulfilled the criteria for chronic fatigue syndrome, and 79/170 (43.4%) fulfilled criteria for fibromyalgia. Tan (Cuellar) also appears as an author on an abstract of a study presented at the American College of Rheumatology national meeting in 1995 in which ANA positivity retreated from 61.3% to 28% following explantation of SBI in a relatively small group of women (21). This data is a variance with ANA data in a considerably larger series (1601 SBI patients and 762 controls) presented by Fritzler, a former trainee of Tan's. In Fritzler's study ANA positivity was 32.4% in implant patients and 34.4% in controls. Neither of these presentations have been published nor subjected to extensive peer review.

Presumably the last two studies utilized the same techniques and standards to perform the ANA test. Despite the best of intentions and the use of positive and negative controls good laboratories will come up with quite difference results. The handling, storage, and manipulation of sera can influence the outcome of laboratory results under the most rigid circumstances. Because of this I make it a practice, as a clinician to use the same laboratory from year to year to minimize the variation that seems inherent in different laboratories (Feigenbaum 1982, Cuellar 1994).

The ANA being discussed here is to single stranded nucleoprotein. It is the basic test.

If the basic test is positive, elaborate tests against other cellular components are performed that give more specific diagnostic and prognostic significance. Silverman et al, in a non-peer reviewed MS to appear in the Potter and Rose book, indicates an incidence of less than 1% of symptomatic breast implanted patients with positive subtype ANAs.

The significance of antinuclear antibodies has long frustrated the scientist. John Klippel (Klippel & Dieppe 1994) in his textbook, **Rheumatology,** writes "Numerous studies have documented the presence of ANAs in normal healthy people. In general, the antibody titer is low (<1:40) and the pattern of a homogenous or diffuse pattern. The frequency increases with age—20–25% of persons over the age of 60 years are ANA positive—and is probably higher in families in which there is a patient with rheumatic illness." Lewy et al, again in the Potter and Rose book, feels he has corrected for age in his evaluation of breast implant women. But his study is flawed by the use of historical controls and by the fact that his evaluations were not done in a blinded (to diagnosis) manner. Patterns of positivity such as homogeneous or speckled may or may not be important. A speckled pattern is generally associated with certain illnesses like scleroderma. Mongey, (Mongey 1988) in an extensive review of antinuclear antibodies concludes, "While these antibodies play an important role in the diagnosis and prognosis of connective tissue diseases, their possible pathologic importance has in many cases yet to be determined." While much is made of the titer or dilution as it relates to disease, it may be less important in midrange. I have enclosed a report (from a large New England commercial laboratory) diagram which is meant to illustrate how high the titers of these antibodies can rise in normal patients relative to titers in patients with some of the classical connective tissue diseases. I use this diagram to emphasize the relative non-specificity of this test in interpretation of patients' symptoms and disease and non-disease. Importantly, antinuclear antibodies are found in >30% of patients with FMS (Bridges, 1993) and 15% of patients with chronic fatigue syndrome. (Bates 1995).

The presence of ANAs in SBI could well represent the result of polyclonal immune stimulation secondary to the individual's exposure to a number of environmental substances including drugs. Well over thirty five drugs are associated with the occurrence of ANAs and some of these drugs induce an illness that has manifestations of systemic lupus erythematosus. (Slater 1996). The presence of anti-tissue antibodies and the understanding of their relation to disease is poor. The production of disease by ANAs has never been confirmed except in unusual neurologic diseases like myasthenia gravis.

Thus one could question both the significance and relevance of the data about ANA and SSRD. Little if anything is known about serologic findings in the woman prior to implantation who are subsequently shown to have positive ANAs in the aftermath of their SBI. Did they pre-exist? Controls for studies have been non-implanted women or historical controls. What drugs are these women taking; what are their co-morbid conditions; their life stress situations?

## Other Serologic Findings

In the matter of silicone blood levels, antibodies to silicone, and elevated levels of immunoglobulins I am not persuaded by the testimony and the provided documentation that these changes are sufficiently tested in large population groups and controlled conditions to confirm the likelihood that they are unique to SBI women. It cannot have escaped the court's awareness that the group of physicians who have attracted SBI patients are more likely than not seeing symptomatic patients and not necessarily those who continue to be asymptomatic with prostheses in place. This is well illustrated in the matter of the widely publicized case controlled study (also quoted by plaintiff's attorneys) of 56 children breast fed by mothers with SBI (Levine & Ilowite) These children were referred by physicians or *support groups* concerned about second generation effects. This MS attracted considerable international recognition. The criticisms raised by Gott and Tinkler include, "the use of a highly selected group of patients with bias evident at each stage of selection, inade-

quate controls in terms of matching, inadequate numbers investigated, inaccuracies in clinical correlations, lack of evidence that abnormalities were clinically significant, lack of corroborative evidence, the effect of any anesthetic agents used on esophageal motility, inappropriate statistical methods and lack of any evidence that silicone was present in milk or ingested." The authors themselves also point that four of the eight children they identified as being abnormal came from one family and that a genetic abnormality to account for the findings was not excluded.

The hypothesis of Drs. Greshwin and Kemple needs to be *tested.* This is best done with epidemiologic studies as has been thoroughly explored and evaluated by the court. I would ask that I be permitted a few comments in this area as a clinician who has been and continues to be involved in such studies of rheumatic disease.

The Henneken's study was one in which female *health professionals* responded to a questionnaire about five connective tissue diseases (RA, SLE, PSS, DM/PM, Sjogren's Syndrome, and *any other connective tissue disease (including mixed)* [italics mine]. These were diagnoses that their physician allegedly provided. Who is a female health professional? As defined by the MS a female health professional is:

She is an RN, practical or vocational nurse, physician, dental hygienist, dental assistant, pharmacist, radiologic technician, speech, hearing and language professional.

To my estimation some of these categories represent persons with little medical sophistication. These women were not examined and therefore the data they provided must be viewed skeptically. As a practicing rheumatologist, and one who has participated in epidemiologic studies, no diagnosis of rheumatologic disease is solid unless the patient has been critically evaluated by a physician, preferably by a rheumatologist, or the patient's record carefully reviewed and diagnoses established according to pre-established criteria for disease. General physicians are not particularly adept at making early rheumatologic diagnoses. You are all already aware of the criticisms of this study by Silverman (1996) as being biased by its

timing (post 1992) referral to the media exploitation of this area. So let me further question this study.

I take particular issue with the category *other connective tissue disease including mixed.* This is so indefinite as to be meaningless. Over the last 15 years a consortium of physicians, in which I participate, has been trying to decide what undifferentiated connective tissue disease is and have learned that it probably does not exist but is simply part of existing disorders. (Alarcon 1991, Clegg 1991, Bulpitt 1993).

Among the other epidemiologic studies, the Mayo Clinic study (Gabriel 1994) while also flawed by failure of physicians to personally interact with the patients, had a better likelihood of identifying individuals with non-typical connective tissue disorders. Such signs and symptoms as joint swelling, dry eyes, dry mouth, keratoconjunctivitis, malar or discoid rash, seizures, psychosis, oral ulcers, photosensitivity, saliva gland enlargement, symmetric muscle weakness, and morning stiffness were sought in the records of these resident's of Olmstead County.

A criticism by Silverman (Silverman 1995) in the FDA meta-analysis of this MS is that follow-up at one of the Mayo clinic affiliates was not guaranteed and patients could be lost to follow up. This is a very weak criticism. Rochester, Minnesota is a small community, once enrolled at that institution for care of a chronic condition it is highly unlikely that a patient would seek follow-up care elsewhere.

Notwithstanding the reservations put forward by Silverman about the Gabriel and Sanchez–Guerro studies I feel that they are among the best we can do in science at this time. Those studies are published in what could be the most prestigious medical publication in the United States. Marcia Angel, executive editor of that publication, indicates that the peer review process for those MSS involved 17 reviewers. It will be a long time before we can equal the numbers in the Harvard nurses study or the rigidity of both these studies and the peer review process of the New England Journal of Medicine.

In concluding, I would like to emphasize the confidence I have in science and the individuals involved with the generation of much of the data that has accumulated both in support and refutation of this controversy. However, in criticizing some of the material used to support arguments I would recommend that peer reviewed literature is to be preferred. Material that appears in reviews, book chapters, abstracts, and oral presentations is subject to much less scrutiny. Errors do occur and some investigators are more careful than others without any implication of deceit. The best scientists are rewarded for their care with publication in prestigious journals whose assessments are most rigid. This is why, for example, I find it difficult to find fault with studies published in places like the New England Journal of Medicine or the Proceedings of the National Academy of Science. I don't place a premium on the volume of publications about a subject particularly in a era when support for research is guided by what is fashionable rather than by a scientists true curiosity.

Many thanks for the opportunities provided me to educate myself in details about this controversy. I hope you understand that the material provided was extensive and I have tried to evaluate it to the best of my ability as a clinical rheumatologist.

Sincerely,

/s/ Robert F. Wilkens

Robert F. Willkens MD

## APPENDIX D

## OREGON HEALTH SCIENCES UNIVERSITY

3181 S.W. Sam Jackson Park Road, L220
Portland, Oregon 97201–3098 (503) 494–7768
*Department of Molecular Microbiology & Immunology*

September 9, 1996

To: Robert E. Jones, U.S. District Judge
/s/ Mary Stenzel–Poore
From: Mary Stenzel–Poore, Ph.D.

Re: Silicone Breast Implant Cases—Analysis of Scientific Reasoning and Methodology Regarding Immunological Studies

This report constitutes my evaluation of scientific literature relied upon and used to form the opinion of the expert witness, Dr. Eric Gershwin. My analysis is restricted to issues involving immunology. The guidelines that I have followed in my analysis were set forth in the Daubert opinion and outlined for the Rule 104 experts by the Court. In my evaluation of the testimony and scientific literature regarding silicone gel breast implantation, I have applied the following questions which were also provided by the Court:

1. Is the expert's opinion supported by sound scientific reasoning and methodology that is generally accepted?

2. Is the expert's opinion based upon scientifically reliable data?

3. Do the methodology and data support the expert's conclusion?

------------------------------

I have evaluated the following scientific issues:

1. Adjuvant potential of silicone gel implants.
2. Potential of immune stimulation of T cells by silicone gel implants
3. Altered natural killer cell activity
4. Immune system cancer formation in rodents

My analysis is by no means an exhaustive review of the scientific literature on these issues. I have focused my discussion on the scientific merits or lack thereof found in some of the specific studies that Dr. Gershwin has relied upon to form his opinions.

**1. Do the findings from studies evaluating the *adjuvant potential* of silicone gel and various components that make up silicone gel and silicone oil support the opinion that SBI cause autoimmune or inflammatory disease in women?**

Studies show the following:

1a. Silicone gel *emulsified with antigen* may act as an adjuvant in humoral (Naim, Lanzafame et al. 1993; Naim, Ippolito et al. 1995; Naim, Lanzafame et al. 1995; Hill, Landavere et al. 1996; Klykken and White 1996; Nicholson, Wong et al. 1996) and cell-mediated immune responses (Naim, Lanzafame et al. 1995; Naim, Ippolito et al. 1996) in rodents.

1b. Silicone oils that are both linear and low molecular weight, *emulsified with antigen* do not act as adjuvants (Naim, Ippolito et al. 1995; Hill, Landavere et al. 1996; Klykken and White 1996; Nicholson, Wong et al. 1996) in rodents.

1c. Silicone oils that are low molecular weight and cyclic (D4) *emulsified with antigen* may act as adjuvants (Naim, Ippolito et al. 1995; Klykken and White 1996).

Direct attempts to demonstrate that immunization with these agents emulsified with "auto-antigens" or given in the absence of antigens failed to show evidence of autoimmune disease despite obvious disease induction by Freund's adjuvant (Chang 1993; Naim, vanOss et al. 1993; Naim, Lanzafame et al. 1995; Naim, Ippolito et al. 1996). Only in the Dark Agouti rat, a genetic strain well known to have high susceptibility to the development of arthritis was evidence reported of arthritis occurring with the use of the antigen, collagen II *emulsified with* silicone gel (not peer-reviewed); importantly, silicone gel alone was not arthritogenic (Naim, Ippolito et al. 1996). Direct injection of silicone gel into the joint of the DA rat appears to induce a foreign body reaction, not a true arthritis; this latter study (Yoshino 1994) implicated the partial involvement of T cells.

Thus, in rodents, silicone gel, high molecular weight silicone oils and D4 appear to act as adjuvants to stimulate antigen-specific antibody responses and specific T cell-mediated immunity if the antigen and silicone agents are *emulsified;* enhanced immune responses are not found if the antigen is not emulsified with the silicone agents (Bradley, Munson et al. 1994; Bradley, White et al. 1994) or given in the absence of antigen (Bradley, Munson et al. 1994; Bradley, White et al. 1994; Naim, Ippolito et al. 1996). Thus far, these effects have been reported in animal models only.

Forming the conclusion that elicitation of autoimmune and/or inflammatory disease occurs in women with SBI based on the evi-

dence that silicone gel acts as an adjuvant *when emulsified with antigen* is **unsupported by the data** since peer-reviewed studies failed to show evidence of autoimmune-mediated disease. In addition, induction of antigen-specific antibodies using silicone gel as an adjuvant mixed with antigens (foreign or self) may not correlate with autoimmune disease. Induction of a cell-mediated immune response using silicone gel as an adjuvant may not correlate with autoimmune disease.

Studies designed to mimic physiological conditions of silicone gel breast implantation (Bradley, Munson et al. 1994; Bradley, White et al. 1994), have failed to conclusively show an increase in antigen-specific responsiveness in the absence of silicone gel-antigen emulsification. Although these studies show a modest increase in the IgG response to the antigen, SRBC, this enhancement was not observed at the peak of the response which is generally accepted as the optimal time to determine such differences. In addition, it was not clear in this study how many times it was replicated—an important consideration when doing these kinds of studies.

The scientific methodology used in the aforementioned studies is generally sound, although it is not always peer-reviewed. However, I believe that Dr. Gershwin's opinion regarding the adjuvant properties of silicone gel and its relationship to SBI-related disease requires a substantial leap of faith since it is undetermined from these studies whether silicone gel breast implants would lead to adjuvant actions, much less autoimmune responses or systemic inflammation; indeed, studies designed to test this hypothesis argue against such an outcome. Thus, the position of Dr. Gershwin is not well-supported by the data available in the published scientific literature nor is it derived from valid conclusions of the studies cited above.

**2. Do the findings from studies evaluating *T-lymphocyte responses* to silicone gel and various components that make up silicone gel and silicone oil support the opinion that SBI cause specific immune responses to silicone and cause disease in women?**

The view that SBIs stimulate antigen-specific T cell mediated responses in vivo is not well substantiated by the experimental studies reported in the literature.

The strongest experimental approach is taken by attempting to directly test the hypothesis posed. Such an approach was made by Brantley et al (Brantley, Davidson et al. 1990) in the Lewis rat by attempting to mimic the biological situation of silicone breast implantation. This study immunized rats with sonicated silicone gel followed by silicone gel implantation. Lymphocyte responses to mitogen, silicone and the combination were measured in vitro (by lymphocyte transformation assays); these measurements failed to show evidence for in vivo immune stimulation by silicone.

In a recent study reported by Narini et al, delayed-type hypersensitivity (DTH) responses were employed to assess whether specific T cell responses occur with silicone gel injection. This study (Narini, Semple et al. 1995) claims that specific immunity develops in response to immunization with silicone gel. This study actually provides rather questionable support for this claim and at the very most, the results may be taken as support for a non-specific inflammatory response to silicone oil.

Narini et al describe the use of a radioactive lymphocyte quantitation assay to measure DTH. In addition to the fact that this assay is not the usual method for quantitating DTH reactions, the authors fail to demonstrate whether this assay correlates with the more conventional assay measuring local induration and swelling. More importantly, however, if one compares the effect of priming animals with saline, Complete Freund's Adjuvant (CFA) or silicone gel followed by challenge with silicone gel, the results are indistinguishable from one another (271 vs. 290 vs. 309 cpm). This does not indicate immunological priming that is antigen-specific. In contrast, the authors show that immunization with CFA followed by challenge with PPD (antigen found in CFA) causes an increase of ~10-fold over saline challenge (saline = 290; PPD = 2403) which is much more likely to represent specific immune responsiveness. The results obtained in this study indicate

essentially background levels of radiolabeled cell infiltration except in the case of PPD (as one would expect in a specific immune response). Thus, the most likely explanation for the small but significant difference the authors show between saline and silicone challenge in silicone-primed sheep is that the infiltration is due to a non-specific inflammatory reaction. It would be helpful, in this regard, to examine another similar gel-substance that does not contain silicone. One would predict that inclusion of such a much-needed control may lead to loss of what is at best, a marginal nonspecific effect of the silicone gel. In light of the discussion above, the results of this study should be viewed with caution and until further necessary controls are included, the conclusion that silicone gel acts as a T-cell specific immunogen to elicit delayed-type hypersensitivity is not warranted from this report.

Several studies have been performed attempting to establish a link between silicone breast implantation in women and silicone-specific T cell responses (Ojo–Amaize, Conte et al. 1994; Ciapetti, Granchi et al. 1995; Granchi, Cavedagna et al. 1995; Smalley and Shanklin 1995; Smalley, Shanklin et al. 1995). While it is quite possible that there is an association between silicone breast implantation and specific T cell activation, these studies have a number of methodological shortcomings and thus should not form the basis of such an opinion.

The study by Granchi et al in 1995 has questionable scientific value since the investigators in this study used an unconventional biological test to measure natural killer cell activity using as target cells, the cell line, K562 and subsequent FLOW cytometry analysis with propidium iodide staining (Granchi, Cavedagna et al. 1995). This assay does not measure antigen-specific responses.

Age-matched controls were not used in this study, thus it is unclear how implanted women and the control group may have differed from one another in view of the significant age difference (16 years) between the test and control groups. In addition, there was not a group representing the co-variable of breast surgery.

The stimulation "extract" described in this study as the silicone-containing antigen source is not defined nor well characterized. It is unclear what this antigen contains—how much silicone is present, if any. Finally, there was no strong evidence for in vitro T cell stimulation using the silicone extract among implanted and control women.

The same study population used by Granchi et al in 1995 was examined again (Ciapetti, Granchi et al. 1995). In addition to the methodological problems discussed above, this study has additional interpretative difficulties rendering it unsuitable scientifically. Several figures indicate that the number of tests that were done is greater than the actual number of controls and sample patients. This suggests that tests were repeated on selected samples. Without any additional information, this is unsettling and leaves one with the concern that the data as presented has been manipulated in some way. Furthermore, the study suggests that both the control extract and silicone extract treatment decreased the TdR incorporation compared to untreated samples. Finally, the authors further divide the study group into two subgroups based on their mammoplasty history (augmentation vs. reconstructive) without detailing how other factors such as age varied between these two groups. In this aspect of the study, the authors claim that "augmented" patients show a significant lymphocyte stimulation compared to the total implantation group whereas "reconstructed" individuals show no significant stimulation. This comparison should have been done comparing only "augmented" individuals treated with control extract to silicone extract treatment of the same individuals. Similar comparisons should have been done with the reconstructed population and control population. Comparing the silicone treatment of these subgroups to the control treatment of the total group of implanted women is incorrect. Overall, the numerous problems with this study (Ciapetti, Granchi et al. 1995) make it unsound scientifically and it should not be relied upon.

The study published by Ojo–Amaize et al is often cited as support for silicone specific lymphocyte responses. This study (Ojo–

Amaize, Conte et al. 1994) purported to find T cell specific responses in twice as many symptomatic implanted women as asymptomatic women exposed to silicone. However, the interpretation of the data obtained in this study must be viewed cautiously. The validity of the study both with respect to scientific methodology and data analysis has been strongly criticized (Cohen 1995).

There is no information on the age of control and test samples; if controls and test samples are not similar, differences in lymphocyte response could exist due to sample bias. The authors place implanted and explanted women into a single group of asymptomatic individuals; this group of 13 women is used to form the basis of their conclusion that asymptomatic women exposed to silicone differ significantly from symptomatic women exposed to silicone implants. The study was reported to be done in a blinded fashion yet all but one of the figures in this paper indicate that the data has been specifically selected requiring knowledge of the sample history and identification.

Information is not given for the complete population showing which antigens (and dose) yielded the stimulation indices used in Figure 1. The authors state that "the highest response obtained for each women in each group at any of the three concentrations tested against any of the three forms of silicon is shown". Since no specific information is provided regarding the antigen and dose yielding the data in this figure one cannot properly assess the significance of their findings. Moreover, it is very concerning that a large number of stimulation indices are below 1.0 in Figure 1 since a value of 1.0 (not less than 1.0) would indicate that the stimulus had no effect. Figures 2 and 3 show stimulation indices of 0 which is difficult to know what this means. It is not the accepted, scientifically established method for data presentation of this type and therefore it should be interpreted with caution. Finally, the use of median rather than mean would be far more valid in this case since a small number of stimulation values are quite large which would have a major impact on the mean value.

Two studies (Smalley and Shanklin 1995; Smalley, Shanklin et al. 1995) have cited evidence for enhanced lymphocyte stimulation responses to silicon in patients with silicone breast implants. These studies have a number of methodological and interpretive shortcomings that should be considered.

The study populations fail to include asymptomatic implanted women. In addition, the control population does not control for the co-variable of breast surgery; one of the studies fails to control for gender differences (Smalley and Shanklin 1995). In both studies, silicon dioxide was used as the antigen which may not be relevant to silicone-gel breast implantation.

There is serious concern regarding the stimulation indices reported. In particular, the unstimulated (background) levels are very low; they lie at the minimal threshold of detection. Given that the background levels of tritiated thymidine incorporation are at this threshold, they are unlikely to accurately detect differences among the unstimulated samples. It is difficult to know precisely how this would affect the data. The studies were performed using manual collection (Smalley and Shanklin 1995) which is not the convention for such experiments; again, it is unclear how this would effect the data, although, at the very least, it is generally considered subject to greater variability than automated harvesting.

It is disturbing that there is no dose response and no kinetic analysis shown for the stimulation studies with silicon dioxide. Demonstration of T cell mediated memory responses to a presumed antigen generally requires experimental validation of dose-response, kinetic analysis and antigen specificity (such as the use of colloidal compounds lacking silicon). It is concerning that studies of the kinetics were not shown for antigen and mitogen stimulations since these kinds of stimulations are usually analyzed at different times (3 days for mitogen and 5–7 days for antigen); in these studies the investigators elected to use day 4. Selecting a timepoint intermediate for the two kinds of assays is not a conventional approach.

In summary, based on the data in these two studies which are inconclusive, Smalley's

claim that "the method used demonstrates clearly that silicone implant patients frequently develop a T-cell-mediated immunopathic response to foreign material from the prosthesis." is not substantiated.

The scientific methodology used in the aforementioned studies is disappointingly poor. In general, the authors' interpretations are invalid due to the lack of appropriate controls and unconventional data manipulations. Thus, I believe that those opinions of Dr. Gershwin regarding the role of silicone gel breast implants in stimulating specific T cell immunity and thereby providing a plausible mechanism of autoimmune induction are not upheld by the literature discussed above. The position of Dr. Gershwin is simply not well-supported by studies available in the published scientific literature nor is it derived from appropriate conclusions regarding the studies cited above.

### 3. Do the findings from studies evaluating *natural killer cell functional changes* in response to silicone gel and various components that make up silicone gel and silicone oil support the opinion that SBI cause specific disease in women?

Changes in natural killer (NK) cell function have been reported to be associated with silicone gel exposure in rodents (Bradley, White et al. 1994; Wilson and Munson 1996) and humans (Campbell, Brautbar et al. 1994; Granchi, Cavedagna et al. 1995). While alterations in NK cell function alone do not support a link to a specific disease state, changes in NK cells have been associated with increased susceptibility to pathogens and tumor formation.

In long term implant studies performed in rats and mice, a modest depression in cytolytic actions of NK cells was reported in two publications (one of which was not peer-reviewed) by the same laboratory (Bradley, White et al. 1994; Wilson and Munson 1996). The results from these experiments may well indicate a modest diminution in NK activity; it is disturbing, however, that this finding was subject to significant variability in both rats and mice. Such variability lead to the comment by the authors that "No inhibition was seen in 3 of 9 studies." In addition, the time course of this inhibition shows a modest depression at post-implantation day 30, enhancement at day 60, followed by a modest depression on days 90 and 180. Whether the proposed silicone gel actions on NK cell function are dose-dependent is somewhat confusing, again based on the disturbing variability shown in these studies.

Given the concerns raised by the degree of irreproducibility and fluctuations in time and dose-dependency, conclusions made regarding the suppressive effect of silicone gel on NK function based on these studies (Bradley, White et al. 1994; Wilson and Munson 1996) are pre-mature.

In 1994, Campbell et al reported that symptomatic silicone-gel breast implanted women showed suppressed NK cell activity that was reversed following explantation. While it is possible that this may be a real finding, based on the findings reported in this study, it is not possible to make this conclusion (Campbell, Brautbar et al. 1994). The fundamental difficulties in this study arise from the failure to include appropriate control groups that would allow the evaluation of NK cell activity over time. In particular, NK activity should have been determined several times prior to explantation and again several times post-explantation since the degree of variability in NK assays done at different times could account for the observed changes. Moreover, NK activity is subject to variation within normal individuals, thus, control groups representing normal healthy women and symptomatic women without silicone implants are necessary. Thus, although the data indicate that 50% of symptomatic women with implants had lower NK activity prior to removal of the implant, it is misleading since the degree of variation is not shown in the implanted women, or in women without implants. It is invalid to conclude that silicone-gel breast implants in women lead to a depressed NK cell activity that is reversible with explantation.

### 4. Do the findings from studies evaluating the development of *immune system cancer* in genetically susceptible mice in response to silicone gel and various components that make up silicone gel and

**silicone oil support the opinion that SBI cause cancer in women?**

In 1994, Potter et al examined the potential of silicone gel and silicone oil to induce plasmacytomas in a mice. In this study (Potter, Morrison et al. 1994). two congenic mouse strains known to be highly susceptible to plasmacytoma formation, developed tumors in response to injection with silicone gel. More importantly, no tumors were elicited with silicone injection in five mouse strains which lacked genetic susceptibility to plasmacytomas. In addition, high and low mw silicone oil failed to induce tumors in any strain tested, most notably, the genetically susceptible strains (Potter and Morrison 1996).

Plasmacytomas that formed in response to silicone gel resembled those formed in response to pristane oil. Importantly, the requirement for tumor formation is chronic inflammation in the peritoneal space; there does not appear to be any specificity to the materials that induce the chronic inflammation since solid plastic, paraffin oil, mineral oil and silicone gels are effective tumor inducers in the genetically susceptible mouse strain.

The data and the methods used in these studies are standard for plasmacytoma formation. The issue is whether this is an appropriate model of human tumor formation. This cannot be answered definitively as yet. However, in my opinion, this is a case where extreme caution should be exercised in making such analogies. In the mouse, this tumor occurs in a very specific context (in the peritoneum in response to certain inflammatory stimuli) and in a very specific genetic strain. Tumors in humans that may represent homologues to mouse plasmacytomas are unusually rare and not often in the peritoneum: extramedullary plasmacytomas are located in the submucosal regions of the upper respiratory tract and the nasopharynx, and GI tract; solitary myelomas of bone and multiple myelomas are thought to develop in bone marrow although the origin of the precursor is unknown.

Based on the above discussion regarding plasmacytoma formation in genetically susceptible mouse strains, I believe that Dr. Gershwin's opinions regarding the development of immune system cancers in women with silicone breast implants is unwarranted from such animal studies. There is no conclusive evidence to date that this model of tumor formation in mice has any human correlate.

Literature Cited

Bradley, S., A. Munson, et al. (1994). "Subchronic 10 day immunotoxicity of polydimethylsiloxane (silicone) fluid, gel and elastomer and polyurethane disks in female B6C3F1 mice." *Drug Chem Tox* 17:175–220.

Bradley, S., K. White, et al. (1994). "Immunotoxicity of 180 day exposure to polydimethylsiloxane (siloxane) fluid, gel, and elastomer and polyurethane disks in female B6C3F1 mice." *Drug Chem Toxicol* 17:221–269.

Brantley, S., S. Davidson, et al. (1990). "Assessment of the lymphocyte response to silicone." *Plast Reconst Surg* 86:1131–1137.

Campbell, A., N. Brautbar, et al. (1994). "Suppressed natural killer cell activity in patients with silicone breast implants: reversal upon explantation." *Tox.Indust. Health* 10:149–154.

Chang, Y. (1993). "Adjuvanticity and arthritogenicity of silicone." *Plast.Reconstr.Surg.* 92:469–473.

Ciapetti, G., D. Granchi, et al. (1995). "Assessment of viability and proliferation of in vivo silicone-primed lymphocytes after in vitro re-exposure to silicone." *J. Biomedical Mat.Res.* 29:583–590.

Cohen, J. (1995). "T-cell response in women with silicone breast implants." *Clin Diag Lab Immunol* 2:253–254.

Granchi, D., D. Cavedagna, et al. (1995). "Silicone breast implants: the role of the immune system on capsular contracture formation." *J. Biomedical Mater. Res.* 29:197–202.

Hill, S., M. Landavere, et al. (1996). The adjuvant effect of silicone gel and silicone elastomer particles in rats. *Immunology of Silicones*. Berlin, Springer–Verlag. 123–137.

Klykken, P. and K. White (1996). The adjuvancy of silicones: dependency on compart-

mentalization. *Immunology of Silicones.* Berlin, Springer–Verlag. 113–121.

Naim, J., K. Ippolito, et al. (1995). "The effect of molecular weight and gel preparation on humoral adjuvancy of silicone oils and silicone gels." *Immunol.Investig.* 24:537–547.

Naim, J., K. Ippolito, et al. (1996). Induction of Type II collagen arthritis in the DA rat using silicone gel as adjuvant. *Immunology of Silicones.* Berlin, Springer–Verlag. 103–111.

Naim, J., R. Lanzafame, et al. (1995). "The effect of silicone gel on the immune response." *J. Biomaterials Science Polymer Edition* 7:123–132.

Naim, J., C. vanOss, et al. (1993). "The induction of autoantibodies to thyrogobulin in rats with silicone gel as adjuvant." *Surgical Forum* XLIV: 676–678.

Naim, J.O., R.J. Lanzafame, et al. (1993). "The adjuvant effect of silicone-gel on antibody formation in rats." *Immunol.Invest.* 22:151–161.

Narini, P., J. Semple, et al. (1995). "Repeated exposure to silicone gel can induce delayed hypersensitivity." *Plast.Reconstr.* 96:371–380.

Nicholson, J., G. Wong, et al. (1996). Silicone gel and octamethylcyclotetrasiloxane potentiate antibody production to bovine serum albumin in mice. *Immunology of Silicones.* Berlin, Springer–Verlag. 139–144.

Ojo–Amaize, E., V. Conte, et al. (1994). "Silicone-specific blood lymphocyte response in women with silicone breast implants." *Clin Diag Lab Immunol* 1:689–695.

Potter, M. and S. Morrison (1996). Plasmacytoma development in mice injected with silicone gels. *Immunology of Silicones.* Berlin, Springer–Verlag. 397–407.

Potter, M., S. Morrison, et al. (1994). "Induction of plasmacytomas with silicone gel in

genetically susceptible strains of mice." *J Nat Cancer Instit.* 86:1058–1065.

Smalley, D. and D. Shanklin (1995). "Immunologic stimulation of T lymphocytes by silica after use of silicone mammary implants." *FASEB* 9:424–427.

Smalley, D., D. Shanklin, et al. (1995). "Detection of lymphocyte stimulation by silicon dioxide." *Internat.J.Occupat.Med Tox* 4:63–70.

Wilson, S. and A. Munson (1996). Silicone-induced modulation of natural killer cell activity. *Immunology of Silicones.* Berlin. Springer–Verlag. 199–208.

Yoshino, S. (1994). "Silicone-induced arthritis in rats and possible role for T cells." *Immunobiol* 192:40–47.

## APPENDIX E

**REPORT TO JUDGE ROBERT E. JONES, U.S. DISTRICT COURT, ON THE SCIENTIFIC MERIT OF CHEMICAL EVIDENCE SUBMITTED IN ANDREWS ET AL. VS. BRISTOL MYERS ET AL.**

Submitted by Ronald W. McClard, Ph.D., Arthur F. Scott Professor of Chemistry, Reed College, on September 10, 1996

### INTRODUCTION

Having been supplied with more documents and videotapes than a human could possibly evaluate critically in the short time given me, I have endeavored to get at the heart of this matter as efficiently as possible. As a guiding principle I used the degree of emphasis placed by the Defendants' Closing Arguments (presented by Ms. Mary Wells) to guide the emphasis I then placed on the documents. Outside of opening remarks and outline and closing summary the detailed discussions were distributed in the following way: 1) the challenge of Donald DePalma's University of Florida M.S. thesis (about 52% of the time); challenge of Dr. Garrido and Dr. Pfleiderer's [1] work on NMR (about 26%

1. Please note that in at least one paper entered as evidence Dr. Bettina Pfleiderer is listed as first author and "author to whom correspondence should be addressed." As such she should be regarded as the leading scientist and I invite others to join me in recognizing that much of

"Garrido's work," is, in fact, at least half Dr. Pfleiderer's since she is regarded by the journal and her coauthor(s) as the principal investigator, according to standard conventions in scientific publication.

of the time); Challenge of Dr. Batich's "silicone-bleeding" results (about 12% of the time); and Challenge of Dr. Batich's silicone migration results (about 10% of the time). Other work was certainly mentioned in passing (such as Dr. Hardt and the Dow Corning experiments) and will be woven into the listed categories. By and large, the emphasis I place on the various subjects will parallel that of the Defendants' closing argument, in respect of the fact that they have raised this issue. Clearly the DePalma thesis has attracted by far the greatest attention in the chemistry portion of these hearings and will receive a similar degree of attention in my analysis. The NMR work of Garrido and others will then be next in attention and so on.

I have taken the liberty to summarize the various questions posed by the two sides in the interest of producing a more efficient and coherent discussion. The headings I have created are: 1) Does silicone depolymerize and change chemically *in vitro* and *in vivo*? 2) Does silicone bleed out of implants (and are the methods used to detect silicone and silicone products adequate) and move throughout the body? 3) Do chemical and physical methods demonstrate that the surface area of silicone microdroplets increase significantly with time? 4) Does silicone degrade to silica in vivo? The reader should bear in mind that the subject matter I have been asked to address contains materials that spans several disciplines. Thus one should not expect that I am expert across all of them.

Parenthetical comments are offered as running footnotes and specific papers and other documents are referenced sequentially and set off in parentheses.

## DISCUSSION OF ISSUES

### 1) Does silicone depolymerize and change chemically *in vitro* and *in vivo*?

*The DePalma*[2] *Masters Thesis*

Clearly this one document (1) has been made the biggest issue in the part of the proceedings dealing with chemistry and will require the greatest discussion. In short, Donald DePalma, under the tutelage of Prof. Batich at the University of Florida, set out to study a model system that would mimic conditions analogous to those on the surface of a silicone breast implant. I believe their choice was a good one. They then set out to study surface chemistry changes that occurred by two independent methods that they compared: surface tension measurements called contact angle goniometry and the surface analytical method called X-ray Photoelectron Spectroscopy (XPS, also sometimes called ESCA). These measurements were used to establish rates of conversion of the silicone polymer to presumed siloxy functionalities. The attendant increase in hydrophilicity was observed as a decrease in the receding contact angle as one might observe as a drop of water might move from a well-waxed (very hydrophobic) part of an automobile to a more hydrophilic part (perhaps non-waxy and covered with dirt). The theory behind such measurement is classical. Experts brought forward by the Defendant's are extremely critical that Mr. DePalma did not report advancing contact angles. Dr. Wamser, in his affidavit, pointed out circumstances where advancing angles can be of little use in some cases and he provided literature examples thereof. It seems to me that Mr. De-

---

**2.** In the videotaped closing arguments presented by Ms. Wells, the Defendants quoted Dr. Wamser as having said "The Ln function requires kinetic **energies,** which do not make chemical sense to me." (Emphasis is mine.) The quote was presented verbally, highlighted by preparing a full-screen graphic, and then presented in transcript form—faithfully repeated in all three cases. Unfortunately, all three quotes by the Defendants are *absolutely incorrect* and potentially misleading. What Dr. Wamser actually wrote in his affidavit (I point your attention to p. 7 lines 1–3) is the following: "The Ln function requires kinet-

ic **equations (7) and (8),** which do not make chemical sense to me." (Emphasis is mine.). Swapping the word "equations" for the word "energies" AND deleting additional text (in this case equation numbers 7 and 8 without dots to indicate such a deletion/ligation, is a substantive change in the meaning of what is presented as a literal quote and is certainly not acceptable practice in academic circles, to say the least. I have no idea what the custom is in a United States District Court but I feel compelled to report this misrepresentation of the facts, whether intentional or just clumsy.

Palma was doing what any scientist would do in such a circumstance—if the advancing angle shows little change in the domain of interest and the receding angle does then by all means pursue the latter course. Now, this fact that advancing angles were done and not reported only came to light recently and Rattner's admonition in this regard is highly appropriate. Had Mr. DePalma made that choice because he knew it would bias his results in some direction he wanted his data to take, then I would consider the subjective choice to be scientifically invalid. In this case his choice was reasonable, in my opinion. However, further discussion should, to a large extent, bear out the reasonableness of his choice. Were it not for DePalma's thoroughness in doing the work to be discussed next, I think that objections raised by Kennan et al (that the hysteresis in advancing and receding angles was due to artifacts) might have been a stickier issue. The XPS studies afforded DePalma the opportunity to make more convincing measurements of the degree of hydrolysis of the silyl groups to bare siloxy groups by trapping them with aminopropyltriethoxysilane, and then measuring the build in of a nitrogen signal on the thin surface as an indirect measure of the -OH functionality appearing at the surface. In my opinion the chemistry proposed is entirely reasonable, and borne out by other studies by other investigators. Despite Dr. Rattner's forceful claim that DePalma should have used "direct" XPS rather than indirect assumes that the former would be superior— that the various different types of Si valence electrons would yield adequately resolved peaks that could be quantified. DePalma's method, though perhaps suboptimal for the reasons given, does offer the advantage that a highly resolved N peak can now be used (of course entering into the picture a whole new set of potential artifacts). The XPS studies apparently then enable DePalma to cross-calibrate his contact angle results in reason-

able fashion. At this point I should mention the testimony of the Defendants' expert witness, Prof. Uhlmann, who most unfortunately muddied the waters by making the odd supposition that the nitrogen that DePalma observed was possibly due to atmospheric $N_2$. Perhaps Dr. Uhlmann is thinking of metallurgic surfaces at extremely elevated temperature and pressure where "nitriding" can occur. The studies of DePalma are run at room temperature or just slightly above (by comparison to metallurgical processes. 100°C can be considered "slightly above" room temperature), and under high vacuum to boot where the adsorption of nitrogen would be a truly novel finding, which had he discovered it should have caused him to win the Nobel prize. Dr. Uhlmann's suggestion that the exceedingly unreactive $N_2$ molecule would react with the materials present on the surface of this polymer is not consistent with present chemical knowledge. Yes, $N_2$ can react, but only under the most extreme conditions, such as in a bolt of lightning or at the spark of an internal combustion engine at elevated pressure and temperature. Indeed the mystery of fixation of $N_2$ by microbes eluded chemists for decades. The further suggestion that a nitrogen oxide compound (suggested by Ms. Pole during the testimony of Dr. Batich) might be the culprit is easy to suggest but its origin must be explained— such compounds exist in the atmosphere in vanishingly small partial pressures. Dr. Torikey made some of these points, along with several others, in his affidavit supporting the Plaintiffs' case.[3]

The next stage of DePalma's work was to use these time-dependent measurements of the appearance of putative siloxy groups (certainly functional groups capable of reacting with a triethoxysilane) to measure rate constants. Here is where a serious problem arises which I believe is the one potential major flaw in DePalma's work (clearly noted and dealt with nicely by Dr. Wamser[4]).

3. I will not elaborate further on this testimony, but, in general, I found Dr. Torikey's analysis to be level-headed and based on good scientific reasoning. The Defendants' closing statement suggested that his remarks should be taken as "self-serving" and therefore ignored. Reference was made to the supposition that he was a colla-

borator and therefore predisposed to DePalma's conclusions. Although Batich admits that he and Dr. Torikey hold patents together I do not see why that automatically should impugn his integrity as a scientist.

4. Here I must take issue with two points raised by the Plaintiffs in their rebuttal videotape. Mr.

Equations 7 and 8 in the thesis are clearly incorrect and I am surprised that neither Dr. Batich nor any member of the examination board (assuming there was one) at the University of Florida caught this. The standard integrated rate law (differential form in parentheses) for a first order decay where reactant, R, is converted to product, P, (and I agree with DePalma's *apparent* recognition of likely first-order behavior) is the following:

$$\ln R_t = \ln R_o - kt \text{ for } (dR/dt = -kR_t)$$

where $R_t$, $R_o$, k, and t respectively stand for amount of R at time t, amount of R at t = 0, the first order rate constant, and time. Unfortunately Mr. DePalma unjustifiably mangled the equation to get (using my terminology) an equation of the form

$$P_t = P_o + k*\ln(t)$$

where ln refers to the natural logarithm. This equation has no basis whatsoever in kinetic theory and cannot yield correct rate constants. Presumably DePalma desired a simple equation for the time-dependent formation of product—but, alas, one can't just make it up. Mathematically speaking, his subsequent graphs of the linear equation cannot yield a meaningful rate constant because the logarithm of a dimensioned quantity (here it is time) is undefinable![5] Dr. Wamser's analysis of DePalma's kinetic data is largely correct having employed the equation I listed. In actuality DePalma's system calls for a more complex analysis since the system does not go to "completion" and the integral calculus is a bit messier but not undoable. I have attached an appropriate section of a recent Physical Chemistry text that deals with this special case (Appendix 1). Dr. Wamser's analysis is an excellent *first approximation* and may well yield the same results. The only other analyses that DePalma could have carried out would have been zeroth and second order fits of his data, but I believe that this reaction is most likely simple first order, as does Dr. Wamser.[6] DePalma then took his measured rates and used them to generate an Arrhenius plot to obtain the energy of activation ($E_{act}$), which could be used to extrapolate down to 37°C and estimate the rate of reaction at human physiological temperature. That is standard practice.[7] From these data DePalma gets two different values of $E_{act}$ depending on whether he uses the contact angle measurements or the XPS data, which, by the way, parallel each other reasonably well. A result such as that tends to convince me that a worker is on the right track. Indeed, regardless of whether or not they agree on the conclusions, the data of Kennan et al (2) are in reasonable agreement, which makes me feel DePalma is making good measurements, despite his erroneous kinetic analysis. One issue that has caused much debate is DePalma's supposed deletion of the 100°C point of the contact angle work. In my opinion he dealt with this issue as honestly as a scientist can, and, in fact, I would have to praise him for being

Williams characterized Dr. Wamser's kinetic analysis as "better" than DePalma's. There should be no doubt that Dr. Wamser's analysis is based in chemical theory and DePalma's was simply grabbed out of the air, inasmuch as I or Dr. Wamser could tell. "Better" is an understatement here. Also Mr. Williams' claim, that throwing out the 100 °C point actually decreased the projected rate at 37 °C rather than increasing it, is not correct without qualification. The direct effect of DePalma's act was unquestionably to increase the extrapolated rate. After Dr. Wamser's analysis, however, the ultimate effect, unknown to DePalma, might have been to increase the rate at 37 °C once the data were fitted to a nearly correct theoretically-based equation.

5. One must resist the temptation to conclude that the same flaw crops up in an Arrhenius plot where the logarithm of the rate constant is plotted on the ordinate. One gets the rise part of the slope from the difference between values of ln(k). Recall that this is mathematically equivalent to the logarithm of the ratio of rate constants which is then dimensionless.

6. In the closing statement, Ms. Wells (Defendants) posed the possibility of several other types of functions such as hyperbolic and parabolic, etc. That remark has no basis in the theory of kinetics, where only certain functions derive from differential rate laws specified by distinct mechanisms. I am unaware of any expert witness that made such a suggestion.

7. Ms. Wells (Defendants) raised the question why an Arrhenius plot was used over alternative methods for obtaining the energy of activation from rate data. I can categorically state that there is absolutely no other method for obtaining that value outside of an Arrhenius plot, so I am at a loss as to what she means.

more forthcoming than most in this regard. He offers a perfectly reasonable (I am not claiming he is right or wrong) explanation for why the point could be tossed out but leaves it on the graph for all to decide as they see fit. To me this is the epitome of the scientific method at work.[8] So, does having made an inexcusable blunder in the kinetic analysis of the data render this work worthless? Perhaps not. The data now belong to the scientific community and anyone is free to interpret them as they will. Dr. Wamser has concluded (and I take no issue with his approximate rendering of the data) that the $E_{act}$ projects a value of approximately one month for the half life of the conversion of surface silicone to siloxy groups at 37°C. Internal Dow Corning results aren't far off (see below). Despite the obvious mistake in the kinetic analysis, this work is reasonable scientific exploration. That various individuals can find various flaws in the thesis does not distinguish this work from nearly the entire body of published work in the scientific literature I am sorry to say. Had this work been submitted for publication I would assume it would have been "tentatively accepted for publication with major revision," possibly including a requirement for more data, particularly more controls. I suspect that a good journal would also require more substantive figure legends, which in their original form are inadequate. That various individuals wish to argue over the conclusions that can be drawn from these data is par for the course and is what makes scientific investigation lively and interesting. I must re-emphasize that I am indeed bewildered how it could be that Dr. Batich, who did a post-doctoral fellowship in physical chemistry, did not catch the blatant error[9] in the kinetic analysis in the thesis or in the meeting abstract (3) that he and DePalma later "published."

In short, the scientific reasoning and methodology of DePalma were scientifically valid. The data were properly obtained and the conclusions that can be drawn are reasonable, once the correct kinetic data analysis was forthcoming and is now established, whether or not performed by Mr. DePalma himself. Clearly these results bear on the matter at hand. Whether or not a masters thesis constitutes a peer-reviewed publication is clearly a matter of debate.

*The NMR Data of Garrido et al— $^{29}Si$ NMR Work (for example: 4, 5)*

Here I will discuss the controversy that has arisen over whether or not Dr. Garrido et al have actually been able to observe various silicon-containing species by employing MAS NMR (magic angle spinning nuclear magnetic resonance) spectroscopy to observe $^{29}Si$. The choice of method was entirely appropriate given the overwhelmingly vast literature on multinuclear applications in biology. The controversy arose when Dr. Macdonald of the University of Toronto published a paper (6) in which he presents findings that dispute whether Garrido et al could have ever measured a $^{29}Si$ signal given amounts of silicon found by atomic absorption. I believe that Macdonald has faithfully reported what he has observed. Garrido claims he sees $^{29}Si$ in his instrument and Macdonald claims that he cannot find a signal when he tries to "repeat" the experiment. I agree with Dr. Peyton, who offered a scrupulously thorough and even-handed analysis of the controversy, when he characterizes the situation as "very much at the limits of detection." It is in this region where the greatest potential for controversy exists. Speaking as a scientist, and not attempting to use legal terminology in this case, the scientific burden of proof in this controversy lies with Dr. Macdonald. The single most distressing aspect of his paper is that he expects us to ignore one of the major

---

8. There is much discussion, particularly by Dr. Ziegler, about DePalma throwing out "25% of his data." This is so much hyperbolae. I am repeating myself, I know, but Mr. DePalma merely suggests what result one gets IF one were to not consider the ONE point. I am sure that Dr. Ziegler knows what kind of response he would get if he made that claim in front of a scientific meeting.

9. It is also important to point out that the Defendants' expert witness, Dr. Uhlmann, also failed to notice this glaring error. Thus I put him, Dr. Rattner, Dr. Ziegler, and Dr. Batich in the same category of having apparently forgotten their basic kinetics training.

tenets of science: "Absence of evidence is not evidence for absence." The Defendants in their closing argument correctly assert that scientific results are only valid when they can be reproduced. But in this instance the admonition can also be applied to Macdonald. Both laboratories used 9.4 Tesla magnets that allowed for observation of $^{29}Si$ at the same frequency of 79.5 MHz and thus had the same *intrinsic* sensitivity. However, Macdonald's instrument is made by Varian and Garrido's by Bruker.[10] Since the two instruments may differ widely in probe design (as I recall Macdonald did not address this issue), it is entirely possible that Garrido could have up to an order of magnitude over Macdonald's instrument. Another factor for which it is very difficult to account is the talent and patience of the person tuning the instrument. It is entirely possible that a person wanting to see a signal at the edge of the detection limit might work extremely hard to shim their magnet whereas another person might subconsciously stop short of getting the maximum from theirs. I am not saying that Macdonald did this, but how can we possibly know? This is a highly subjective matter but cannot be ruled out at all. Had Garrido published brilliant, clear, huge S/N peaks I would be far more suspicious. Unless the probe sensitivity issue can be cleared up unambiguously, I believe Dr. Garrido must be given the benefit of the doubt. To be perfectly frank I am surprised that an excellent journal like *Analytical Chemistry* published Dr. Macdonald's paper without holding him to a higher standard of proof.

One thing about Garrido's spectra that plagues me is illustrated in Figure 2 of the paper that Macdonald cited (4). He offers Figure 2a as a clear example of background in a control with little or no detectable Si. Figure 2b apparently then reveals lots of signal. I disagree with Dr. Peyton's evaluation on this point. Why didn't Garrido et al show us the noise on either side of the signal *to prove to the reader that the area of interest is indeed different from the noise?* Since Garrido et al did not specifically state that these spectra were presented in the absolute intensity mode (AIM), can we be 100% sure that Figure 2b is nothing more than the same noise in 2a scaled to fill the screen, which the instrument will do automatically unless instructed to work in the AIM. All of Garrido's subsequent spectra leave this doubt in my mind.

Regrettably, Macdonald offered a somewhat pejorative explanation of how he believed Garrido obtained his weak signals. His explanation was that Garrido may have inadvertently manufactured them during the data work-up.[11] Indeed I have seen all kinds of artifacts crop up in NMR spectra including peaks attributed, by better experts than I, as harmonics from local radio stations. While artifacts from data handling is a good superficial explanation of the existence of Garrido's $^{29}Si$ peaks, I have to agree with Dr. Peyton that it seems odd that the presumed artifacts came and went in correlation with the different types of samples studied in appropriate fashion over many years and different tissues. Dr. Macdonald's conclusions are based on a greater faith in the AA Si determinations than I would give them. In fact, Garrido is entirely candid about finding over an order of magnitude more Si by NMR than by AA in some cases, and offers a very

10. I happened to choose a Bruker instrument over Varian myself because of the (potentially apocraphyl) better reputation Bruker has in building NMR instruments, particularly probes. The main point here is that practical sensitivities can vary among instrument manufacturers. I am surprised that Dr. MacDonald did not speak to that possibility surely knowing that he was effectively condemning the work of Garrido et al. it is apparently due to that condemnation that Dr. Ziegler unfairly refers to Garrido's work as largely discredited.

11. I discussed this possibility with Dr. Martine Ziliox at Bruker Instruments in Billerica, Massa-

chusetts. She informed me that the type of operation that MacDonald suggested is *not possible* on the model of spectrometer that Garrido et al used in their studies. Therefore, the accusation he launches at Garrido in the MacDonald paper and in the 104 testimony (p.575 1.15–16) is unwarranted. Additionally, I find it rather uncollegial on the part of MacDonald to have relied on the good offices of Dr. Garrido at the early stage of his work leading to the *Analytical Chemistry* paper, yet never returned the courtesy by giving Garrido an opportunity to answer to his (MacDonald's) findings in the manuscript.

reasonable possible explanation. Low molecular weight silanes and alkoxysilanes are notoriously volatile and may not survive the harsh ashing procedure. Macdonald is overstating his case (104 Testimony, p. 583 1. 11–21) when he claims that 99.9% of the Si would have to have evaporated unless he chooses to ignore all other possible sources of discrepancy between his and Garrido's results. He (Macdonald) does admit (104 Testimony, p. 584 1. 1–3) that his AA Si values were a factor of five or so lower than those of a group at Berkeley. Is the difference that he used a clean room or that the two sets of workers have samples of different composition, for whatever reason? One last point, I recall that AA by silicates (what all forms are converted to for analysis) is greatly suppressed by such common lab agents as $K^+$, HF, and boric acid. I assume that all possible interferences were eliminated, but can we be certain? We *trust* that they were.

The "controversy" over what S/N constitutes a peak is a legal matter and not a scientific one since there is no generally-agreed upon criterion that I know of in this regard, although I will defer to Dr. Peyton's criterion of 2. Macdonald claims that Garrido would need 10,000 times more scans (thus 60 million scans at 10 seconds/scan, thus 600 million seconds, thus 10 million minutes) thus 19 years per spectrum rather than the "multiple centuries" claimed incorrectly by Macdonald. If the discrepancy between AA and $^{29}$Si NMR standards accounted for one to two orders of magnitude and probe sensitivity, probe tuning, and careful shimming were another factor of ten you have two laboratories who are now arguing over pocket change. I have racked my brain for hours trying to discover the key reason for this discrepancy and I cannot find it, if it exists— other than my own intuition offered above. So, there we are—basically nowhere. In the end, both Macdonald and Garrido are doing science, but cannot seem to reach the same conclusion. What I don't understand is why Garrido doesn't seek out a 750 MHz ($^1$H

frequency) instrument, which must be somewhere in the Boston area, and simply try a blood sample in a standard wide bore tube, and employing inverse-gated $^1$H-decoupling, as suggested by Macdonald, to sharpen signals while eliminating negative nuclear Overhauser effects, where his S/N would go up at least an order of magnitude and all of this uncertainty could probably be laid to rest! In the end I would like to suggest that Dr. Macdonald make the following change to his statement near the end of his testimony (p. 588 1. 15, bold words are mine): "... the levels of silicon are just too low to observe via silicon MNR [sic] **on our instrument,** ..."

In short, I believe that Garrido's claimed observations of $^{29}$Si in the NMR is supported by scientifically valid reasoning and methodology. In my opinion his data are bordering on the edge of detection limit as one would expect. These data are clearly relevant to the matter at hand. I am unable to say whether they are right or wrong. I doubt anyone really can at this point.

*The NMR Results of Garrido et al in General*

Given the above discussion, I believe that the NMR work of Garrido and coworkers, particularly Dr. Pfleiderer, are valid as relates to the question at hand. This is particularly true of the $^1$H NMR and MRI work which is cutting edge research and beyond criticism. Clearly Garrido and Pfleiderer sought a method that would not only detect the Si atom but could also provide information as to the chemical nature of the Si atom as it underwent putative chemical transformations. They were absolutely correct to pick $^{29}$Si NMR as the method of choice. The literature on biological NMR is absolutely vast and they are following in a marvelous tradition.[12] Their assignments of peaks in all of their work are entirely reasonable, and although they might not be able to be absolutely certain about the precise identity of chemical species observed, they should be able to make conclusions as to number of

12. For a good example of the relevancy of this method one only need to look at the book "Silicon–Based Polymer Science," edited by Zeigler and Fearon (kindly supplied to me by the Defen- dants) wherein there is a chapter by Doughty, Assink, and Kay entitled "Hydrolysis and Condensation Kinetics of Dimeric Sol–Gel Species by $^{29}$Si NMR Spectroscopy."

-OH, alkoxy, or alkyl groups attached. In my opinion they have taken proper care to do this.

In summary, the NMR work of Garrido, et al used to detect silicone being converted to other, generally more highly oxidized, species is relevant to the matter at hand, is based on good scientific methodology and reasoning, although the $^{29}Si$ data are, in my opinion, controversial yet not "discredited" as has been alleged. The $^1H$ NMR and MRI work does not appear to be challenged.

*Dow Corning Internal Studies*

The study by Spielvogel et al (7) clearly shows that an aryl D4 siloxane is taken up through ingestion and, most importantly, absorbed gastrointestinally unchanged and then later metabolized to various derivatives, which were unambiguously characterized by gas chromatography/mass spectrometry. These derivatives were found to have varying degrees of oxygenation on the aryl groups, alkyl side chains, and frequently depolymerized to give various mono-, di-, and trisilanols. These products were formed by biotransformation after gastrointestinal adsorption and thus occurred under relatively neutral pH conditions in various tissues. The products were eventually cleared to some extent via excretion through the kidneys. Similar results were obtained in proprietary studies by Spielvogel and Robinson (8), R.B. Annelin at the Dow Corning Toxicology Department using the Aqueous Silanol Functionality Test (9), Spielvogel and Robinson (10), who also found that radioactive D4 completely disappeared and was converted to various smaller silanols some of which appeared in lymph nodes of monkeys within ten days. All of that work was serious, exhaustively precise, internally reviewed science. The identities of the metabolic products are clear. There can be no doubt whatsoever that siloxane polymers are metabolized to silyl polyols of smaller molecular weight.

*The $^{29}Si$ T1 Study of Stroman et al (11)*

A group in Quebec (11) has recently demonstrated that the spin lattice relaxation time of Si drops in animal-imbedded implants over a time-span of months. This effect is interpreted by the authors as an indication of redistribution of the siloxy groups in the polymer to an overall distribution to species that tumble more efficiently. This could be redistribution among linear forms along with formation of more highly branched species. Such an effect is consistent with silicon chemistry that has been accepted for some time.[13]

**2) Does silicone bleed out of implants (and are the methods used to detect silicone and silicone products adequate) and move throughout the body?**

*Work of Dr. Batich*

I reviewed "published" materials of Dr. Batich and found them to be somewhat unimpressive. He lists several submitted meeting abstracts (such as 3, 12, 13), which end up as one-page mini-papers, as "reviewed publications" in his C.V. but I am skeptical as to the extent of peer review in this work.[14] This misgiving is fed by continual inputs of odd treatment of data. For example, in Marotta et al (12) the table of results reports mean values of PPM PDMS (found in brain and capsule) that are reported to five significant figures even though the reported standard deviations are sometimes nearly twice the magnitude of the nominal value. I cannot understand how one can get SD's twice the mean unless several of the silicon values are negative. This requires explanation. I plotted the data from that "paper" and offer

13. I quote Eugene Rochow from his book "Silicon and Silicones," (1987, Springer Verlag, p. 101) in a discussion of the formation of silicone polymers: "... although the average molecular weight of such a chain-stopped silicone oil can be regulated by using the appropriate proportions of M and D units in the initial reaction mixture, a statistical distribution of molecular sizes and weights will always result. This is a consequence of the random redistribution reaction which we call equilibration." This results from an expected dynamic Si–O bond.

14. One such abstract (3) blindly recounts the inarguably incorrect DePalma kinetic analysis, which is most unfortunate—it certainly makes me wonder whether Dr. Batich is paying attention when he repeatedly fails to notice what most freshman chemistry students know about simple kinetics.

them as Appendix 2. If the odd variance, particularly due to the apparent inclusion of negative Si concentrations in some samples,[15] in the data is that enormous how can anyone conclude anything meaningful from them? For example, statistically speaking ZERO is a reasonable result for each of the cases in the brain experiment since that value is included within one standard deviation of the mean, regardless of the observation that the mean is higher than those of the means of the other groups. Perhaps the standard deviations reported are done so in error, which would not leave us a particularly assuring option. Additionally, my reading of "Instrumental Analysis" by G.D. Christian and J.E. O'Reilly states that the ICP method has a detection limit of 10 PPM (or $\mu g/g$, or $\mu g/mL$ which is Batich's way of reporting PPM). Reporting means and standard deviations with three orders of magnitude greater precision than the detection limit of the method seems cavalier. The lack of detailed discussion of experimental procedures is the crux of the problem with evaluating meeting abstracts. I have little faith in the results in that abstract and I seriously doubt Dr. Batich has a firm grasp of error analysis. If the abstracts of the Fifth World Biomaterials Congress were indeed "peer-reviewed" then I would assume that they were reviewed for little more than appropriateness of subject matter and typing format. Dr. Batich seems

to prefer to offer his results in the form of tiny snippets rather than to produce even medium-sized scientific papers published in *bona fide* peer-reviewed journals where all the detailed methods and data are well documented and exposed to critical analysis *prior to printing*. Outside of the DePalma thesis and other papers in other areas, I regard the bulk of his silicone work to be marginal science as presented. Since he seems to resist publication of his data as full papers I have reservations as to the reliability of the conclusions therein. I can only speak to my own familiarity in organic chemistry, biochemistry, physical chemistry, molecular biology where the word "publication" holds a much higher expectation for details and thoroughness. The ever increasing demand put on journal space has caused their editors to demand more and more conciseness—but not that much. In his Rule 104 testimony he appears fairly competent[16], especially when responding to criticisms raised by Ziegler[17] and Rattner, so I don't understand why he (Batich) doesn't publish. Overall I would confess that he is, at some level, employing reasonable scientific approaches but one wonders if he is overly distracted when it comes to presenting his data. One last thought: some claim that meeting abstracts do offer peered review science because individuals can attend the talks or posters and comment/argue at the meeting, but those who did not attend those discussions are not

15. Since the region of plus or minus one standard deviation only encompasses 68% of the data points, there must be negative [Si] outliers to account for values given. If Dr. Batich is not concerned that he is measuring negative Si levels then he needs to explain.

16. In the Rule 104 Transcript I must assume there is a clerical error. On page 415 1. 3–5 Dr. Batich seems to be agreeing to the term "amino-saline," uttered by Ms. Pole, when I would assume he was hearing "amino-silane." The former would make absolutely no sense whatsoever. A similar error occurs at p. 415 1.3–6.

17. Let me deal with Dr. Ziegler's testimony here. First, my overall impression is that his testimony is overly harsh. He makes a very valid point that DePalma and Batich should have felt obliged to report the results of the advancing angle measurements (p. 444 1. 17–23) but then seems to admit unfamiliarity with contact angle hysteresis and admits that receding angles are more relevant under some circumstances (p. 451 1. 16 to

p. 452 1. 3). His later willingness to even discuss the kinetic results and Arrhenius graph indicates to me that he accepts them at some level. His entire discussion of the Arrhenius theory, multiple processes, and the "A" factor (p. 459) is completely irrelevant yet superficially impressive. That he buys into the incorrect kinetic analysis of DePalma and Batich causes this discussion to be a waste of time. Dr. Ziegler seems so intent on his point of view that he makes the absolutely bizarre claim (p. 491 1. 6–10) that because D4 has a boiling point of 274 °C that it is not appreciably volatile. The boiling point of water is 100 °C yet a bowl of water kept at room temperature, 22 °C, will disappear over the weekend. Where did it go? Mr. Williams caught Dr. Ziegler on this when he correctly raised the issue of enthalpy of vaporization (p. 495 1. 9–12), to which Dr. Ziegler's response is evasive. Dr. Ziegler's answers regarding the Dow results are, in my opinion, biased.

privy to what arises therefrom. No, the rest of us are left with the *written record*, the abstract, which preceded the discussion and could well be entirely in error.

### Other Gel–Bleed Papers

My impression from reading through the literature is that this phenomenon is generally accepted (see for example, Peters, et al (14)). I shall not pursue this further.

### The NMR Results of Garrido et al

The NMR work of Garrido, et al used to detect silicone bleeding from implants and reaching other tissues is relevant to the matter at hand, is based on good scientific methodology and reasoning, although the data are, with the exception of the $^1H$ studies, controversial.

### 3) Do chemical and physical methods demonstrate that the surface area of silicone microdroplets increase significantly with time?

This issue depends solely on the paper by Dr. Nancy Hardt, Chris Batich, and coworkers (15), as I understand it. The concept of increased surface area attending increased number of particles is a simple matter of geometry, of course. Their conclusion rests on the identity of objects that were apparently observed by light microscopy. Then "... in selected cases the identity of observed foreign materials was confirmed by applying 4 drops of the aspirate to an infrared crystal for infrared spectroscopy (Hardt et al., 1994)." This method is presumably what they refer to in the text as "microscopically directed FTIR"; unfortunately the paper to which they referred (16), I was unable to obtain before submitting this report. However, I was able to obtain an abstract by running an internet Medline search through the University of Washington. The abstract states that relevant FTIR spectra were reported, but I have not seen them. This method has been around for some time, and if applied correctly should be informative if, and only if, Hardt et al (16) unambiguously demonstrated the capability of their method to chemically confirm the presence of silicone, and this must be with spectral analysis versus controls. I would consider this claim

to be within reason. I am not aware of any studies on the kinetics of drop size changes, per se.

### 4) Does silicone degrade to silica in vivo?

The Razzaboni article (17) clearly attempts to offer a biochemical explanation for the silica-caused hemolytic process. This article seems scientifically sound. IF silicones are converted to silica then this article seems relevant to the issue at hand. I am unaware that any of the papers that I reviewed clearly demonstrated the conversion of silicone to silica (most likely amorphous forms thereof), though such a process seems possible given the known chemistry of silicon. The link between silicones and the Razzaboni article is a prospective one.

### A SHORT COMMENT ON THE TESTIMONY OF DR. ALEXANDER

It is my understanding that I have been asked to comment on the testimony of Dr. Harold Alexander, Plaintiffs' biomaterials expert. I read and studied the testimony given by Dr. Alexander in the Jennings case, and, assuming it is anticipated he will give similar testimony in the current case, I must say that I find it difficult to find much at all within my field on which to comment. I would agree that he holds strong opinions and that he seems to claim an extraordinary power to read minds, but those matters do not seem to involve me. What chemistry he discusses seems properly explained.

### OVERALL CONCLUSIONS

I believe I will use the metaphor of Mr. Williams, attorney for the Plaintiffs, to sum up my conclusion on this matter. It's a bit like two doctors looking at a chest X-ray (having both agreed that a chest X-ray was the correct diagnostic procedure to use) and disagreeing, sometimes heatedly, over the interpretation of a shadow on the film and perhaps how long the exposure should have been. I have no doubt that all of the chemical studies examined in these hearings are based on appropriate methods, whether or not there are serious questions about fine points of technique or far-reaching conclusions. Indeed some of the work is inadequately documented and of clearly debatable

value, but that is really not for me to decide, to be sure.

If I have accomplished nothing more than to clarify some areas where the ensuing conversations can be made more efficient and more to the points at hand, then I will feel that I have done some good.

### SPECIFIC LITERATURE CITED

1. DePalma, Donald (1992) Masters Thesis, University of Florida School of Engineering.

2. Kennan, J.J., Peters, Y.A., Swarthout, D.E., Owen, M. J., Namkanisorn, A., and Chaudhury, M.K. apparent Dow Corning study submitted to unknown venue as presumed meeting abstract.

3. Batich, DePalma, and others, Fifth World Congress on Biomaterials meeting abstr., I misplaced my copy of this but it has the incorrect kinetic equation prominently displayed.

4. Garrido, L., Pfleiderer, B., Jenkins, B.G., Hulka, C.A., and Kopans, D.B. (1994) *Magn. Reson. Med.* **31**, 328–330.

5. Pfleiderer, B., Ackerman, J.L., and Garrido, L. (1993) *Magn. Reson. Med.* **30**, 534–543.

6. Macdonald, P., Plavac, N., Peters, W., Lugowski, S., and Smith, D. (199X) *Analyt. Chem.*, rest of citation unknown.

7. Spielvogel, Robinson, Hanneman, Dow Corning Corporation, report # 5027, July 3, 1979).

8. Spielvogel and Robinson, Dow Corning Corporation, report # 5088, November 15, 1979).

9. R.B. Annelin, Dow Corning Toxicology Department, File # 3135–1.

10. Spielvogel and Robinson, Dow Corning Corporation, report # 5265, December 10, 1980).

11. Stroman, P.W., Alikacem, N., Mayanloo, M., Dorvil, J.C., and Guidon, R. abstract of paper presented at the Fifth World Biomaterials Conference.

12. Marotta, J., LaTorre, G., Batich, C., Hardt, N.S., and Yu, L. "Measurement of Silicon in Tissue ......." abstract subm. to Fifth World Biomaterials Conference, Toronto, 1996.

13. Batich abstract: Fifth World Biomaterials Conference.

14. Peters, W., Smith, D., Lugowski, S., McHugh, A., and Baines, C. (1995) *Ann. Plast.Surg.* **34**, 343–347.

15. Hardt, N.S., Emery, J.A., LaTorre, G., Batich, C., and Winter, W.E., "Macrophage–Silicone Interactions in Women with Breast Prostheses," citation seems unavailable from materials supplied.

16. Hardt, N.S., Emery, J.A., LaTorre, G., Batich, C., and Winter, W.E., *Mod. Pathol.* **7**, 669–676.

17. Razzaboni, B.L. and Bolsaitis, P. (1990) *Environ. Health Perspec.* **87**, 337–341.